**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CREDITINCOME LIMITED;
CREDITINCOME PENSION SCHEME;
DOUBLE PLATEAU HOLDINGS LLC;
GI RUI CO., LTD.;
RED WHITE INVESTMENT, LTD.;
RUI GI LOU INTERNATIONAL CO., LTD;
SOLAR TALENT INTERNATIONAL LIMITED;
SPRINGCORE LTD,

               Plaintiffs,

     v.

THE SWISS CONFEDERATION,

               Defendant.

Case No.:_____

**COMPLAINT**

     Plaintiffs, by and through their undersigned counsel, bring this Complaint against defendant the Swiss Confederation ("**Switzerland**") and allege as follows:

## NATURE OF THE ACTION

     1.     This case arises out of Switzerland's March 19, 2023 conversion of debt securities known as Additional Tier 1 Bonds (or "**AT1s**") issued by Credit Suisse AG ("**Credit Suisse**") and beneficially owned by Plaintiffs. Plaintiffs' AT1s at issue here had a face value of over $82 million. Their conversion by Switzerland had a direct effect in New York because the AT1s at issue in this action were registered with and cleared through the Depository Trust Company ("**DTC**") clearing system in New York. Eschewing its regulatory role and instead assuming the role of an investment bank brokering the sale of a distressed bank, Switzerland cherry-picked the only remaining major Swiss bank, UBS Group AG ("**UBS**"), to buy Credit Suisse without considering any other potential buyers. Switzerland then wiped out the AT1s—unnecessarily and

in plain violation of the investors' rights—to facilitate the merger.  Plaintiffs now seek relief in New York, where their AT1s were registered, cleared, and ultimately rendered worthless.

2.      In March 2023, Credit Suisse had been in slow decline for over a decade. Corruption scandals, civil litigation and bad business decisions all took their toll.  Throughout Credit Suisse's decline, a panoply of competitors and other investors interested in acquiring such a prestigious Swiss banking institution viewed the once mighty bank as an attractive potential takeover target.

3.      Regulators in Switzerland and the United States, meanwhile, had devised state-of-the-art "**Resolution**" restructuring procedures following the 2008 financial crisis precisely to handle the risks posed by "too big to fail" banks.  A Resolution solution tailored to Credit Suisse's woes was, in Switzerland's words, "ready for signature" at the time of Credit Suisse's demise.[1]

4.      But Switzerland threw out the Resolution playbook and employed what it described as a "commercial solution" to Credit Suisse's financial woes[2]—stepping out of its regulatory shoes and adopting the role of investment bank to broker, in its words, a "private-law merger" (the "**Takeover**") of Credit Suisse by UBS.[3]

5.      As often happens when governments attempt to play the role of private market participant, Switzerland botched the job.  Driven by pride and economic nationalism, and at the behest of self-interested politicians, Switzerland rammed through the deal, ignored the multitude of other potential buyers, and limited the bidding to just UBS—Switzerland's only other major

---

[1] FINMA, FINMA REPORT: LESSONS LEARNED FROM THE CS CRISIS § 5.5, at 20 (Dec. 19, 2023), https://tinyurl.com/48whnrva.

[2] *Swiss Finance Minister: UBS Buying Credit Suisse Is Not a Bailout*, BLOOMBERG TV (Mar. 19, 2023, 4:07 PM), https://tinyurl.com/2azfwuk7.

[3] FINMA REPORT, *supra* note 1, § 5.5, at 19.

bank.  Without any competitors, UBS was free to name its price and dictate the terms of its acquisition.

6.     And what a deal for UBS!  UBS acquired one of Europe's largest banks, with a $12 billion market capitalization as of December 31, 2022[4] and a book value of $40 billion, for just $3.4 billion; received government guarantees worth hundreds of billions of dollars to boot; and had billions of dollars of Credit Suisse's liabilities entirely written off.  Indeed, the deal was such a windfall for UBS that the following quarter was the best financial quarter for UBS that *any* bank has *ever* had in history.[5]  UBS reported $29 billion in profits in Q2 2023, compared to $1 billion in Q1.[6]

7.     The unfortunate victims of Switzerland's actions were AT1 investors like the Plaintiffs.  In order to make the Takeover as attractive as possible to UBS, Switzerland bargained away $17.3 billion of Credit Suisse's outstanding AT1s—ordering Credit Suisse to write the AT1s down to zero (the "**Write-Down Direction**").  Obliged to follow this directive, Credit Suisse immediately instructed its New York-based securities depository DTC to terminate all AT1 trading and record all AT1 book entries as worthless.  As a result, the global securities embodying those AT1s—which were held by DTC in New York and registered in the name of its nominee, New York-based Cede & Co.—were wiped out.  And the value of over $17 billion face amount of debt securities was transferred from investors like Plaintiffs to UBS, which is now one of Europe's largest banks.

---

[4] CREDIT SUISSE, EARNINGS RELEASE 4Q22, at 2 (Feb. 9, 2023), https://tinyurl.com/4resv6f3.

[5] Michael J. de la Merced, *UBS Reports Record-Breaking $29 Billion Profit*, N.Y. TIMES (Aug. 31, 2023), https://tinyurl.com/kb9kd7s7.

[6] *Id.*

8.     The Write-Down Direction was not authorized by the AT1s' bond terms.  Indeed, when Switzerland informed Credit Suisse of its intention to order the write-down, Credit Suisse protested that the Write-Down Direction was prohibited under the AT1s' contractual terms. Undeterred, to paper over its illegal conduct, Switzerland enacted a bespoke emergency ordinance to empower itself to issue the Write-Down Direction.

9.     Switzerland maintains that its conversion of the AT1s was a "necessary part of the overall [Takeover] package"[7] in which UBS acquired Credit Suisse.  But Switzerland had alternatives—including running a competitive sale process for Credit Suisse or invoking the Resolution process developed following the financial crises in 2008 to deal with precisely this type of scenario.[8]  Indeed, just two months ago, the Chairman of the U.S. Federal Deposit Insurance Corporation ("**FDIC**") derided Switzerland's failure to employ Resolution as "unhelpful and ultimately a missed opportunity."[9]

10.    In short, the Write-Down Direction was an unlawful encroachment on Plaintiffs' property rights.  It resulted in the complete loss of Plaintiffs' investments in the AT1s at issue here.  Plaintiffs must be compensated for Switzerland's wrongful and unnecessary conversion of their property.

## **THE PARTIES**

11.    All of Plaintiffs' claims arise from the loss of Credit Suisse AT1s registered with— and which cleared through—DTC in New York.  The total face amount of Plaintiffs' claims is $82,253,306.00, as set forth in Exhibit A.

---

[7] FINMA REPORT, *supra* note 1, § 5.5, at 19.

[8] Brooke Masters, Stephen Gandel & Owen Walker, *US regulator criticises Swiss handling of Credit Suisse as 'unhelpful,'* FIN. TIMES (Apr. 10, 2024), https://tinyurl.com/5aedn2tm.

[9] *Id.*

12.     Plaintiff Creditincome Limited is a limited liability company organized and existing under the Laws of England and Wales, with a business address of 35 Ballards Lane, London, England, N3 1XW.

13.     Plaintiff Creditincome Pension Scheme was constituted by Trust Deed on March 5, 2008, under the Laws of England and Wales, with a business address of 35 Ballards Lane, London, England, N3 1XW.

14.     Plaintiff Double Plateau Holdings LLC is a limited liability company organized and existing under the laws of Delaware, with a business address of The Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware 19801.

15.     Plaintiff Gi Rui Co., LTD. is a limited liability company organized and existing under the laws of the Independent State of Samoa, with a business address of Portcullis Chambers, P.O. Box 1225, Apia, Samoa.

16.     Plaintiff Red White Investment, Ltd. is an exempted company organized and existing under the law of the Cayman Islands, with a business address of Walkers Corporate Limited, 190 Elgin Avenue, George Town, Grand Cayman KY1-9001, Cayman Islands.

17.     Plaintiff Rui Gi Lou International Co., LTD is a limited liability company organized and existing under the laws of the British Virgin Islands, with a business address of Portcullis Chambers, 4th Floor, Ellen Skelton Building, 3076 Sir Francis Drake Highway, Road Town, Tortola, British Virgin Islands, VG1110.

18.     Plaintiff Solar Talent International Limited is a limited liability company organized and existing under the laws of the British Virgin Islands, with a business address of Portcullis Chambers, 4th Floor, Ellen Skelton Building, 3076 Sir Francis Drake Highway, Road Town, Tortola, British Virgin Islands, VG1110.

19.     Plaintiff Springcore Ltd is a limited company incorporated in the British Virgin Islands with a registered address of Vistra Corporate Services Center, Wickhams Cay II, Road Town, Tortola, British Virgin Islands, VG1110.

20.     Switzerland is a foreign state, as defined by the Foreign Sovereign Immunities Act (the "**FSIA**"), 28 U.S.C. § 1603(a).

## JURISDICTION AND VENUE

21.     This Court has subject-matter and personal jurisdiction pursuant to 28 U.S.C. § 1330(a) because Switzerland is a foreign state under the FSIA and is not entitled to sovereign immunity under the FSIA with respect to the claims asserted in this action.

22.     Specifically, Switzerland is not entitled to sovereign immunity because the third clause of the commercial activity exception to sovereign immunity, 28 U.S.C. § 1605(a)(2), applies to Plaintiffs' claims.  Section 1605(a)(2) provides, in relevant part:

> A foreign state shall not be immune from the jurisdiction of courts of the United States  or of the States in any case . . . in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

23.     Plaintiffs' claims are "based . . . upon" the Write-Down Direction, which proximately and inexorably caused the complete loss of Plaintiffs' beneficial interests in the AT1s.

24.     The Write-Down Direction was "an act outside the territory of the United States in connection with a commercial activity" under 28 U.S.C. § 1605(a)(2) because it was undertaken in connection with Switzerland's brokering of the Takeover—a commercial activity routinely performed by private parties like investment banks.  The Write-Down Direction was "in connection with" Switzerland's brokering the Takeover because, according to Switzerland, the

6

Write-Down Direction was a "necessary part of the overall [Takeover] package"[10]—which Switzerland itself characterized as a "commercial solution" to the distress of Credit Suisse in March 2023.  The Write-Down Direction was also commercial activity because a write-down of bonds is not an inherently sovereign function, but rather can be performed by private commercial parties acting, for example, as liquidator or receiver with respect to the estate of an insolvent bank or other private party.

25.     Finally, the Write-Down Direction "cause[d] a direct effect in the United States" under 28 U.S.C. § 1605(a)(2) because Plaintiffs' claims all derive from AT1s that cleared through and were held in New York by DTC—a New York central securities depository corporation.  The Write-Down Direction caused the AT1s to be canceled, delisted, and lose all value in New York. This total loss of all proprietary value in a security held by a U.S. securities depository constitutes a direct effect on intangible property held in the United States and thus caused a direct effect in the United States.

26.     Venue in the Southern District of New York is proper pursuant to 28 U.S.C. § 1391(f)(1) because, among other things, a substantial part of the events and omissions giving rise to the claims alleged occurred in this District, and a substantial part of the property that is the subject of the action is situated in this District.

---

[10] FINMA REPORT, *supra* note 1, § 5.5, at 19.

## FACTUAL ALLEGATIONS

### I.      A Brief Background On Financial Crisis Management

#### A.      Financial Crises Have Historically Been Mediated By Private Actors.

27.      "Bank panics" have been a recurring feature of the international financial system for centuries, and long predate state regulation or intervention in the banking sector.[11]  Indeed, before the passage of the Federal Reserve Act in 1913, there was no meaningful federal regulation of banking in the United States.  Banking regulation did not come to Switzerland until two decades later with the creation of the Federal Banking Commission (*Eidgenössische Bankenkommission*) in 1934—which, in 2007, was succeeded by the Swiss Financial Market Supervisory Authority ("**FINMA**").

28.      As a result, for much of the history of banking, it was the private sector, not the government, which had the primary responsibility of responding to banking crises.  Before 1836, the First and Second Banks of the United States—both private institutions chartered by the federal government—performed this function.  In later decades, private banks like J.P. Morgan—which was responsible for mitigating the financial "panic" of 1907—took over this role.

#### B.      The Public Sector Continues To Employ Commercial Tools To Mitigate Financial Crises.

29.      Beginning in the twentieth century, government regulators gradually replaced the private sector as the lead protagonists in resolving financial crises.  Even today, these state actors deploy a mix of the commercial tools long used by private sector actors as well as uniquely sovereign tools that the private sector lacks the power to employ.

---

[11] *See generally* CHARLES P. KINDLEBERGER & ROBERT ALIBER, MANIAS, PANICS AND CRASHES: A HISTORY OF FINANCIAL CRISES (5th ed. 2005).

30.     One function once performed by private actors which governments now perform is acting as the "lender of last resort" in financial crises.  This role generally entails expanding credit, lowering rates, and encouraging lending when financial markets are in grave distress—strategies that the United States Federal Reserve employed in response to Black Monday (1987), the Asian Financial Crisis (1997), and COVID-19 (2020), to name just a few examples.

31.     State banking regulators sometimes play the role of investment bank in financial crises as well—stepping in to act as sell-side advisers for distressed financial institutions, soliciting buyers, and offering financial guarantees to sweeten the deal.  The United States employed this tool during the financial crisis in 2008, persuading J.P. Morgan and Bank of America to purchase Bear Stearns and Merrill Lynch, respectively.[12]  And to resolve the Savings and Loan Crisis of the late 1980s, the United States similarly encouraged mergers in the "thrifts" industry in an effort to stabilize the economy and minimize its own financial exposure if these insured institutions collapsed.[13]

32.     These tools are commercial at their core.  The government acts as a bank when it lends money and as an investment bank when it brokers a merger.

33.     But unlike banks, state banking regulators have uniquely sovereign tools that they also can employ in a financial crisis.  For example, near the end of the Savings and Loan Crisis in the late 1980s, when its initial "merger" policy failed, Congress created the Resolution Trust

---

[12] *See, e.g.*, ANDREW ROSS SORKIN, TOO BIG TO FAIL: THE INSIDE STORY OF HOW WALL STREET AND WASHINGTON FOUGHT TO SAVE THE FINANCIAL SYSTEM—AND THEMSELVES 36 (2010); *Acquisition of Merrill Lynch by Bank of America*, Testimony Before the Comm. on Oversight and Gov't Reform, U.S. House of Rep. (2009) (statement of Ben S. Bernanke, Chairman, Board of Governors of the Fed. Rsrv. Sys.), https://tinyurl.com/4mt9dcem.

[13] See, e.g., United States v. Winstar Corp., 518 U.S. 839, 847-48 (1996).

Company to act as receiver and manage and dispose of the assets of failed thrift banks.[14]   The FDIC has performed a similar role for failed depository institutions that it insures since the Great Depression.

### C.  The Post-2008 Regulatory Regime For "Too Big To Fail" Banks

34.     In the wake of the 2008 financial crisis, the global financial community developed new regulatory tools to prevent distressed banks from failing and to rescue distressed banks from collapse.  Under the post-2008 crisis global regulatory framework—known as "Basel III"—the uniquely regulatory device of "Resolution" is the principal rescue mechanism.  Resolution generally entails placing large, systematically important banks into receivership.  In a resolution process, national financial authorities act as receiver to restructure the banks' assets and liabilities—by, for example, liquidating portfolios, selling subsidiaries (or entire banks), or other necessary steps tailored to the banks' financial needs.[15]   Leadership is immediately replaced, corporate operations are stabilized, and the bank is permitted to exit Resolution when, in general, it reaches an agreement with creditors to swap prior debts for new debt or equity.[16]

### D.  The Role Of AT1s In The Post-2008 "Too Big To Fail" Regime

35.     The Basel III regime also seeks to prevent financial crises by imposing more protective minimum capital ratios consisting of "common shares plus retained earnings divided by risk-weighted assets."[17]   Banks' "Additional Tier 1 Equity" for capital requirements consists

---

[14] *See, e.g.*, H.R. REP. NO. 101-54, at 308 (1989).

[15] Martin J. Gruenberg, Chairman, FDIC, The Orderly Resolution of Global Systemically Important Banks: An Update from the FDIC (Apr. 10, 2024), https://tinyurl.com/y96m34tb.

[16] *Id.*

[17] *Everything you need to know about AT1s*, TWENTYFOUR, A BOUTIQUE OF VONTOBEL, https://tinyurl.com/2ysefm5s (last visited June 3, 2024).

of equity, earnings, and AT1s.[18]  AT1s are a type of bank debt securities known as contingent convertibles.  These securities are convertible because they can be converted from bonds into equity or written down, and contingent because the conversion or write-down can occur only in limited circumstances.  AT1s thus allow banks to have a larger capital cushion without issuing new stock.[19]

36.     The documents governing the terms of AT1s generally provide that, under certain, expressly enumerated conditions (generally tied to the bank's capital position and financial viability), the bonds can be written down to zero or converted into equity.  But absent a write-down or conversion, AT1s rank in priority below all other bonds and just above equity in priority.[20]

37.     As of March 2023, there was a $275 billion AT1 market worldwide.[21]  Credit Suisse's $17.3 billion in outstanding AT1s made up, at that time, just over 6% of that market.

38.     Credit Suisse AT1s as of March 2023 differed from most AT1s, in that their terms and conditions provided that they could only be written down, not converted into equity.

## II.     The Long Decline Of Credit Suisse And The Many Parties Interested In Acquiring It

39.     Originally founded in 1856 to finance the construction of railways, Credit Suisse played a major role in funding Swiss industrialization in the nineteenth century.  Over the course of the twentieth century, after various mergers, it transitioned to retail and later to investment

---

[18] Alana Pipe & Nate Rattner, *What Are AT1 Bonds, and Why Are They Risky?*, WALL ST. J. (Mar. 24, 2023, 8:00 AM), https://tinyurl.com/5n8kzm78.

[19] Hannah Benjamin-Cook & Tasos Vossos, *What Are CoCos or AT1s And Why Are They Risky?*, BLOOMBERG (June 15, 2023, 8:00 AM), https://tinyurl.com/43hcchh3.

[20] Thomas Hale, *Additional tier 1 bonds: the wiped-out debt at centre of Credit Suisse takeover*, FIN. TIMES (Mar. 20, 2023), https://tinyurl.com/4rjwb5fh.

[21] *Explainer: What are AT1 bonds and why are Credit Suisse's wiped out?*, REUTERS (Mar. 24, 2023, 11:48 AM), https://tinyurl.com/46n2hwa2.

banking.  Eventually, it became, along with UBS, one of the two largest banks in Switzerland—and among the largest banks in the world.

40.     Credit Suisse suffered fewer losses than many leading banks during the 2008 financial crisis.  But in the 2010s and early 2020s, it became enmeshed in fraud and corruption scandals, leading to massive fines, civil litigation, and resulting capital outflows.

41.     In 2014, Credit Suisse pled guilty to conspiracy to assist U.S. taxpayers in filing false tax returns and agreed to pay $2.6 billion in penalties.[22]

42.     In 2020 and 2021 alone, Credit Suisse (1) disclosed that it faced up to $680 million in potential losses from U.S. residential mortgage-backed securities lawsuits; (2) announced that its customers could lose up to $2.3 billion resulting from the collapse of the U.K.-based financial services firm Greensill Capital; (3) lost nearly $5.5 billion from the collapse of Archegos Capital Management; and (4) incurred nearly $500 million in U.S. and U.K. fines for its role in the Mozambique "Tuna Bonds" corruption scandal.[23]

43.     2022 was no better.  Credit Suisse was convicted by Swiss authorities for helping Bulgarian cocaine traffickers launder money, and was fined $22 million.[24]   *The Guardian*

---

[22] Jessica Silver-Greenberg & Ben Protess, *In Tax Case, Credit Suisse Is Denied Milder Penalty*, N.Y. TIMES (May 19, 2014, 8:59 PM), https://tinyurl.com/4f3aerys.

[23] Joseph Cotterill & Owen Walker, *Mozambique reels from Credit Suisse 'tuna bond' scandal*, FIN. TIMES (Oct. 24, 2021), https://tinyurl.com/2wpjxm2m; Erik Schatzker, Sridhar Natarajan & Katherine Burton, *Bill Hwang Had $20 Billion, Then Lost It All in Two Days*, BLOOMBERG (Apr. 27, 2022, 8:19 AM), https://tinyurl.com/2kbkvew4; Margot Patrick & Julie Steinberg, *Credit Suisse Identifies $2.3 Billion at Risk in Greensill Funds*, WALL ST. J. (Apr. 13, 2021), https://tinyurl.com/5n8ze42x; *Credit Suisse says new court order could result in $680 million RMBS judgment*, REUTERS (Dec. 1, 2020, 7:08 AM), https://tinyurl.com/dhu6w8nb.

[24] Hugo Miller, *UBS Inherits Legacy of Legal Headaches From Credit Suisse*, BLOOMBERG (May 3, 2023, 1:21 AM), https://tinyurl.com/yh68zc3n; Owen Walker & Stephen Morris, *Credit Suisse: the rise and fall of the bank that built modern Switzerland*, FIN. TIMES (Mar. 24, 2023), https://tinyurl.com/5yna4r8u; Jack Ewing, *Credit Suisse is fined for helping a Bulgarian drug ring launder money, a court said*, N.Y. TIMES (June 27, 2022), https://tinyurl.com/29s8f9fv.

newspaper also obtained account information for 30,000 Credit Suisse clients and published an exposé into the most unsavory details: tax dodgers, corrupt politicians, human traffickers, torturers, and so on, all of whom benefited from Switzerland's expansive bank secrecy laws.[25]

44.    These scandals spawned extensive civil litigation against Credit Suisse.[26]

45.    The scandals and litigation also spooked depositors.  In the last three months of 2022, customers withdrew CHF 111 billion from Credit Suisse—8% of all assets under management.[27]

46.    All this hurt Credit Suisse's stock price, which trended slowly downwards over the course of the 2010s.

47.    Swiss authorities took note and prepared potential rescue plans.  Switzerland had its own Resolution plans specific to Credit Suisse that it had spent months perfecting, with substantial efforts to update the plans in Fall 2022.  The plans were, as Switzerland later said, "ready for signature" in March 2023 and would have been implemented had the Takeover not taken place.[28]

48.    Things eventually reached a breaking point for Credit Suisse.  By March 13, 2023, its share price had dropped 67% over the preceding 12 months to less than $2.50—an all-time low.[29]

---

[25] David Pegg, Kalyeena Makortoff, Martin Chulov, Paul Lewis & Luke Harding, *Revealed: Credit Suisse leak unmasks criminals, fraudsters and corrupt politicians*, GUARDIAN (Feb. 20, 2022, 12:00 PM), https://tinyurl.com/4avbntwy.

[26] Miller, *UBS Inherits Legacy*, *supra* note 24.

[27] Walker & Morris, *supra* note 24.

[28] FINMA REPORT, *supra* note 1, § 5.5, at 20.

[29] Hanna Ziady, *Credit Suisse finds 'material weakness' in its financial reporting, scraps exec bonuses*, CNN (Mar. 14, 2023, 9:09 AM), https://tinyurl.com/2nedsd3z.

49.     Credit Suisse throughout all this time was solvent, with capitalization ratios meeting Swiss requirements.  The issue was depositors' lack of confidence in Credit Suisse.

## III.     Switzerland Acts As An Investment Bank And Brokers The Takeover.

50.     The United States and other leading countries have affirmed "that the cross-border resolution framework was sound" and should have been employed to resolve Credit Suisse's woes.[30]  But Switzerland went its own way, arguing that Resolution "should be used only if no better solution is available."[31]  And Switzerland thought it had found one: a "private-law merger" between UBS and Credit Suisse.[32]

51.     On March 15, 2023, representatives from FINMA, the Swiss National Bank (the "**SNB**") and Switzerland met with UBS leadership to float their proposal.  In that meeting, the SNB, FINMA, and Switzerland urged UBS to acquire Credit Suisse, and warned that if it failed to do so, Credit Suisse might be placed into Resolution.[33]

52.     While Switzerland was urging UBS to acquire Credit Suisse, it was also pressuring Credit Suisse to agree to the merger.  Also on March 15, Switzerland and the SNB extended to Credit Suisse CHF 50 billion in emergency loans with major strings attached.  Swiss Finance

---

[30] Gruenberg, *supra* note 15; Press Release, European Banking Authority, SRB, EBA and ECB Banking Supervision statement on the announcement on 19 March 2023 by Swiss authorities (Mar. 20, 2023), https://tinyurl.com/uwk2xrka; *Bank of England Statement: UK creditor hierarchy*, BANK OF ENGLAND (Mar. 20, 2023), https://tinyurl.com/24hthtc6; Media Release, Monetary Authority of Singapore, MAS' Statement on Additional Tier 1 Instruments Issued by Singapore Banks, (Mar. 22, 2023), https://tinyurl.com/35sx945p; Press Release, Hong Kong Monetary Authority, HKMA's response to media enquiries (Mar. 22, 2023), https://tinyurl.com/rvnmruss; *Canada's banking regulator reaffirms creditor hierarchy after Credit Suisse deal angers bondholders*, REUTERS (Mar. 20, 2023, 4:13 PM), https://tinyurl.com/yrwc9skj.

[31] FINMA REPORT, *supra* note 1, § 7.8, at 74.

[32] *Id.* § 5.5, at 19.

[33] UBS Group AG, Securities Act of 1933, Amendment No. 4 to Form F-4, at 44 (June 9, 2023), https://tinyurl.com/2h7pwhya.

Minister Karin Keller-Sutter and representatives from SNB and FINMA told the CEO and Chair of Credit Suisse: "You will merge with UBS and announce Sunday evening before Asia opens. This is not optional."[34]

53.    This plan, a government-brokered acquisition by UBS, was nothing like Switzerland's Resolution option.  Instead, Switzerland acted as an investment bank, using the promises of financial guarantees to UBS and low-interest loans to Credit Suisse to broker a merger between Switzerland's two largest banks.  Switzerland itself called its merger strategy a "commercial solution."[35]

54.    But Switzerland botched the job.  In particular, it did not solicit or consider alternative bids from alternative bidders, despite other financial institutions' prior interests in buying Credit Suisse.  As Switzerland negotiated with UBS, both Saudi National Bank and BlackRock reportedly tried to assemble bids for Credit Suisse.  Switzerland blocked both from participating.[36]  And from 2020 through early 2023, several other banks considered purchasing all or part of Credit Suisse.[37]  Ignoring these other potential buyers, and focused on ramming through a merger that would keep Credit Suisse out of foreign hands, Switzerland decided there could be only one bidder: Switzerland's other major national bank, UBS.

---

[34] Stephen Morris, James Fontanella-Khan & Arash Massoudi, *How the Swiss 'trinity' forced UBS to save Credit Suisse*, FIN. TIMES (Mar. 20, 2023), https://tinyurl.com/2p4jfafw.

[35] *Swiss Finance Minister: UBS Buying Credit Suisse Is Not a Bailout*, *supra* note 2.

[36] Marion Halftermeyer, *Saudi National Bank Wanted 40% Stake in Credit Suisse: Blick*, BLOOMBERG (July 9, 2023, 3:06 AM), https://tinyurl.com/3s6y97tt; *Why Blackrock Didn't Make a Move on Credit Suisse*, FINEWS.COM (Mar. 22, 2023, 2:22 PM), https://tinyurl.com/33yvnwx3.

[37] *McKinsey advising UBS on potential Credit Suisse merger*, CONSULTANCY.EU (Sept. 22, 2020), https://tinyurl.com/23tevbk2; Oliver Hirt, Pamela Barbaglia & David French, *EXCLUSIVE BlackRock, Mustier's blank-check firm eye Credit Suisse fund management arm - sources*, REUTERS (Apr. 9, 2021), https://tinyurl.com/yc8zx5pk; Brenna Hughes Neghaiwi, *State Street denies interest in buying Credit Suisse*, REUTERS (June 9, 2022, 3:40 PM), https://tinyurl.com/5n88bk2c.

55.     That decision gave UBS all the leverage.  When there is only one potential buyer, absent an upfront agreement "on key deal terms such as price[] and structure," the seller has no leverage.[38]  Those terms were not negotiated upfront in this case.  And so UBS knew that it was the only commercial game in town and had the power to dictate the terms it wanted for the Takeover.

56.     And dictate it did.  On Sunday, March 19, 2023, Switzerland, FINMA, the SNB, UBS, and Credit Suisse announced that UBS would purchase Credit Suisse for the equivalent of $3.4 billion.  As part of the transaction, Switzerland offered Credit Suisse CHF 200 billion in increased liquidity and UBS a CHF 9 billion guarantee against losses arising from the Takeover.[39]  And as discussed below, the Takeover happened only after Switzerland issued the Write-Down Direction to benefit UBS.

57.     This was the deal of the century for UBS.  UBS acquired one of the world's largest banks for a song.  The transaction was so immediately profitable that within just a few months UBS decided it no longer needed Switzerland's CHF 9 billion guarantee.[40]  UBS reported $29 billion in profits in Q2 2023—the biggest ever quarterly profit that any bank has ever posted.[41]  In comparison, it posted quarterly profits of $1-2 billion in the nine preceding quarters, and just

---

[38] JOSHUA ROSENBAUM & JOSHUA PEARL, INVESTMENT BANKING: VALUATION, LBOS, M&A, AND IPOS 305 (3d ed. 2022).

[39] John O'Donnell, Stefania Spezzati & Elisa Martinuzzi, *How Swiss authorities bungled Credit Suisse oversight*, REUTERS (Dec. 18, 2023, 9:59 PM), https://tinyurl.com/5a6x7e45; *UBS sees agreement on Credit Suisse loss guarantee by June 7*, REUTERS (June 6, 2023, 10:46 AM), https://tinyurl.com/ybx63xab.

[40] Chris Hughes, *UBS Keeps Torturing Credit Suisse Bondholders*, BLOOMBERG (Aug. 20, 2023, 10:00 PM), https://tinyurl.com/mpvnfh9r.

[41] Owen Walker, *UBS breaks record with $29bn profit after Credit Suisse deal*, FIN. TIMES (Aug. 31, 2023), https://tinyurl.com/3wrt23uw.

$1 billion in Q1 2023.[42]  UBS's share price grew 60% in the year after the Takeover.[43]  This past April, UBS announced plans for $2 billion in share buybacks.[44]

58.     But someone had to shoulder the costs from the Takeover and subsidize UBS's gains.  And that someone was AT1 bondholders like Plaintiffs.

**IV.     Switzerland Issues The Write-Down Direction, Wiping Out $17.3 Billion In Assets.**

59.     The same day the Takeover was announced, Switzerland's financial regulator, FINMA, issued the Write-Down Direction to Credit Suisse—resulting in the wipe-out of $17.3 billion in AT1s worldwide.  This meant that the AT1s were permanently cancelled, and New York–based DTC, the securities depository holding the bonds, was ordered to suspend all clearance and settlement of the AT1s.

60.     The Write-Down Direction is not like any tool employed by regulators in past financial crises.  When the United States government brokered takeovers of distressed financial institutions in 2008, for example, it offered financial guarantees against losses.  It did not take a red pen to Bear Stearns' and Merrill Lynch's debts to make them more attractive takeover targets.  The Write-Down Direction was a singular event in financial history: a conversion of creditors' property rights by Switzerland's executive branch of government designed to facilitate a commercial takeover of a company that was not in bankruptcy.

61.     The Write-Down Direction was not necessary to prevent a financial collapse.  Switzerland could have, for example, opened the sales process to more bidders.  And even without the Write-Down Direction, the Takeover would have still been wildly profitable for UBS.  And

---

[42] de la Merced, *supra* note 5.

[43] Walker, *UBS breaks record*, *supra* note 41.

[44] *Id.*

of course, Switzerland could have employed the Resolution proceedings that were devised to handle bank collapses like this one.

62.     Switzerland chose to issue the Write-Down Direction in any case because it intended to make the predominantly foreign AT1 bondholders subsidize the gains of UBS, Switzerland's leading bank.  The Write-Down Direction, in short, was Switzerland's way of picking the Takeover's winners and losers.

63.     The Write-Down Direction was also impermissible under the AT1s' governing terms.  The terms and conditions governing such a write-down, which were applicable to all the AT1s at issue in this case, authorized FINMA to issue a Write-Down Direction only in a limited set of conditions.   As relevant here, the Write-Down Direction was authorized only if (1) "customary measures to improve" Credit Suisse's "capital adequacy" were "inadequate or unfeasible"; (2) Credit Suisse "receive[d] an irrevocable commitment of extraordinary support from the public sector"; and (3) that support had, or imminently would have, the effect of improving Credit Suisse's capital adequacy.[45]

64.     These conditions were not met.  In March 2023, Credit Suisse's capital adequacy ratios were sufficient under the AT1s.  Switzerland itself declared in a press release on March 15, 2023 that "Credit Suisse meets the capital and liquidity requirements imposed on systemically important banks."[46]  In a December 2023 press release, Switzerland again stated that "Credit Suisse satisfied the regulatory capital requirements" in March 2023.[47]  Credit Suisse has also

---

[45] Credit Suisse Investor Relations, Brief Description of Our Existing High- and Low-Trigger Regulatory Capital Instruments, (Sept. 11, 2017), https://tinyurl.com/yc2asmx7.

[46] Press Release, Swiss Nat'l Bank, SNB and FINMA issue statement on market uncertainty (Mar. 15, 2023), https://tinyurl.com/33nypddp.

[47] Press Release, FINMA, FINMA publishes report and lessons learned from the Credit Suisse crisis (Dec. 19, 2023), https://tinyurl.com/3mj6pcfj.

represented that it met the relevant capital adequacy requirements in March 2023.[48]  Moreover, Switzerland's loans to Credit Suisse could not improve Credit Suisse's "capital adequacy" by definition, as all loans create corresponding liabilities.  In March 2023, Credit Suisse had a crisis of confidence and a liquidity problem at most, and Switzerland was not authorized to issue a Write-Down Direction under these conditions.  The bondholders agreed only to a write-down in response to capital adequacy problems, not liquidity issues.

65.    The Write-Down Direction was issued without any regard to a fair market valuation of Credit Suisse's assets.  As such, it was a fiction that lacked economic basis or substance.

66.    Even Credit Suisse, the issuer of the AT1s, agreed that the Write-Down Direction was not permissible under Swiss law or the AT1s' governing terms.  In pending Swiss litigation, FINMA was forced to disclose a secret March 22 ordinance that referred to Credit Suisse correspondence challenging the Write-Down Direction's validity.[49]

67.    Because Switzerland had no lawful authority to issue the Write-Down Direction, Switzerland changed the law.  The night of the Takeover, the Swiss Federal Council (Switzerland's executive branch) issued an emergency ordinance that authorized the Write-Down Direction.[50]  Article 5a, entitled "Additional Tier 1 capital," was a ticket good for one day only,

---

[48] Laurie McAughtry, *Investors gear up for litigation over Credit Suisse write-down*, TRADE (Mar. 23, 2023, 12:22 PM), https://tinyurl.com/453vsvnr.

[49] Robert Smith, Owen Walker & Stephen Morris, *Credit Suisse privately challenged Finma's AT1 writedown*, FIN. TIMES (May 22, 2023), https://tinyurl.com/94nvvp4b.

[50] BUNDESVERFASSUNG [BV] [CONSTITUTION] Mar. 19, 2023, Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks, art. 5a (Switz.), https://tinyurl.com/3n43muhp.

providing that "FINMA may order the borrower and the financial group to write down additional Tier 1 capital."[51]

**V.      Plaintiffs Should Be Compensated For The Losses They Suffered As A Result Of The Write-Down Direction.**

68.      This Court is the only forum where Plaintiffs can seek relief.  In Switzerland, challenges to Switzerland's Takeover and Write-Down Direction had to be brought within thirty (30) days of Switzerland converting Plaintiffs' property.  Plaintiffs here missed that deadline for their claims and thus have no recourse in the Swiss courts.

69.      This Court, rather than Switzerland's own tribunals, is also the proper forum to hear this case, given the Write-Down Direction's impact on New York and New York's ties to the underlying dispute.  Absent judicial relief, there will always be a future risk that other sovereigns will wipe out financial instruments held in New York.

70.      The Write-Down Direction directly converted bonds located in New York.  Like many bonds issued worldwide, Plaintiffs' AT1s were registered securities held by DTC, a securities depository located in New York.  The AT1s were registered in the name of DTC's nominee, Cede & Co., which is a general partnership located in New York and the legal holder of the AT1 securities.  DTC and its participants, in turn, record beneficial ownership interests in the AT1s, such as those owned by Plaintiffs.

71.      Finally, Credit Suisse itself had significant connections to New York.  Most of the AT1s were denominated in dollars, and Switzerland developed its Credit Suisse Resolution procedures in close consultation with the U.S. Federal Reserve Board, the FDIC, the U.S. Securities and Exchange Commission, the Federal Reserve Bank of New York, and the New York

---

[51] *Id.*

State Department of Financial Services. The inclusion of the U.S. and New York authorities was, in Switzerland's words, "deemed necessary" because they were "responsible for the New York branch of [Credit Suisse] and thus ha[d] supervisory sovereignty over its liquidity holdings."[52] Switzerland further acknowledged that "US securities law would have come into play" had Resolution gone forward, as Resolution "would have affected US investors."[53]

72. New York, accordingly, has an interest in hearing this case to protect New York financial instruments, New York investors, and New York markets.

## CLAIMS FOR RELIEF

### COUNT I
### (Conversion)

73. Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 72 herein.

74. The AT1s and Plaintiffs' beneficial interests in the AT1s are a specific identifiable type of property that are capable of being converted.

75. Plaintiffs or their predecessors-in-interest had ownership, possession, or control over their beneficial interests in the AT1s at the time of the conversion.

76. Switzerland exercised an unauthorized dominion over the AT1s and Plaintiffs' beneficial interests in them by executing the Write-Down Direction.

77. The Write-Down Direction effected an unauthorized dominion because it resulted in the AT1s becoming untradeable, DTC marking them as being worth $0, and Credit Suisse stopping payments on the AT1s.

---

[52] FINMA REPORT, *supra* note 1, § 7.8, at 72.

[53] *Id.*

78.     Plaintiffs are entitled to the face value of the AT1s as damages for Switzerland's conversion.

## COUNT II
### (N.Y. Gen. Bus. L. § 349)

79.     Plaintiffs repeat and reallege the allegations set forth in paragraphs 1 through 78 herein.

80.     The Write-Down Direction was consumer-oriented because it targeted AT1s which were securities marketed to all members of the public.

81.     Switzerland's actions were deceptive because they caused Credit Suisse to deceptively promise that it would pay the AT1s based on certain terms set in advance but fail to keep that promise.

82.     Plaintiffs suffered an injury as a result of the deception because their AT1s and beneficial interests in them were written down to $0.

83.     Plaintiffs accordingly suffered actual damages equal to the face value of the AT1s.

## <u>PRAYER FOR RELIEF</u>

Plaintiffs respectfully requests entry judgment in favor of Plaintiffs and against Defendant granting the following relief:

a.     a money judgment for $82,253,306.00 plus costs and interest accruing at 9% per annum from March 19, 2023, with interest continuing to accrue thereafter until paid; and

b.     such other and further relief as deemed appropriate.

DATED:  June 6, 2024        Respectfully submitted,

QUINN EMANUEL URQUHART &
SULLIVAN, LLP

By:    */s/ Dennis H. Hranitzky*
      Dennis H. Hranitzky
      2755 E. Cottonwood Pkwy, Ste. 430
      Salt Lake City, UT 84121
      801-515-7300 Main Office Number

      Jeremy D. Andersen (*Pro hac vice to be filed*)
      865 S. Figueroa St., 10th Floor
      Los Angeles, CA 90017
      213-443-3000 Main Office Number

      Debra D. O'Gorman
      51 Madison Avenue, 22nd Floor
      New York, NY 10010
      212-849-7000 Main Office Number

      Alex H. Loomis (*Pro hac vice to be filed*)
      111 Huntington Ave, Suite 520
      Boston, MA 02199
      617-712-7100 Main Office Number

WOLLMUTH MAHER & DEUTSCH LLP

      David H. Wollmuth
      Joshua M. Slocum
      Sean P. McGonigle
      500 Fifth Avenue
      New York, NY 10110
      212-382-3300 Main Office Number

      *Counsel for Plaintiffs*