**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CREDITINCOME LIMITED, *et al.*,

          *Plaintiffs*,

    v.

THE SWISS CONFEDERATION,

          *Defendant*.

---

Case No. 24-cv-4316 (DEH)

ORAL ARGUMENT
REQUESTED

 

# THE SWISS CONFEDERATION'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION TO DISMISS THE COMPLAINT

 

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for the Swiss Confederation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ................................................................................................................ 2

    A.    Credit Suisse and its governing regulations ........................................................ 3

    B.    The AT1 notes issued by Credit Suisse ................................................................ 4

    C.    The write-down of Credit Suisse AT1 notes ........................................................ 6

    D.    Legal proceedings in Switzerland ........................................................................ 9

    E.    This action ............................................................................................................. 9

ARGUMENT ..................................................................................................................... 10

    I.    THE COURT LACKS JURISDICTION BECAUSE SWITZERLAND IS
          IMMUNE FROM SUIT .......................................................................................... 10

          A.    The FINMA write-down order was not an act taken in connection with a
               commercial activity of Switzerland ................................................................ 11

          B.    The FINMA write-down order did not cause a direct effect in the United
               States ............................................................................................................. 16

    II.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF A SWISS
          FORUM .................................................................................................................. 17

    III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF .............................. 23

          A.    The complaint fails to state a claim for conversion ........................................... 23

          B.    The complaint fails to state a claim under N.Y. General Business Law
               § 349 .............................................................................................................. 24

CONCLUSION .................................................................................................................. 25

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Aenergy, S.A.* v. *Republic of Angola,*
    31 F.4th 119 (2d Cir. 2022) .......................................................................18, 19, 20, 21, 22

*In re Alcon S'holder Litig.,*
    719 F. Supp. 2d 263 (S.D.N.Y. 2010)...................................................................................19

*Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero),*
    600 F.3d 171 (2d Cir. 2010)...............................................................................11, 13, 14, 15

*Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic,*
    961 F.3d 193 (2d Cir. 2020).......................................................................................10, 12, 13

*Chambers* v. *Time Warner, Inc.,*
    282 F.3d 147 (2d Cir. 2002) .....................................................................................................2

*Citadel Mgmt., Inc.* v. *Telesis Tr., Inc.,*
    123 F. Supp. 2d 133 (S.D.N.Y. 2000)...................................................................................23

*Daou* v. *BLC Bank, S.A.L.,*
    42 F.4th 120 (2d Cir. 2022) ............................................................................................16, 17

*Garb* v. *Republic of Poland,*
    440 F.3d 579 (2d Cir. 2006)...................................................................................................15

*Guirlando* v. *T.C. Ziraat Bankasi A.S.,*
    602 F.3d 69 (2d Cir. 2010)....................................................................................................16

*Int'l Design Concepts, LLC* v. *Saks Inc.,*
    486 F. Supp. 2d 229 (S.D.N.Y. 2007)...................................................................................25

*Iragorri* v. *United Techs. Corp.,*
    274 F.3d 65 (2d Cir. 2001)....................................................................................................18

*Jeffers* v. *Am. Univ. of Antigua,*
    125 A.D.3d 440 (1st Dep't 2015) ..........................................................................................23

*LaSala* v. *UBS, AG,*
    510 F. Supp. 2d 213 (S.D.N.Y. 2007)...................................................................................22

*Magi XXI, Inc.* v. *Stato della Citta del Vaticano,*
    714 F.3d 714 (2d Cir. 2013)...................................................................................................17

*Matar* v. *Dichter*,
    500 F. Supp. 2d 284 (S.D.N.Y. 2007)..........................................................................17 n.2

*Maurizio* v. *Goldsmith*,
    230 F.3d 518 (2d Cir. 2000)..........................................................................................25

*Pollux Holding Ltd.* v. *Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)............................................................................................19

*R. Maganlal & Co.* v. *M.G. Chem. Co.*,
    942 F.2d 164 (2d Cir. 1991)..........................................................................................18

*Rand* v. *Travelers Indem. Co.*,
    637 F. Supp. 3d 55 (S.D.N.Y. 2022).............................................................................25

*In re Refco Sec. Litig.*,
    759 F. Supp. 2d 301 (S.D.N.Y. 2010)...........................................................................24

*Republic of Argentina* v. *Weltover, Inc.*,
    504 U.S. 607 (1992)...............................................................................11, 12, 13, 16

*Revitalizing Auto Communities Env't Response Tr.* v. *Nat'l Grid USA*,
    92 F.4th 415 (2d Cir. 2024) ...........................................................................................2

*Rolls-Royce Motor Cars, Inc.* v. *Schudroff*,
    929 F. Supp. 117 (S.D.N.Y. 1996) ...............................................................................24

*Rong* v. *Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006) ......................................................................................14

*Rynasko* v. *New York Univ.*,
    63 F.4th 186 (2d Cir. 2023) ....................................................................................23, 24

*Schertenlieb* v. *Traum*,
    589 F.2d 1156 (2d Cir. 1978).................................................................................22, 23

*Schur* v. *Dougan*,
    2024 WL 4252647 (S.D.N.Y. Sept. 19, 2024)..............................................................18

*Star Colbert* v. *Dougan*,
    724 F. Supp. 3d 304 (S.D.N.Y. 2024).........................................................18, 19, 20, 21, 22

*Teller* v. *Bill Hayes, Ltd.*,
    630 N.Y.S.2d 769 (2d Dep't 1995)...............................................................................25

**Statutes and Rule:**

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*........................................10

    28 U.S.C. § 1603(a) .......................................................................................................10

    28 U.S.C. § 1603(d) ..................................................................................................11, 12

    28 U.S.C. § 1604 ...........................................................................................................10

    28 U.S.C. § 1605(a)(2)........................................................................................10, 15, 16

N.Y. Gen. Bus. Law § 349...........................................................................................9, 24, 25

Fed. R. Civ. P. 12:

    Rule 12(b)(1)...................................................................................................................25

    Rule 12(b)(2)...................................................................................................................25

    Rule 12(b)(6)...................................................................................................................25

**Other Authorities:**

4 Thomas Lee Hazen, *Law of Sec. Reg.* § 14:22 (8th ed. 2024) ......................................24

Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries,

    69 Fed. Reg. 70852 (Dec. 7, 2004) ...........................................................................24

## INTRODUCTION

Eight plaintiffs bring this action against the Swiss Confederation (Switzerland) to recover alleged losses on canceled debt instruments, so-called "AT1" notes. The Swiss Confederation neither issued nor guaranteed those notes. Rather, the notes were issued by Credit Suisse, a Swiss bank. Under the note terms, which were expressly subject to Swiss law, the notes could be "written down"—permanently canceled—by Credit Suisse if FINMA, the Swiss banking regulator, determined that either a write-down of the notes or extraordinary government assistance was necessary to allow Credit Suisse to avoid insolvency or bankruptcy, to timely pay its debts, or to carry on its business. In March 2023, Credit Suisse suffered a financial crisis and could not be stabilized, despite multiple emergency loans by the Swiss government. The Swiss government concluded that a rescue acquisition by UBS, another Swiss bank, best served Switzerland's interests in protecting the proper functioning of its financial markets. To facilitate UBS's acquisition of the failing bank, the Swiss Federal Council—Switzerland's highest executive authority—enacted ordinances that extended additional central bank liquidity assistance to Credit Suisse and waived certain legal obstacles to a merger. In those ordinances, the Swiss Federal Council also confirmed FINMA's authority to order Credit Suisse to write down its Additional Tier 1 capital, a species of regulatory capital, thus triggering a write-down of the notes by Credit Suisse.

Plaintiffs claim that FINMA's order to Credit Suisse violated the terms of the notes and that the Swiss government is therefore liable for the alleged nominal value of their note interests. But as a foreign state, Switzerland is entitled to sovereign immunity from suit unless this action falls within a statutory exception to immunity recognized in the Foreign Sovereign Immunities Act. Plaintiffs contend that Switzerland is not entitled to immunity because its facilitation of the

merger was "commercial" activity.  But as the above description of Switzerland's actions shows, it acted as a regulator of the marketplace, not a private player within it.  Its actions were thus quintessentially regulatory, not "commercial."

Switzerland's immunity from suit provides a clear ground for dismissal.  A second ground for dismissal, equally clear, is the *forum non conveniens* doctrine.  Analysis under that doctrine, balancing private and public interests, overwhelmingly favors the Swiss courts as the most sensible, the most efficient, the most convenient forum for adjudication of this dispute—a dispute under Swiss law, against the Swiss government, for allegedly violating the terms of notes issued by a Swiss bank and subject to a Swiss forum-selection clause.  Indeed, this Court has already twice ordered *forum non conveniens* dismissals of actions brought by aggrieved Credit Suisse AT1 noteholders, finding it "obvious" that a Swiss court is the proper forum for their claims.  Whether considered as a question of sovereign immunity or the most convenient forum, this suit belongs in Switzerland, not New York.

And in any event, this suit cannot proceed in New York.  The factual allegations of the complaint do not state a claim under New York law against the Swiss government for the action of a Swiss regulatory agency against a Swiss bank.  One way or another, this action should be dismissed.

## BACKGROUND

This background is drawn from the allegations of the complaint and from documents cited in and relied on in the complaint.  *See Revitalizing Auto Communities Env't Response Tr.* v. *Nat'l Grid USA*, 92 F.4th 415, 437 (2d Cir. 2024) (explaining that a court deciding a motion under Rule 12(b)(6) may consider documents on which plaintiffs "relied upon" in bringing suit (quoting *Chambers* v. *Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002))).

A.       **Credit Suisse and its governing regulations**

Until Credit Suisse Group AG ("Credit Suisse") was acquired by UBS Group AG ("UBS") in March 2023, it was incorporated in Switzerland and headquartered in Zurich.  Credit Suisse, Annual Report (Form 20-F) 174 (Mar. 14, 2023) [hereinafter Credit Suisse, 2022 Annual Report]. Credit Suisse was "subject to the Basel III framework, as implemented in Switzerland, as well as Swiss legislation and regulations for systemically important banks."  *Id.* at 28, 115.  In addition, the Swiss Financial Market Supervisory Authority (FINMA), an independent regulatory agency and the "sole bank supervisory authority in Switzerland," "close[ly] and continuous[ly]" monitored Credit Suisse.  *Id.* at 28; *see also* FINMA – An Overview, https://www.finma.ch./en/finma/finma-an-overview/ (last visited Dec. 4, 2024).

The Basel III framework was created by the Bank for International Settlements, an organization of central banks, in response to the 2008 financial crisis.  *See* Compl. ¶ 34; *see also* Credit Suisse, 2022 Annual Report 115.  "The Basel III regime . . . seeks to prevent financial crises by imposing more protective minimum capital ratios" on banks.  Compl. ¶ 35.  In particular, the Basel III framework "introduced . . . an explicit requirement that all capital instruments must be able to fully absorb losses at the so-called point of non-viability (PoNV) before taxpayers are exposed to loss."  Bank for International Settlements, Definition of Capital in Basel III at 1 (June 27, 2019), https://www.bis.org/fsi/fsisummaries/defcap_b3.pdf.  Common Equity Tier 1 capital (CET1) "is the highest quality of regulatory capital, as it absorbs losses immediately when they occur."  *Id.*  Additional Tier 1 capital (AT1) "also provides loss absorption on a going-concern basis, although AT1 instruments do not meet all the criteria for CET1."  *Id.*  Tier 2 capital "is gone-concern capital," so "when a bank fails, Tier 2 instruments must absorb losses before depositors and general creditors do."  *Id.*

3

"The PoNV [point of non-viability] condition requires all AT1 and Tier 2 instruments to be capable of being converted into common equity or written off." *Id.* at 2. "The trigger for the conversion/write-off is the earlier of (i) a decision of the relevant authority that the conversion/write-off is necessary, given that the bank is assessed to be non-viable; and (ii) a decision to inject public funds to prevent the bank's failure." *Id.* And "[t]his may happen based on either the authority's statutory power or the contractual features of the capital instruments." *Id.* Accordingly, "the terms of AT1s generally provide that, under certain, expressly enumerated conditions (generally tied to the bank's capital position and financial viability), the [AT1] bonds can be written down to zero or converted into equity." Compl. ¶ 36.

### B.    The AT1 notes issued by Credit Suisse

As of March 2023, Credit Suisse had issued AT1 notes thirteen times and its outstanding AT1 notes had a face value of approximately $17.3 billion. Credit Suisse, 2022 Annual Report 422; Compl. ¶ 37. In compliance with Basel III requirements, those notes were "contingent" or "trigger" capital instruments whose "principal amount . . . is written down to zero upon the occurrence of certain specified triggering events." Credit Suisse, 2022 Annual Report 119, 421; *see* Compl. ¶¶ 36, 38. The terms of all the Credit Suisse AT1 notes "provided that they could only be written down, not converted into equity," upon the occurrence of those events. Compl. ¶ 38; *see id.* ¶ 63 (alleging that "[t]he terms and conditions governing such a write-down . . . were applicable to all the [Credit Suisse] AT1s at issue in this case").

Specifically, the terms of the Credit Suisse AT1 notes provide that if a "Write-down Event" occurs, then "the full principal amount of each Note will be written down to zero," "the Holders will be deemed to have irrevocably waived their rights to, and will no longer have any rights against the Issuer with respect to, repayment of the aggregate principal amount of the Notes, and the Holders will be deemed to have agreed to the foregoing," and the Notes will "be permanently

cancelled." Reddy Decl. Ex. 9, Credit Suisse AT1 Notes Terms and Conditions pt. A, § 7(b)(i)-
(iv) (June 23, 2022) [hereinafter "Note Terms"].[1]

A "Write-down Event" is defined as either a "Contingency Event" or a "Viability Event."
*Id.* § 7(a)(i). A Contingency Event occurs if CET1 capital falls below the requisite threshold,
unless FINMA agrees that the level of such capital has been, or imminently will be, restored to an
adequate level. *See id.* § 7(a)(ii). A Viability Event occurs if the "Regulator" determines that
either a write-down of the notes or extraordinary support from the public sector was or is necessary
to prevent Credit Suisse from becoming "insolvent, bankrupt, unable to pay a material part of its
debts as they fall due or unable to carry on its business." *Id.* § 7(a)(iii)(A), (B); *see also* Compl.
¶ 63 & n.45 (partially quoting the definition of "Viability Event"). "Regulator" is defined as "the
national regulator body having the leading authority to supervise and regulate CSG with respect
to its consolidated capital adequacy at the relevant time being, at the Issue Date, FINMA." Note
Terms pt. A, § 18. Following a Write-down Event, Credit Suisse must notify registered
noteholders that a Write-down Event has occurred and specify the date of the Write-down.
*Id.* § 7(a)(ii), (iii).

The prospectuses for the notes contained extensive disclosure of "risk factors" for potential
purchasers to consider. Reddy Decl. Ex. 9, Credit Suisse AT1 Notes Prospectus 10-44 (June 23,
2022). That disclosure stated that "[t]he occurrence of a Viability Event, and a Write-down
resulting therefrom, is subject to, *inter alia*, a subjective determination by the Regulator" and that,

---

[1] The prospectuses, including the terms and conditions, for each of the nine issuances of AT1 notes
registered with DTC are attached as Exs. 1 to 9 to the Declaration of Anitha Reddy. *See* Compl.
¶ 11 (alleging that plaintiffs' claim "all" arise from AT1 notes "registered with—and which cleared
through—DTC"). This brief generally cites the prospectus for the last of the nine issuances, on
June 23, 2022, Ex. 9, as illustrative of the prospectuses, including the terms and conditions, for all
nine issuances. The portions relevant to this motion are the same in each prospectus.

"[a]s a result, the Regulator may require and/or the federal government may take actions contributing to the occurrence of a Write-down in circumstances that are beyond the control of CSG and with which CSG does not agree."  *Id.* at 12.  And it cautioned that "[t]he Notes will be the obligations of CSG only and Holders must solely look to CSG for the performance of CSG's obligations under the Notes."  *Id.* at 19; *see also id.* ("[t]he Notes will not be covered by any government compensation or insurance scheme" or "any government guarantee").

The note terms provide that they "are governed by, and shall be construed in accordance with, the laws of Switzerland" and that "[a]ny dispute that might arise based" on them "shall fall within the exclusive jurisdiction of the Courts of the City of Zurich."  Note Terms pt. A, § 19.

### C.    The write-down of Credit Suisse AT1 notes

On March 10, 2023, Silicon Valley Bank failed after a bank run.  Four days later, on March 14, Credit Suisse filed its annual report for 2022, acknowledging "material weaknesses" in its financial reporting.  *See* Compl. ¶ 48 & n.29; *see also* Credit Suisse, 2022 Annual Report 50-51, 257.  The next day, the Swiss National Bank (SNB) and FINMA issued a joint statement "that the problems of certain banks in the USA do not pose a direct risk of contagion for the Swiss financial markets."  Press Release, SNB and FINMA Issue Statement on Market Uncertainty (Mar. 15, 2023), https://tinyurl.com/33nypddp (cited in Compl. ¶ 64 & n.46).  The statement specifically addressed Credit Suisse, acknowledging that its "stock exchange value and the value of its debt securities have been particularly affected by market reactions in recent days."  *Id.*  It then explained that while Credit Suisse currently "meets the higher capital and liquidity requirements applicable to systemically important banks," "the SNB will provide liquidity" to Credit Suisse "if necessary," and that FINMA and SNB "are in close contact with the Federal Department of Finance to ensure financial stability."  *Id.*  Despite this confirmation, "[t]he issue was depositors' lack of confidence

in Credit Suisse." Compl. ¶ 49. By the next day, the Swiss National Bank had extended CHF 48 billion in emergency loans to Credit Suisse. *Id.* ¶ 52.

Also on March 15, representatives of the Swiss government, the Swiss National Bank, and FINMA met with representatives of UBS and asked if UBS was willing to rescue Credit Suisse by acquiring it. *See* Compl. ¶ 51 & n.33 (citing UBS, Amendment No. 4 to Registration Statement (Form F-4/A) 44 (June 9, 2023) [hereinafter UBS, Registration Statement]). These representatives informed UBS that a rescue of Credit Suisse through an "orderly takeover" by UBS was, in their view, the option that would be "most successful in reassuring markets and minimizing negative fallout." UBS, Registration Statement 44. And unless a merger was agreed by March 19, they said, Credit Suisse would have to be placed into "Resolution"—a restructuring—or bankruptcy. *See* Compl. ¶ 51 & n.33 (citing UBS, Registration Statement 44); *see also* Compl. ¶ 50 & nn.31-32 ("Switzerland . . . argu[ed] that Resolution 'should be used only if no better solution is available'" and "Switzerland thought it had found one: a 'private-law merger' between UBS and Credit Suisse" (quoting FINMA, FINMA Report: Lessons Learned from the CS Crisis 19, 74 (Dec. 19, 2023), https://tinyurl.com/48whnrva [hereinafter FINMA Report])). In that meeting and another meeting the following day, UBS representatives stated that UBS was willing to consider an acquisition of Credit Suisse "but only . . . with the necessary governmental engagement and support in Switzerland and other key jurisdictions." UBS, Registration Statement 45.

On March 16, the Swiss Federal Council enacted an emergency ordinance authorizing the Swiss National Bank to make additional liquidity assistance loans to systemically important banks and specifying the conditions under which the federal government would grant a default guarantee to the Swiss National Bank. *See* Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National

Bank to Systemically Important Banks, Systematische Sammlung des Bundesrechts, Mar. 16, 2023, SR 952.3.

On March 19, the Federal Council amended the March 16 ordinance to institute various extraordinary measures to stabilize Credit Suisse and facilitate its merger with UBS.  *See* Compl. ¶ 56; UBS, Registration Statement 46; *see also* FINMA Report 39 ("Based on the [amended ordinance], the federal government . . . put in place measures to shore up CS's solvency in order to safeguard financial stability and the Swiss economy as well as to facilitate the merger with UBS within the framework of an overall package.").  These measures made available additional emergency liquidity assistance loans from the Swiss National Bank to Credit Suisse and UBS, CHF 100 billion of which were secured by a federal default guarantee, and exempted the merger from shareholder approval requirements.  *See* Compl. ¶ 56; UBS, Registration Statement 46.

The amended ordinance also confirmed FINMA's authority to order Credit Suisse to write down its Additional Tier 1 capital if Credit Suisse was granted liquidity assistance loans secured by a federal default guarantee.  *See* Compl. ¶ 67 (quoting Systematische Sammlung des Bundesrechts, Mar. 19, 2023, SR 952.3, art. 5a  ("At the time of the credit approval in accordance with Article 5, FINMA may order the borrower and the financial group to write down additional Tier 1 capital.")).  Following the enactment of the amended ordinance, FINMA ordered Credit Suisse to write down its AT1 regulatory capital.  Compl. ¶ 59.

In the evening of March 19, Credit Suisse and UBS announced that they had entered into a merger agreement, with UBS agreeing to pay stock consideration valued at CHF 3 billion, equivalent to approximately $3.4 billion.  Compl. ¶ 56; Credit Suisse, Merger Announcement (Form 6-K) 3 (Mar. 20, 2023).  Credit Suisse stated that "[t]his move comes after the Swiss Federal Department of Finance, the Swiss National Bank and FINMA asked both companies to conclude

the transaction to restore necessary confidence in the stability of the Swiss economy and banking system." Credit Suisse, Merger Announcement 3.  Credit Suisse also disclosed that "[o]n Sunday, Credit Suisse has been informed by FINMA that FINMA has determined that Credit Suisse's Additional Tier 1 Capital (deriving from the issuance of Tier 1 Capital Notes) in the aggregate nominal amount of approximately CHF 16 billion will be written off to zero." *Id.*

### D.    Legal proceedings in Switzerland

The Swiss Federal Administrative Court is presently adjudicating "approximately 230 appeals, involving roughly 2500 appellants," seeking to overturn the FINMA write-down order to Credit Suisse.  Press Release, Swiss Federal Administrative Court, Press Release Regarding Strike-off Decision B-2254/2023 of 15 May 2023 (May 23, 2023), https://www.bvger.ch/media-releases/17ef53e2-d002-4b4f-8457-1f7d54953153/en/mm_b-2254-2023_en_web.pdf.

### E.    This action

Plaintiffs are eight entities that allegedly held beneficial interests in Credit Suisse AT1 notes.  Compl. ¶ 11.  Seven are foreign entities; one is a Delaware entity.  *Id.* ¶¶ 13-19.  The complaint asserts two claims against Switzerland: a common-law claim for conversion and a claim under N.Y. General Business Law § 349.  *Id.* ¶¶ 73-83.  The complaint alleges that Switzerland converted the plaintiffs' AT1 note interests when it "exercised an unauthorized dominion over the AT1s and Plaintiffs' beneficial interests in them by executing the [FINMA] Write-Down Direction" in breach of the note terms.  *Id.* ¶¶ 63, 76.  The complaint also alleges that Switzerland violated N.Y. General Business Law § 349 by issuing the FINMA write-down order "because [it] caused Credit Suisse to deceptively promise that it would pay the AT1s based on certain terms . . . but fail to keep that promise."  *Id.* ¶¶ 80-81.  Plaintiffs seek as relief a money judgment of $82,253,306, allegedly the nominal value of their note interests.  *Id.* at 22.

9

**ARGUMENT**

## I.    THE COURT LACKS JURISDICTION BECAUSE SWITZERLAND IS IMMUNE FROM SUIT

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*, provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States. *Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 199 (2d Cir. 2020). Under the Act, a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the enumerated exceptions applies. § 1604. The "commercial activity" exception of § 1605(a)(2) provides that a foreign state is not immune from suit in any case

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

Plaintiffs acknowledge that Switzerland is a foreign state, as defined in the FSIA. *See* Compl. ¶ 20 (citing § 1603(a)). But they assert that the third clause of the "commercial activity" exception to immunity applies to this case. *Id.* ¶ 22. Jurisdiction thus depends on whether this action is (1) "based . . . upon an act outside the territory of the United States," (2) that was taken "in connection with a commercial activity" of Switzerland outside this country, and (3) that "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Plaintiffs allege that their "claims are 'based . . . upon' the Write-Down Direction" FINMA made to Credit Suisse on March 19, 2023. Compl. ¶ 23. But that act of FINMA, taken in Switzerland, is insufficient to establish jurisdiction under § 1605(a)(2) for two reasons. It was not taken "in connection with a commercial activity" of Switzerland. Nor did it "cause a direct effect in the United States."

A.    **The FINMA write-down order was not an act taken in connection with a commercial activity of Switzerland**

The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Although that instruction "leaves the critical term 'commercial' largely undefined," the FSIA "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity." *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 612 (1992). Under that theory, "[a] foreign state engaging in commercial activities does not exercise powers peculiar to sovereigns; rather, it exercises only those powers that can also be exercised by private citizens." *Id.* at 614 (internal quotation marks and alterations omitted). Accordingly, "a foreign state engages in commercial activity 'when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it.'" *Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero)*, 600 F.3d 171, 176 (2d Cir. 2010) (quoting *Weltover*, 504 U.S. at 614).

Plaintiffs assert that the FINMA write-down order was an act "in connection with a commercial activity" because "it was undertaken in connection with Switzerland's brokering of the Takeover [of Credit Suisse]—a commercial activity routinely performed by private parties like investment banks." Compl. ¶ 24. But Switzerland acted nothing like an investment bank in seeking to stabilize Credit Suisse and prevent a broader disruption to its financial markets. The actions of the Federal Council, the Swiss National Bank, and FINMA to protect Credit Suisse's solvency and to facilitate the acquisition of Credit Suisse by UBS were all expressly undertaken pursuant to their governmental authority. The Federal Council, exercising its constitutional authority, enacted ordinances authorizing the Swiss National Bank to extend liquidity assistance loans worth hundreds of billions of Swiss francs, approving a federal default guarantee for CHF 100 billion of those loans, waiving normally applicable legal requirements for shareholder

11

approval of mergers, and confirming FINMA's supervisory authority to order a write-down of Credit Suisse's Additional Tier 1 capital.  And the Swiss National Bank and FINMA acted pursuant to both those ordinances and their pre-existing statutory authority in extending extraordinary liquidity assistance to Credit Suisse and ordering a write-down of Credit Suisse AT1 capital.  None of those actions could have been taken by an investment bank.  All were exercises of "powers peculiar to sovereigns."  *Weltover*, 504 U.S. at 614; *see also Barnet*, 961 F.3d at 199.

The actions of the Swiss government to facilitate the merger were thus quintessentially regulatory, not commercial.  Plaintiffs claim that the Swiss government's implementation of an "overall [Takeover] package" was nonetheless commercial activity because it was intended to facilitate an acquisition of Credit Suisse.  *See* Compl. ¶ 24.  The Swiss government's activity, they allege, was analogous to that of an investment bank seeking to facilitate the acquisition of its client. *See id.* ¶¶ 31, 32.  The Swiss government, however, acted "to safeguard CS's solvency and to assist the acquisition of CS by UBS" because it "had concluded that in the present circumstances the scenario of this takeover was the best and most reliable way of achieving the aims . . . of protecting the creditors and the proper functioning of the financial markets."  FINMA Report 6.  Its purpose was thus not comparable to that of an investment bank, whose end is the transaction of its client to justify its fee.  Its purpose was not to earn a profit on a single transaction, but to safeguard the public welfare by "protecting . . . the proper functioning of the financial markets."  *Id.*

Even if the Swiss government's immediate objective—facilitation of the merger—could be likened to that of an investment bank, its activity to achieve that objective would not be properly classified as "commercial."  Under the FSIA, the activity's "'purpose' (*i.e.*, the *reason* why the foreign state engages in the activity)" is "irrelevant."  *Weltover*, 504 U.S. at 617 (discussing § 1603(d) (emphasis in original)).  What matters is only the activity's "'nature' (*i.e.*, the outward

form of the conduct that the foreign state performs or agrees to perform).”  *Id.*  The test of commerciality is therefore “not ‘whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives.’”  *Anglo-Iberia*, 600 F.3d at 177 (quoting *Weltover*, 504 U.S. at 614).  The relevant question is “rather ‘whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in ‘trade and traffic or commerce.’”  *Id.* (quoting *Weltover*, 504 U.S. at 614 (emphasis in original)).

“[T]he particular actions” the Swiss government took to facilitate an acquisition of Credit Suisse were the enactment and enforcement of laws.  When a foreign state’s activity takes that form, it is sovereign activity—as *Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193 (2d Cir. 2020), confirms.  In *Barnet*, the court concluded that Greece’s dispatch of a letter claiming ownership of an ancient figurine pursuant to its patrimony law was not an act taken in connection with commercial activity.  *Id.* at 200-03.  It so held because “the ‘outward form’ of Greece’s ‘activity’ was the enactment and enforcement of laws declaring the figurine to be state property,” which were neither “the *type* of actions by which a private party engages in trade and traffic or commerce,” nor “analogous to a private commercial transaction.”  *Id.* at 201 (quoting *Weltover*, 504 U.S. at 616, 617); *see also Weltover*, 504 U.S. at 614 (“[A] foreign government’s issuance of regulations . . . is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party.”).

Like the plaintiff in *Anglo-Iberia Underwriting Management Co.* v. *P.T. Jamsostek (Persero)*, 600 F.3d 171 (2d Cir. 2010), plaintiffs here “mischaracterize[] the nature of” the foreign state activity at issue.  *Id.* at 177.  In *Jamsostek*, the plaintiff argued that a health insurer owned by Indonesia engaged in commercial activity because its services resembled those of private insurers.

13

*Id.* at 177.   The court rejected that argument because the state-owned insurer operated "as the default health insurer, under Indonesia's national social security program" and did "not sell insurance to workers or to employers in any traditional sense" or "otherwise compete in the marketplace like a private insurer." *Id.* at 177.   In facilitating the acquisition of Credit Suisse, the Swiss government likewise acted in its capacity as the ultimate guardian of the stability of Swiss financial markets and the Swiss economy.   At no time did the Swiss government sell investment banking services "in any traditional sense" or "otherwise compete in the marketplace" for those services.   *Id.*   Its activity, like the activity of Indonesia's default insurer, does "not equate to those of an independent actor in the private marketplace."   *Id.*

Plaintiffs allege that the Swiss government's implementation of an "overall [Takeover] package" was "commercial" activity because the "Takeover" was a "private-law merger" and thus a "commercial solution" to the distress of Credit Suisse.   Compl. ¶¶ 4, 24.   But as explained above, "[i]n determining whether the 'commercial activity' exception applies, the court looks to the character of the foreign state's exercise of power rather than its effects."   *Rong* v. *Liaoning Province Gov't*, 452 F.3d 883, 888 (D.C. Cir. 2006); *see also Jamsostek*, 600 F.3d at 177.   That is true even when the effect of the foreign state's activity is an acquisition of a private entity.   *Rong* v. *Liaoning Province Government*, 452 F.3d 883 (D.C. Cir. 2006), illustrates the point.   The plaintiff, who had entered into a joint venture with a Chinese city, challenged the provincial government's appropriation of his equity interests, which had been accomplished through a "takeover" of a related entity.   *Id.* at 886-88.   The court held that the provincial government's activity was not "commercial," even though a private party could also take control of a private entity.   *Id.* at 889-91.   Rather, its activity was "quintessentially sovereign" because it had effected the "takeover" by making law—specifically, by issuing a declaration that all equity interests in the

entity were "state assets." *Id.* at 889-90. As the court put it, "[a] private party in the market could not have done what the Province did here." *Id.* at 890. A private party likewise could not have done what the Swiss government did here—enact and apply ordinances to facilitate the merger of Credit Suisse and UBS. That is dispositive in determining that the Swiss government's activity was sovereign, not commercial.

Even assuming for argument's sake that the Swiss government's activity in implementing the "overall [Takeover] package" was "commercial," Compl. ¶ 24, the FINMA write-down order was not "in connection with" that activity, § 1605(a)(2). An act is "in connection with" a commercial activity "so long as there is a 'substantive connection' or a 'causal link' between them." *Jamsostek*, 600 F.3d at 178 (quoting *Garb* v. *Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006)). Plaintiffs contend that the requisite link exists because FINMA itself described the write-down order as "a necessary part" of "the overall package of measures to enable th[e] merger." FINMA Report 19 (quoted in Compl. ¶ 24). And they contrast the "commercial solution" of a merger with a concededly "sovereign" solution: "Resolution," *i.e.*, a restructuring plan, "specific to Credit Suisse" that was "'ready for signature' in March 2023 and would have been implemented had the Takeover not taken place." Compl. ¶¶ 33, 47, 53 (quoting FINMA Report 20). But FINMA would have issued a write-down order to Credit Suisse even if Credit Suisse had instead been placed into "Resolution." Under that plan, as FINMA itself also explained, not just "share capital" but "[t]he AT1 instruments would also have been completely written off, with the result that the AT1 creditors would also have lost their entire investment with this option." FINMA Report 19-20. So there was no "substantive connection" or "causal link" between the FINMA write-down order and the package of government measures enabling the merger. *Jamsostek*, 600 F.3d at 178 (quoting *Garb*, 440 F.3d at 587).

**B.     The FINMA write-down order did not cause a direct effect in the United States**

The FINMA write-down order did not "cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2).  The "commercial activity" exception therefore does not apply to this case, even assuming that the write-down order was an act "in connection with a commercial activity." *Id.*  According to plaintiffs, the write-down order "proximately and inexorably caused the complete loss of [their] beneficial interests in the AT1s."  Compl. ¶ 23.  And, they allege, because those beneficial interests "were held in New York by DTC," a securities depository corporation, "[t]his total loss of all proprietary value . . . constitutes a direct effect on intangible property held in the United States."  *Id.* ¶ 25.

The effect of the FINMA write-down order on the value of plaintiffs' alleged beneficial AT1 interests may have been "inexorabl[e]," but it was far from direct.  An effect is "direct" for purposes of the commercial activity exception "if it follows as an immediate consequence of the defendant's activity."  *Daou* v. *BLC Bank, S.A.L.*, 42 F.4th 120, 135 (2d Cir. 2022) (quoting *Weltover*, 504 U.S. at 618).  "[T]he mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the United States."  *Id.* (quoting *Guirlando* v. *T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010)).  Here, most of the plaintiffs are not even American citizens.  Compl. ¶¶ 12-19.  In any event, the effect of the write-down order on their AT1 interests was indirect, not "immediate."  *Daou*, 42 F.4th at 135.

Plaintiffs acknowledge that FINMA, as "Switzerland's financial regulator," "issued the Write-Down direction to Credit Suisse" in Switzerland, not to any person or entity in the United States.  Compl. ¶ 59.  Under the terms of the AT1 notes registered with DTC, Credit Suisse was then obligated to notify registered noteholders that a "Write-down Event" had occurred, resulting

16

in the permanent cancellation of the notes on the noticed write-down date.  *See* Note Terms pt. A, § 7(a)(ii)-(iii), (b)(i)-(iv).  As alleged holders of beneficial note interests, plaintiffs were "Indirect Holders" under the terms of the notes.  *See id.* pt. A, § 18.  And as such, they were neither the subject of the FINMA write-down order nor recipients of any notice by Credit Suisse.  Indeed, as "Indirect Holders," they generally had no rights under the notes.  *See id.* ("No other person, including any Indirect Holder, shall (i) be a Holder for the purpose of these Conditions, or (ii) other than as described in Condition 2(d)(ii), have any rights, or be owed any obligations by the Issuer, under the Notes.").

As the foregoing shows, the loss of plaintiffs' beneficial interests in AT1 notes was not "an immediate consequence" of the FINMA write-down order.  *Daou*, 42 F.4th at 135.  The "direct effect" of the order was on Credit Suisse, a Swiss bank subject to FINMA's regulatory jurisdiction in Switzerland and the only recipient of the order.  *Id.*  Plaintiffs' loss was merely the ultimate consequence of Credit Suisse's decision to issue a write-down notice to registered noteholders, as contemplated by the note terms.[2]

## II.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF A SWISS FORUM

Irrespective of whether the Court has jurisdiction over this action, the Court may—and should—apply the *forum non conveniens* doctrine to dismiss it in favor of a Swiss forum.  *See Magi XXI, Inc.* v. *Stato della Citta del Vaticano*, 714 F.3d 714, 720 n.6 (2d Cir. 2013) (dismissing action under *forum non conveniens* doctrine without reaching the question of jurisdiction under

---

[2] Because exercising jurisdiction over a foreign state implicates U.S. foreign policy interests, a court may invite the State Department to submit a statement of interest regarding a motion for dismissal under the FSIA.  *See, e.g., Matar* v. *Dichter*, 500 F. Supp. 2d 284, 287 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009) (dismissing complaint after inviting the State Department to "state its views, if any" on a motion for dismissal under the FSIA).

the FSIA because a "non-merits ground for dismissal," such as *forum non conveniens*, permits the court to "bypass[] questions of subject-matter and personal jurisdiction").

"The central purpose of a *forum non conveniens* inquiry is to determine where trial will be most convenient and will serve the ends of justice." *Star Colbert* v. *Dougan*, 724 F. Supp. 3d 304, 319 (S.D.N.Y. 2024) (quoting *R. Maganlal & Co.* v. *M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991)).  Here, that analysis clearly points to the courts of Switzerland.  Indeed, this Court has already applied the *forum non conveniens* doctrine to dismiss two actions brought by aggrieved Credit Suisse AT1 noteholders.  *See Star Colbert*, 724 F. Supp. 3d at 339; *Schur* v. *Dougan*, 2024 WL 4252647, at *1 (S.D.N.Y. Sept. 19, 2024).  As the Second Circuit has explained, "the principles underlying the *forum non conveniens* doctrine apply with equal weight—indeed, in some cases perhaps with greater weight—to lawsuits against foreign states." *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 127 (2d Cir. 2022).

"The decision to dismiss a case on *forum non conveniens* grounds lies wholly within the broad discretion of the district court." *Iragorri* v. *United Techs. Corp.*, 274 F.3d 65, 72 (2d Cir. 2001).  To determine if dismissal is appropriate, the court "(1) determine[s] the degree of deference properly accorded the plaintiff's choice of forum; (2) consider[s] whether the alternative forum proposed by the defendants is adequate to adjudicate the parties' dispute; and (3) balance[s] the private and public interests implicated in the choice of forum." *Aenergy*, 31 F.4th at 128 (internal quotation marks omitted).  In the circumstances here, plaintiffs' choice of a New York forum is entitled to minimal deference, Switzerland is a more than adequate alternative forum, and the relevant interests weigh strongly in favor of litigation in Switzerland.

Plaintiffs' choice to sue in this Court is "entitled to little deference" because all but one of them are foreign entities. *Star Colbert*, 724 F. Supp. 3d at 320; *see* Compl. ¶¶ 12-19.  And the

remaining plaintiff is not a New York entity, but a Delaware company that alleges the address of a registered agent as its only U.S. business address. Compl. ¶ 14. "[W]hen a foreign plaintiff sues in a United States forum such choice is entitled to less deference because one may not easily presume that choice is convenient." *Star Colbert*, 724 F. Supp. 3d at 320 (quoting *Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003)). Moreover, all plaintiffs are suing in their capacity as alleged former holders of beneficial interests in the AT1 notes—notes issued by a Swiss corporation and whose terms contain Swiss choice-of-law and forum-selection provisions. *See* Note Terms pt. A, § 19. It would therefore be "unreasonable" to conclude that plaintiffs "were not on notice of possible litigation in foreign courts." *Star Colbert*, 724 F. Supp. 3d at 320; *see also In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 271 (S.D.N.Y. 2010).

Switzerland easily qualifies as an adequate alternative forum for resolution of this dispute. An alternative forum is adequate "if the defendants are amenable to service of process there" and "if it permits litigation of the subject matter of the dispute." *Aenergy*, 31 F.4th at 130 (quoting *Pollux*, 329 F.3d at 75). Private parties may assert civil claims against the Swiss Confederation in Swiss courts. *See* von Salis Decl. ¶¶ 8-9. And Switzerland allows litigation on the subject of this dispute. *See id.* Indeed, the Swiss Federal Administrative Court is presently adjudicating more than 230 appeals of the FINMA write-down order, involving approximately 2,500 appellants. *See* Press Release, Swiss Federal Administrative Court; *see also* von Salis Decl. ¶¶ 23-24.

Plaintiffs allege that "[t]his Court is the only forum where [they] can seek relief" because they "missed" the 30-day deadline that Swiss law imposes on "challenges to Switzerland's Takeover and Write-Down Direction." Compl. ¶ 68. Plaintiffs' unexplained failure to meet that alleged deadline does not render Switzerland an inadequate forum. To begin with, the 30-day deadline to which plaintiffs apparently refer is a deadline of Swiss administrative law that

19

generally applies to actions seeking to overturn the decision of a regulatory agency. *See* von Salis Decl. ¶ 26. By contrast, an action asserting claims for monetary relief against the Swiss Confederation is subject to a three-year statute of limitations—and that is the kind of action plaintiffs seek to bring in this Court. *See id.* In any event, this Court need not resolve the question of the timeliness of plaintiffs' claims under Swiss law to find that Switzerland is an adequate forum. "[C]ourts overwhelmingly hold that analysis of a foreign legal system's statute of limitations issues is more appropriately conducted by the foreign court." *Star Colbert*, 724 F. Supp. 3d at 327 (collecting cases). So "the open statute of limitations questions do not render Switzerland an inadequate forum," but rather "render Switzerland the correct forum in which to resolve this dispute." *Id.* at 327-28. Nor does the possibility of a Swiss ruling adverse to plaintiffs on the time-bar issue undermine this conclusion. "The courts of this country do not expand the rights available to litigants under foreign law." *Id.* at 328. Therefore, "if a claim arising under Swiss law is barred by limitations in Switzerland, it will be barred by limitations in the United States." *Id.*

A balancing of the private and public interest factors "strongly favors" litigation in the courts of Switzerland. *Id.* at 329. Relevant private interests include the ease of access to evidence, the cost of witnesses to attend trial, the availability of compulsory process, and all other considerations "that make trial of a case easy, expeditious and inexpensive." *Aenergy*, 31 F.4th at 132. All interests are served by litigation in Switzerland. As the complaint expressly confirms, plaintiffs' claims are premised on their allegation that the FINMA write-down order was "unauthorized." Compl. ¶¶ 23, 63, 77. Documentary evidence concerning that order is located in Switzerland, not New York. *See Aenergy*, 31 F.4th at 133 (finding private interest factors supported dismissal where "[a]ll of the key events occurred in Angola"). And most, if not all of

that evidence, will have to be translated into English for use in this Court, as English is not one of the four official languages of Switzerland. *See* von Salis Decl. ¶ 22; *Aenergy*, 31 F.4th at 133-34 (finding that cost and difficulty of translating documents and witness testimony weighs in favor of dismissal). Such evidence would also have to be collected "in a manner . . . compliant with Swiss legal restrictions," including the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters. *Star Colbert*, 724 F. Supp. 3d at 330; *see* von Salis Decl. ¶¶ 12, 16-21. As this Court concluded in another case brought by AT1 noteholders, "this massive inefficiency and inconvenience that using the Hague Evidence Convention would create . . . is all the more striking given the existence of an alternative forum where many of these problems would not arise." *Star Colbert*, 724 F. Supp. 3d at 332 (internal quotation marks and alterations omitted); *see also* von Salis Decl. ¶¶ 10-11. Litigation in this Court will also impose costs on the Swiss government to produce witnesses in New York. The Swiss government will need to fund the travel of Swiss government witnesses that could have been avoided, and travel to New York will diminish the time those witnesses would otherwise spend on their official duties. *See id.* at 331 (concluding that, given the cost and complexity of "attempting to compel [Swiss government] officials to travel to the Southern District, it is far more convenient for the case to instead proceed within the Swiss court system"); *Aenergy*, 31 F.4th at 133 (finding no error in "giving priority to the availability of" Angolan state officials because "[t]he Angolan government is at the heart of this case"). Finally, the United States and Switzerland do not have a treaty providing for the reciprocal recognition of judgments, and the Swiss Confederation's governmental status poses additional hurdles to the enforcement of any U.S. court judgment against it in Switzerland. *See Star Colbert*, 724 F. Supp. 3d at 336; von Salis Decl. ¶¶ 13-15.

The relevant public interests are likewise served by litigation in Switzerland. These include the administrative burdens of court congestion, the unfairness of imposing jury duty on a community with no relation to the litigation; the local interest in deciding local controversies; and the avoidance of difficult problems in conflict of laws and the application of foreign law. *Aenergy*, 31 F.4th at 133. Most relevant here, New York has "at best, limited relations to this litigation." *Star Colbert*, 724 F. Supp. 3d at 337. That is because "[t]he FINMA-ordered write-down of Credit Suisse's AT1 bonds is at the heart of this case." *Id.* Accordingly, it would be unfair to require a New York jury to spend time resolving this dispute. *See id.* "Whatever interest the United States has" in resolving this dispute, "it pales in comparison with that of Switzerland" because "Switzerland possesses a strong interest in regulating the conduct of banks within its borders." *Id.* (quoting *LaSala* v. *UBS, AG*, 510 F. Supp. 2d 213, 229 (S.D.N.Y. 2007)). And "[t]he uncontested role of the Swiss regulator in ordering the write-down of the AT1 bonds necessarily lessens the United States' interest in the litigation while further increasing that of Switzerland." *Id.* at 338 (internal quotation marks omitted). Especially given the existence of pending proceedings challenging the FINMA write-down order in Switzerland, and the concomitant risk of inconsistent judgments presented by parallel litigation in New York, Switzerland has the greatest interest in adjudicating this dispute. *See* von Salis Decl. ¶¶ 23-27; *Star Colbert*, 724 F. Supp. 3d at 334 (concluding that "[t]he risk of inconsistent judgments," given the pending Swiss Federal Administrative Court proceedings, "weighs in favor of dismissal"). Furthermore, plaintiffs' claims cannot be resolved without resolving issues of Swiss law, which governs not only the terms of the AT1 notes but also the scope of Switzerland's law-making and regulatory authority. *See* von Salis Decl. ¶¶ 8, 25. "[D]etermining the content of Swiss law is obviously easier at trial" in Switzerland. *Id.* at 338 (quoting *Schertenlieb* v. *Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978)). And while a U.S.

court can undertake that determination, doing so "necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law, and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition." *Id.* at 338-39 (quoting *Schertenlieb*, 589 F.2d at 1165).

As this Court concluded in ordering a *forum non conveniens* dismissal of another action by AT1 noteholders, "[t]his case is not even close." *Id.* at 318. Plaintiffs "seek to recover for losses on bonds that were issued in Switzerland and whose terms are governed by Swiss law," that "were the subject of a mandatory write-down by order of the Government of Switzerland," and that "contain a forum selection clause that specifies Zurich as the exclusive location for any lawsuit" based on their terms or relating to their cancellation. *Id.* "In light of all this," the Court found, "the answer is obvious. New York has no business adjudicating this dispute." *Id.*

## III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

Even if the Court determines that it has jurisdiction, and that it should exercise that jurisdiction, this action should still be dismissed. Assuming the truth of the factual allegations of the complaint, the complaint fails to state a claim upon which relief can be granted.

### A.    The complaint fails to state a claim for conversion

The complaint alleges that "Switzerland exercised an unauthorized dominion over the AT1s and Plaintiffs' beneficial interests in them by executing the Write-Down Direction," which "was . . . impermissible under the AT1's governing terms." Compl. ¶¶ 63, 77. These allegations are insufficient to state a claim for conversion. "A claim of conversion under New York law 'cannot be predicated on a mere breach of contract.'" *Rynasko* v. *New York Univ.*, 63 F.4th 186, 196 (2d Cir. 2023) (quoting *Jeffers* v. *Am. Univ. of Antigua*, 125 A.D.3d 440, 443 (1st Dep't 2015)); *see also Citadel Mgmt., Inc.* v. *Telesis Tr., Inc.*, 123 F. Supp. 2d 133, 148 (S.D.N.Y. 2000).

So "[w]here a conversion claim is grounded in a contractual dispute, the plaintiff must show acts that were unlawful or wrongful as opposed to mere violations of contractual rights." *In re Refco Sec. Litig.*, 759 F. Supp. 2d 301, 327 (S.D.N.Y. 2010). But plaintiffs do not allege that the FINMA write-down order was wrongful for some reason independent of its supposed violation of the note terms. That failure dooms the claim. *See Rolls-Royce Motor Cars, Inc.* v. *Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996) (dismissing conversion claims because "[i]n identifying the dealer agreement as the source of its allegedly superior right of possession, plaintiff tacitly admits that it is seeking to enforce a contract right").

There is another problem with the claim. "An action for conversion under New York law is insufficient as a matter of law unless it is alleged that the money converted was in specific funds of which claimant was the owner and entitled to immediate possession." *Rynasko*, 63 F.4th at 196. Plaintiffs allege that Switzerland converted their beneficial interests in AT1 notes "registered with—and which cleared through—DTC." Compl. ¶¶ 11, 75. But securities deposited with DTC are registered in DTC's nominee's name and "held in fungible bulk for the benefit of its participants and their customers." Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries, 69 Fed. Reg. 70852, 70854 (Dec. 7, 2004); *see also* 4 Thomas Lee Hazen, *Law of Sec. Reg.* § 14:22 (8th ed. 2024). Because the complaint does not allege that plaintiffs' alleged beneficial note interests "were segregated or otherwise specifically identifiable" as theirs, it fails to state a claim for conversion. *Rynasko*, 63 F.4th at 196.

### B.    The complaint fails to state a claim under N.Y. General Business Law § 349

N.Y. Gen. Bus. Law § 349 prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." "The typical violation contemplated by the statute involves an individual consumer who falls victim to

misrepresentations made by a seller of consumer goods usually by way of false and misleading advertising." *Teller* v. *Bill Hayes, Ltd.*, 630 N.Y.S.2d 769, 773 (2d Dep't 1995). The complaint alleges that FINMA's write-down order to Credit Suisse was a "deceptive" act that violated § 349 because it "caused Credit Suisse to deceptively promise that it would pay the AT1s based on certain terms set in advance but fail to keep that promise." Compl. ¶¶ 80, 81.

These allegations do not sustain a claim under § 349. The complaint does not allege that Switzerland "conduct[ed] . . . any business, trade or commerce" or "furnish[ed] . . . any service in this state." § 349. Nor does the complaint allege facts to support "a prima facie case under § 349"—that "(1) the defendant's deceptive acts were directed at consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio* v. *Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000). The complaint alleges no materially misleading statement in the write-down order, let alone one directed to consumers. To the contrary, the complaint acknowledges that FINMA "issued the Write-Down Direction *to Credit Suisse*." Compl. ¶ 59 (emphasis added). *See Rand* v. *Travelers Indem. Co.*, 637 F. Supp. 3d 55, 72 (S.D.N.Y. 2022) (dismissing § 349 claim because the plaintiff did not "plausibly allege she was ever exposed to any purportedly deceptive misrepresentation"); *Int'l Design Concepts, LLC* v. *Saks Inc.*, 486 F. Supp. 2d 229, 239 (S.D.N.Y. 2007) (dismissing § 349 claim because the plaintiff "failed to allege any conduct on the part of defendants which is . . . consumer-oriented").

## CONCLUSION

For the foregoing reasons, the Court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) and (2) for lack of jurisdiction or under the *forum non conveniens* doctrine. In the alternative, the Court should dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Dated:  December 4, 2024             WACHTELL, LIPTON, ROSEN & KATZ
        New York, New York

                                     By:

                                     William Savitt
                                     Anitha Reddy
                                     Alexis J. Abboud

                                     51 West 52nd Street
                                     New York, New York 10019
                                     Telephone:  (212) 403-1000
                                     Facsimile:  (212) 403-2000

                                     *Attorneys for the Swiss Confederation*

26

## CERTIFICATION OF COMPLIANCE

This memorandum complies with the page-count limit of Rule 4(c)(ii) of Judge Ho's

Individual Rules and Practices in Civil Cases because it contains 25 pages, excluding the parts of

the memorandum exempted by Rule 4(c)(iv).


Dated:  December 4, 2024                    WACHTELL, LIPTON, ROSEN & KATZ
       New York, New York

By: _____

William Savitt
Anitha Reddy
Alexis J. Abboud

51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for the Swiss Confederation*