**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

CREDITINCOME LIMITED, *et al.*,

*Plaintiffs*,

v.

THE SWISS CONFEDERATION,

*Defendant*.

---

Case No. 24-cv-4316 (DEH)

ORAL ARGUMENT
REQUESTED

# THE SWISS CONFEDERATION'S MEMORANDUM OF LAW
# IN SUPPORT OF ITS MOTION TO DISMISS THE AMENDED COMPLAINT

WACHTELL, LIPTON, ROSEN & KATZ
51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for the Swiss Confederation*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ..................................................................................................... 1

BACKGROUND ...................................................................................................... 2

    A.    Credit Suisse and its governing regulations ........................................ 2

    B.    The AT1 notes issued by Credit Suisse .............................................. 4

    C.    The write-down of Credit Suisse AT1 notes ...................................... 5

    D.    Legal proceedings in Switzerland ...................................................... 8

    E.    This action ........................................................................................... 8

ARGUMENT ............................................................................................................ 8

    I.    THE COURT LACKS JURISDICTION BECAUSE SWITZERLAND IS
           IMMUNE FROM SUIT ................................................................................ 8

           A.    The FINMA write-down order was not an act taken in connection with a
                commercial activity of Switzerland .................................................. 10

           B.    The FINMA write-down order did not cause a direct effect in the United
                States .................................................................................................. 15

    II.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF A SWISS
           FORUM ........................................................................................................ 17

    III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF ............................ 22

CONCLUSION ........................................................................................................ 25

# TABLE OF AUTHORITIES

**Page**

**Cases:**

*Abramoski* v. *State*,
   146 A.D.3d 1063 (3d Dep't 2017) .............................................................................24

*Aenergy, S.A.* v. *Republic of Angola*,
   31 F.4th 119 (2d Cir. 2022) ..............................................................17, 18, 19, 20

*Aetna Casualty & Surety Co.* v. *Aniero Concrete Co.*,
   404 F.3d 566 (2d Cir. 2005)................................................................................24

*Arch Trading Corp.* v. *Republic of Ecuador*,
   839 F.3d 193 (2d Cir. 2016)......................................................................... 9 & n.2

*Ashland Inc.* v. *Morgan Stanley & Co.*,
   652 F.3d 333 (2d Cir. 2011)................................................................................25

*In re Alcon S'holder Litig.*,
   719 F. Supp. 2d 263 (S.D.N.Y. 2010)..................................................................18

*Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero)*,
   600 F.3d 171 (2d Cir. 2010)...................................................9, 10, 12, 13, 14, 15

*Bahgat* v. *Arab Republic of Egypt*,
   2015 WL 13654006 (S.D.N.Y. Mar. 31, 2015) ....................................................21

*Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*,
   961 F.3d 193 (2d Cir. 2020)....................................................................8, 11, 12

*Bates* v. *Abbott Labs.*,
   727 F. Supp. 3d 194 (N.D.N.Y. 2024) .................................................................25

*Corsello* v. *Verizon N.Y., Inc.*,
   18 N.Y.3d 777 (N.Y. 2012) .................................................................................25

*Daou* v. *BLC Bank, S.A.L.*,
   42 F.4th 120 (2d Cir. 2022) .............................................................................15, 16

*Garb* v. *Republic of Poland*,
   440 F.3d 579 (2d Cir. 2006)............................................................................14, 15

*Guirlando* v. *T.C. Ziraat Bankasi A.S.*,
   602 F.3d 69 (2d Cir. 2010)..................................................................................16

*Int'l Design Concepts, LLC* v. *Saks Inc.*,
    486 F. Supp. 2d 229 (S.D.N.Y. 2007)...................................................25

*Jeffers* v. *Am. Univ. of Antigua*,
    125 A.D.3d 440 (1st Dep't 2015) ......................................................22

*LaSala* v. *UBS, AG*,
    510 F. Supp. 2d 213 (S.D.N.Y. 2007)................................................21

*Magi XXI, Inc.* v. *Stato della Citta del Vaticano*,
    714 F.3d 714 (2d Cir. 2013).............................................................17

*Matar* v. *Dichter*,
    500 F. Supp. 2d 284 (S.D.N.Y. 2007)..........................................16 n.3

*Maurizio* v. *Goldsmith*,
    230 F.3d 518 (2d Cir. 2000).............................................................25

*Pollux Holding Ltd.* v. *Chase Manhattan Bank*,
    329 F.3d 64 (2d Cir. 2003)...............................................................18

*R. Maganlal & Co.* v. *M.G. Chem. Co.*,
    942 F.2d 164 (2d Cir. 1991).............................................................17

*Rand* v. *Travelers Indem. Co.*,
    637 F. Supp. 3d 55 (S.D.N.Y. 2022).................................................25

*Republic of Argentina* v. *Weltover, Inc.*,
    504 U.S. 607 (1992)...................................................10, 11, 12, 15

*Roche Diagnostics GmbH* v. *Enzo Biochem, Inc.*,
    992 F. Supp. 2d 213 (S.D.N.Y. 2013)...............................................23

*Rolls-Royce Motor Cars, Inc.* v. *Schudroff*,
    929 F. Supp. 117 (S.D.N.Y. 1996) ...................................................23

*Rong* v. *Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006)..........................................................13

*Rynasko* v. *New York Univ.*,
    63 F.4th 186 (2d Cir. 2023) .........................................................22, 23

*Schertenlieb* v. *Traum*,
    589 F.2d 1156 (2d Cir. 1978).......................................................21, 22

*Schur* v. *Dougan*,
    2024 WL 4252647 (S.D.N.Y. Sept. 19, 2024)..........................................................................17

*Star Colbert* v. *Dougan*,
    724 F. Supp. 3d 304 (S.D.N.Y. 2024)..................................................17, 18, 19, 20, 21, 22

*Teller* v. *Bill Hayes, Ltd.*,
    213 A.D.2d 141 (2d Dep't 1995) .........................................................................................24

*United States* v. *Moseley*,
    980 F.3d 9 (2d Cir. 2020)......................................................................................................21

**Statutes and Rule:**

Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*..........................................8
    28 U.S.C. § 1603(a) ...............................................................................................................8
    28 U.S.C. § 1603(d) .........................................................................................................10, 12
    28 U.S.C. § 1604 ....................................................................................................................8
    28 U.S.C. § 1605(a)(2).............................................................................................9, 10, 14, 15

N.Y. Gen. Bus. Law § 349...............................................................................................8, 23, 24, 25

Fed. R. Civ. P. 12:
    Rule 12(b)(1).........................................................................................................................25
    Rule 12(b)(2).........................................................................................................................25
    Rule 12(b)(6).........................................................................................................................25

Fed. R. Evid. 604 ....................................................................................................................9 n.2

**Other Authorities:**

4 Thomas Lee Hazen, *Law of Sec. Reg.* § 14:22 (8th ed. 2024) .................................................23

Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries,
    69 Fed. Reg. 70852 (Dec. 7, 2004) .....................................................................................23

**INTRODUCTION**

Plaintiffs bring this action against the Swiss Confederation (Switzerland) to recover alleged losses on canceled debt instruments, so-called "AT1" notes, which are specifically designed to absorb losses in a crisis. The Swiss Confederation neither issued nor guaranteed those notes. Rather, the notes were issued by Credit Suisse, a Swiss bank important to the global banking system. Under the note terms, which were expressly governed by Swiss law, the notes could be "written down"—permanently canceled—by Credit Suisse if FINMA, the Swiss banking regulator, determined that either a write-down of the notes or extraordinary government assistance was necessary to allow Credit Suisse to avoid insolvency or bankruptcy, to timely pay its debts, or to carry on its business. In March 2023, Credit Suisse suffered a financial crisis and could not be stabilized, despite multiple emergency loans by the Swiss government. The Swiss government concluded that a rescue acquisition by UBS, the other global systemically important Swiss bank, best served Switzerland's interests in preserving domestic and international financial stability. Consequently, the Federal Council—Switzerland's highest executive authority—enacted ordinances that authorized extraordinary state support of more than CHF 100 billion in additional central bank liquidity assistance to Credit Suisse and that waived legal requirements otherwise applicable to a merger. In those ordinances, the Federal Council also confirmed FINMA's authority to order Credit Suisse to write down its Additional Tier 1 (AT1) instruments upon the emergency parliamentary approval of the federal default guarantee for the liquidity assistance.

Plaintiffs claim that FINMA's order to Credit Suisse violated the terms of the notes and that the Swiss government is therefore liable for the nominal value of their alleged note interests. But as a foreign state, Switzerland is entitled to sovereign immunity from suit unless this action falls within a statutory exception to immunity recognized in the Foreign Sovereign Immunities

Act.  Plaintiffs contend that Switzerland is not entitled to immunity because its facilitation of the merger was "commercial" activity.  But as the above description of Switzerland's actions shows, it acted as a regulator of the marketplace, not a private player within it.  Its actions were thus quintessentially regulatory, not "commercial."

Switzerland's immunity from suit provides a clear ground for dismissal.  A second ground for dismissal, equally clear, is the *forum non conveniens* doctrine.  Analysis under that doctrine, balancing private and public interests, overwhelmingly favors the Swiss courts as the most sensible, the most efficient, the most convenient forum for adjudication of this dispute—a dispute under Swiss law, against the Swiss government, for allegedly violating the terms of notes issued by a Swiss bank and subject to Swiss choice-of-law and forum-selection clauses.  Indeed, this Court has already twice ordered *forum non conveniens* dismissals of actions brought by former Credit Suisse AT1 noteholders, finding it "obvious" that a Swiss court is the proper forum for their claims.  Whether considered as a question of sovereign immunity or the most convenient forum, this suit belongs in Switzerland, not New York.

And in any event, this suit cannot proceed in New York.  The allegations of the complaint do not state a claim under New York law against the Swiss government for the action of a Swiss regulatory agency against a Swiss bank.  One way or another, this action should be dismissed.

## BACKGROUND

This background is drawn from allegations of the amended complaint, documents cited in and relied on in that complaint, and documents that may otherwise be considered on this motion.

### A.    Credit Suisse and its governing regulations

The "massive public support provided" to global systemically important banks here and abroad "to prevent their failure during the 2008 crisis shattered th[e] perception" that such banks "were unlikely to fail."  Martin J. Gruenberg, Chairman, FDIC, Remarks at the Peterson Institute

for Int'l Economics (Apr. 10, 2024) (cited in Compl. (ECF No. 44) ¶ 74 & n.18).  In response to the crisis, the Bank for International Settlements, an organization of central banks, created a regulatory framework known as "Basel III," which strengthened supervision of international banks and "impos[ed] more protective minimum capital ratios."  Compl. ¶¶ 74, 76.

In particular, Basel III required that a bank's capital instruments fully absorb losses at the so-called "point of non-viability" before taxpayers are exposed to loss.  FINMA, FINMA Report: Lessons Learned from the CS Crisis 80 (Dec. 19, 2023), https://tinyurl.com/48whnrva [hereinafter FINMA Report] (cited in Compl. *passim*).  Basel III ranks Common Equity Tier 1 capital (CET1) as the highest quality of regulatory capital, then Additional Tier 1 capital, then Tier 2 capital.  *See* Bank for International Settlements, Definition of Capital in Basel III at 1 (June 27, 2019), https://www.bis.org/fsi/fsisummaries/defcap_b3.pdf.  Basel III's "PoNV [point of non-viability] condition requires all AT1 and Tier 2 instruments to be capable of being converted into common equity or written off."  *Id.* at 2.  "The trigger for the conversion/write-off is the earlier of (i) a decision of the relevant authority that the conversion/write-off is necessary, given that the bank is assessed to be non-viable; and (ii) a decision to inject public funds to prevent the bank's failure." *Id.*  Accordingly, "the terms of AT1s generally provide that, under certain, expressly enumerated conditions (generally tied to the bank's capital position and financial viability), the [AT1] bonds can be written down to zero or converted into equity."  Compl. ¶ 77.

Until it was acquired, Credit Suisse Group AG ("Credit Suisse") was incorporated and headquartered in Switzerland.  Compl. ¶ 80.  As a systemically important bank, it was subject to Basel III, as implemented by Swiss law, and to the supervision and oversight of Swiss government authorities, including the Swiss Financial Market Supervisory Authority (FINMA), the agency charged with "ensur[ing] the proper functioning of the financial markets."  Compl. ¶¶ 66, 74;

3

FINMA Report 10.

**B.     The AT1 notes issued by Credit Suisse**

The AT1 notes issued by Credit Suisse were "contingent" or "trigger" capital instruments whose principal amount would be written down to zero upon specified triggering events.  *See* Compl. ¶¶ 76, 78 (alleging that the note terms "provided that," if triggered, the notes "could only be written down, not converted into equity"); *see also* Bundesgesetz über die Banken und Sparkassen [Federal Act on Banks and Savings Banks], SR 952.0, art. 11 (authorizing, subject to conditions, a bank's issuance of such instruments).  The terms provide that if a "Write-down Event" occurs, then "the full principal amount of each Note will be written down to zero," "the Holders will be deemed to have irrevocably waived their rights to, and will no longer have any rights against the Issuer with respect to, repayment of the aggregate principal amount of the Notes," and the Notes will "be permanently cancelled."  Reddy Decl. Ex. 9, Credit Suisse AT1 Notes Terms and Conditions pt. A, § 7(b)(i)-(iv) (June 23, 2022) [hereinafter "Note Terms"].[1]

A "Write-down Event" is defined as either a "Contingency Event" or a "Viability Event." *Id.* § 7(a)(i).  A Contingency Event occurs if CET1 capital falls below the requisite threshold, unless the "Regulator"—defined as FINMA—agrees that the level of such capital has been, or imminently will be, restored to an adequate level.  *See id.* § 7(a)(ii).  A Viability Event occurs if the "Regulator" determines that either a write-down of the notes or extraordinary support from the public sector was or is necessary to prevent Credit Suisse from becoming "insolvent, bankrupt, unable to pay a material part of its debts as they fall due or unable to carry on its business."  *Id.*

---

[1] The prospectuses, including the terms and conditions, for the issuances of Credit Suisse AT1 notes registered with DTC are attached as Exs. 1 to 9 to the Declaration of Anitha Reddy.  *See* Compl. ¶ 11 (alleging that plaintiffs' claims arise from such notes).  As relevant to this motion, the prospectuses are the same.  This brief cites as illustrative the last prospectus, Ex. 9.

§ 7(a)(iii)(A), (B), § 18; *see also* Compl. ¶ 115 & n.79.  If a Write-down Event occurs, Credit Suisse must notify registered noteholders and specify its date.  *Id.* § 7(a)(ii), (iii).

The prospectuses for the notes contained extensive disclosure of "risk factors" for potential purchasers to consider.  Reddy Decl. Ex. 9, Credit Suisse AT1 Notes Prospectus 10-44 (June 23, 2022).  That disclosure stated that "[t]he occurrence of a Viability Event, and a Write-down resulting therefrom, is subject to, *inter alia*, a subjective determination by the Regulator," *i.e.*, FINMA, and that, "[a]s a result, the Regulator may require and/or the federal government may take actions contributing to the occurrence of a Write-down in circumstances that are beyond the control of CSG and with which CSG does not agree."  *Id.* at 12.  And it cautioned that "[t]he Notes will be the obligations of CSG only and Holders must solely look to CSG for the performance of CSG's obligations under the Notes."  *Id.* at 19; *see also id.* ("[t]he Notes will not be covered by any government compensation or insurance scheme" or "any government guarantee").

The note terms provide that they "are governed by, and shall be construed in accordance with, the laws of Switzerland" and that "[a]ny dispute that might arise based" on them "shall fall within the exclusive jurisdiction of the Courts of the City of Zurich."  Note Terms pt. A, § 19.

### C.    The write-down of Credit Suisse AT1 notes

By 2022, Credit Suisse had spent more than a decade enmeshed in fraud and corruption scandals, paid billions in regulatory fines and penalties, and been the target of extensive civil litigation.  Compl. ¶¶ 81-85.  Then, in October 2022, it suffered the first of several bank runs: customers withdrew more than CHF 100 billion by the end of the year.  *Id.* ¶¶ 86, 89.  In early October 2022, supervision of Credit Suisse was transferred to a FINMA "crisis" unit; from then on "there was daily interaction" between FINMA and Credit Suisse.  *Id.* ¶ 89; FINMA Report 34.

On March 10, 2023, Silicon Valley Bank failed after a bank run, spooking global markets.  By March 13, Credit Suisse's stock price had dropped to less than $2.50, an all-time low.  *See*

Compl. ¶ 90 & n.35.  On March 15, the Swiss National Bank (SNB) and FINMA issued a joint statement explaining that "the SNB will provide liquidity" to Credit Suisse "if necessary," and that FINMA and SNB "are in close contact with the Federal Department of Finance to ensure financial stability."  Press Release, SNB and FINMA Issue Statement on Market Uncertainty (Mar. 15, 2023), https://tinyurl.com/33nypddp (cited in Compl. ¶ 116 & n.80).

The same day, March 15, representatives of the Swiss government, the Swiss National Bank, and FINMA met with representatives of UBS Group AG ("UBS") and asked if UBS was willing to rescue Credit Suisse by acquiring it.  *See* Compl. ¶ 96 & n.49 (citing UBS, Amendment No. 4 to Registration Statement (Form F-4/A) 44 (June 9, 2023) [hereinafter UBS, Registration Statement]).  The government representatives stated that a rescue of Credit Suisse through a UBS "takeover" was, in their view, the option that would be "most successful in reassuring markets and minimizing negative fallout."  UBS, Registration Statement 44.  Unless a merger was agreed by March 19, they said, Credit Suisse would have to be placed into "Resolution"—a restructuring— or bankruptcy.  Compl. ¶¶ 3, 96  & n.49 (citing UBS, Registration Statement 44); FINMA Report 19-20.  UBS representatives responded that UBS was willing to consider an acquisition "only . . . with the necessary governmental engagement and support in Switzerland and other key jurisdictions."  UBS, Registration Statement 45.

Despite the statement issued by the Swiss National Bank and FINMA, "depositors[] lack[ed] . . . confidence in Credit Suisse."  Compl. ¶ 91.  By March 16, the Swiss National Bank had extended CHF 50 billion in emergency loans to Credit Suisse.  *Id.* ¶ 97.  The same day, the Federal Council enacted an emergency ordinance authorizing the Swiss National Bank to make more than CHF 100 billion in additional liquidity assistance loans to Credit Suisse and specifying the conditions under which the federal government would grant a default guarantee on those loans.

*See* Verordnung über zusätzliche Liquiditätshilfe-Darlehen und die Gewährung von Ausfallgarantien des Bundes für Liquiditätshilfe-Darlehen der Schweizerischen Nationalbank an systemrelevante Banken [Ordinance on Additional Liquidity Assistance Loans and the Granting of Federal Default Guarantees for Liquidity Assistance Loans from the Swiss National Bank to Systemically Important Banks] [hereinafter Emergency Ordinance], SR 952.3.  Three days later, the Federal Council amended the ordinance to institute further extraordinary measures to stabilize Credit Suisse and facilitate a merger with UBS.  *See* Compl. ¶ 121 & n.88.  These measures waived legal requirements otherwise applicable to a merger and extended a loss protection guarantee to UBS, up to CHF 9 billion, that covered certain Credit Suisse assets.  *See* Compl. ¶¶ 108, 121; FINMA Report 39-40 ("Based on the [amended ordinance], the federal government . . . put in place measures to shore up CS's solvency in order to safeguard financial stability and the Swiss economy as well as to facilitate the merger with UBS within the framework of an overall package.").

The amended ordinance also confirmed FINMA's authority to order Credit Suisse to write down its Additional Tier 1 capital if Credit Suisse was granted liquidity assistance loans secured by a federal default guarantee.  *See* Compl. ¶ 121 (quoting Emergency Ordinance, SR 952.3, art. 5a ("At the time of the credit approval in accordance with Article 5, FINMA may order the borrower and the financial group to write down additional Tier 1 capital.")).  Following the enactment of the amended ordinance, FINMA ordered Credit Suisse to write down its AT1 regulatory capital.  Compl. ¶¶ 111, 121.

In the evening of March 19, Credit Suisse and UBS announced that they had entered into a merger agreement, with UBS agreeing to pay stock consideration valued at CHF 3 billion, equivalent to approximately $3.4 billion.  Compl. ¶ 108.

### D.    Legal proceedings in Switzerland

The Swiss Federal Administrative Court is presently adjudicating "approximately 230 appeals, involving roughly 2500 appellants," seeking to overturn the FINMA write-down order to Credit Suisse.  Press Release, Swiss Federal Administrative Court, Press Release Regarding Strike-off Decision B-2254/2023 of 15 May 2023 (May 23, 2023), https://www.bvger.ch/media-releases/17ef53e2-d002-4b4f-8457-1f7d54953153/en/mm_b-2254-2023_en_web.pdf.

### E.    This action

Plaintiffs are alleged former holders of beneficial interests in Credit Suisse AT1 notes. Compl. ¶ 11.  Thirty-four are foreign residents or entities organized under foreign law; the remaining entities, almost all mutual funds, are organized under U.S. state law.  *Id.* ¶¶ 12-58.  The complaint asserts three claims against Switzerland: (1) conversion, or, solely in the alternative, tortious interference with contract; (2) a claim under N.Y. General Business Law § 349; and (3) unjust enrichment.  *Id.* ¶¶ 127-147.  As relief, plaintiffs seek $372,330,000, allegedly the nominal value of their note interests.  *Id.* at 38.

## ARGUMENT

## I.    THE COURT LACKS JURISDICTION BECAUSE SWITZERLAND IS IMMUNE FROM SUIT

The Foreign Sovereign Immunities Act of 1976, 28 U.S.C. § 1602 *et seq.*, provides the "sole basis" for obtaining jurisdiction over a foreign sovereign in the United States.  *Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193, 199 (2d Cir. 2020).  Under the Act, a "foreign state shall be immune from the jurisdiction of the courts of the United States and of the States" unless one of the enumerated exceptions applies.  § 1604.  Plaintiffs acknowledge that Switzerland is a foreign state, as defined in the FSIA, Compl. ¶ 59 (citing § 1603(a)), and so bear "the burden . . . to show that a FSIA-enumerated exception to sovereign

immunity applies," *Anglo-Iberia Underwriting Mgmt. Co.* v. *P.T. Jamsostek (Persero)*, 600 F.3d 171, 175 (2d Cir. 2010); *see also Arch Trading Corp.* v. *Republic of Ecuador*, 839 F.3d 193, 199-200 (2d Cir. 2016) (explaining that "the plaintiff has the burden of going forward with evidence" on disputed factual issues, while "the foreign sovereign shoulders the burden of persuasion on the ultimate question of subject matter jurisdiction").

Plaintiffs assert that the third clause of the "commercial activity" exception of § 1605(a)(2) applies to this case. *Id.* ¶ 61. That exception provides that a foreign state is not immune from suit in any case

> in which the action is based [1] upon a commercial activity carried on in the United States by the foreign state; or [2] upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or [3] upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States.

The existence of jurisdiction under the third clause thus depends on whether this action is "based . . . upon an act outside the territory of the United States," that was taken "in connection with a commercial activity" of Switzerland outside this country, and that "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). Plaintiffs allege that their "claims are 'based . . . upon' the Write-Down Direction" FINMA made to Credit Suisse.[2] Compl. ¶ 62. But that act of

---

[2] The complaint, selectively and misleadingly, purports to quote or paraphrase an "unofficial English translation" of a report issued by a commission created by the Federal Assembly (the Swiss parliament) to review the actions of Swiss federal authorities in connection with the Credit Suisse crisis. *See* Compl. ¶¶ 9, 89, 93-96, 99, 100-104, 107, 111, 113, 118-120, 125. Plaintiffs allege that the report is an "admission" of the Swiss Confederation. *See id.* ¶ 113. That is incorrect. The report itself states that the commission's investigation is political and therefore cannot bind a court, and it further recognizes that the commission's procedures differ fundamentally from those of a court. Moreover, if plaintiffs seek to rely on the report to carry their burden of production on any disputed jurisdictional matters, they are required to submit a certified translation. *See, e.g.*, *Arch Trading*, 839 F.3d at 199; *see also* Fed. R. Evid. 604.

FINMA does not establish jurisdiction under § 1605(a)(2) for two reasons. It was not taken "in connection with a commercial activity" of Switzerland. Nor did it "cause a direct effect in the United States."

### A.    The FINMA write-down order was not an act taken in connection with a commercial activity of Switzerland

The FSIA provides that "[t]he commercial character of an activity shall be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Although that instruction "leaves the critical term 'commercial' largely undefined," the FSIA "largely codifies the so-called 'restrictive' theory of foreign sovereign immunity." *Republic of Argentina* v. *Weltover, Inc.*, 504 U.S. 607, 612 (1992). Under that theory, "[a] foreign state engaging in commercial activities does not exercise powers peculiar to sovereigns; rather, it exercises only those powers that can also be exercised by private citizens." *Id.* at 614 (internal quotation marks and alterations omitted). Accordingly, "a foreign state engages in commercial activity 'when a foreign government acts, not as a regulator of a market, but in the manner of a private player within it.'" *Jamsostek*, 600 F.3d at 176 (quoting *Weltover*, 504 U.S. at 614).

Plaintiffs allege that the FINMA write-down order was an act "in connection with a commercial activity" because "it was undertaken . . . in connection with Switzerland's brokering of the Takeover [of Credit Suisse by UBS]—a commercial activity routinely performed by private parties like investment banks." Compl. ¶ 63. But Switzerland acted nothing like an investment bank in seeking to stabilize Credit Suisse and prevent a broader disruption to financial markets. The actions of the Federal Council, the Swiss National Bank, and FINMA to protect Credit Suisse's solvency and to facilitate the acquisition of Credit Suisse by UBS were all undertaken using their governmental powers. The Federal Council, exercising its constitutional authority,

enacted ordinances that authorized the Swiss National Bank to extend liquidity assistance loans worth hundreds of billions of Swiss francs, approved a federal default guarantee for CHF 100 billion of those loans, waived normally applicable legal requirements for shareholder approval of mergers, extended to UBS a CHF 9 billion loss protection guarantee covering certain assets of Credit Suisse, and confirmed FINMA's supervisory authority to order a write-down of Credit Suisse's Additional Tier 1 capital.  Emergency Ordinance, SR 952.3.  And the Swiss National Bank and FINMA acted pursuant to both those ordinances and their pre-existing statutory authority in extending extraordinary liquidity assistance to Credit Suisse and ordering a write-down of Credit Suisse AT1 capital.  *Id.*; *see, e.g.*, Federal Act on Banks and Savings Banks, SR 952.0, arts. 25, 26 (authorizing FINMA to order protective measures).  None of those actions could have been taken by an investment bank.  All were exercises of "powers peculiar to sovereigns."  *Weltover*, 504 U.S. at 614; *see also Barnet*, 961 F.3d at 199.

The actions of the Swiss government were thus quintessentially regulatory, not commercial.  Plaintiffs allege that the Swiss government's implementation of the "[Takeover] package" was nonetheless "commercial" activity because the "Takeover" was a "private-law merger" and thus a "commercial solution" to the Credit Suisse crisis.  Compl. ¶¶ 4, 63.  According to plaintiffs, it follows that the Swiss government "adopt[ed] the role of an investment bank to broker" the merger and so acted as a market participant, not a regulator.  *Id.* ¶ 4.

The Swiss government's activity, however, was not comparable to that of an investment bank, which acts at its client's direction to pursue a transaction in exchange for a fee.  The Swiss government acted not at the behest or engagement of Credit Suisse or UBS.  Rather, it acted "to safeguard CS's solvency and to assist the acquisition of CS by UBS" because it "had concluded that in the present circumstances the scenario of this takeover was the best and most reliable way

of achieving the aims . . . of protecting the creditors and the proper functioning of the financial markets" and thus safeguarding public welfare. FINMA Report 6. Importantly, even if the Swiss government's immediate objective—facilitation of the merger—could be likened to that of an investment bank, its activity to achieve that objective would not be properly classified as "commercial." Under the FSIA, the activity's "'purpose' (*i.e.*, the *reason* why the foreign state engages in the activity)" is "irrelevant." *Weltover*, 504 U.S. at 617 (discussing § 1603(d) (emphasis in original)). What matters is only the activity's "'nature' (*i.e.*, the outward form of the conduct that the foreign state performs or agrees to perform)." *Id.* The relevant question is thus "whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Jamsostek*, 600 F.3d at 177 (quoting *Weltover*, 504 U.S. at 614 (emphasis in original)).

Here, "the particular actions" the Swiss government took to facilitate an acquisition of Credit Suisse were the enactment and enforcement of laws. When a foreign state's activity takes that form, it is sovereign activity—as *Barnet* v. *Ministry of Culture & Sports of the Hellenic Republic*, 961 F.3d 193 (2d Cir. 2020), confirms. In *Barnet*, the court concluded that Greece's dispatch of a letter claiming ownership of an ancient figurine pursuant to its patrimony law was not an act taken in connection with commercial activity. *Id.* at 200-03. It so held because "the 'outward form' of Greece's 'activity' was the enactment and enforcement of laws declaring the figurine to be state property," which were neither "the *type* of actions by which a private party engages in trade and traffic or commerce," nor "analogous to a private commercial transaction." *Id.* at 201 (quoting *Weltover*, 504 U.S. at 616, 617); *see also Weltover*, 504 U.S. at 614 ("[A] foreign government's issuance of regulations . . . is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party.").

Like the plaintiff in *Anglo-Iberia Underwriting Management Co.* v. *P.T. Jamsostek (Persero)*, 600 F.3d 171 (2d Cir. 2010), plaintiffs here "mischaracterize[] the nature of" the foreign state activity at issue. *Id.* at 177. In *Jamsostek*, the plaintiff argued that a health insurer owned by Indonesia engaged in commercial activity because its services resembled those of private insurers. *Id.* at 177. The court rejected that argument because the state-owned insurer operated "as the default health insurer, under Indonesia's national social security program" and did "not sell insurance to workers or to employers in any traditional sense" or "otherwise compete in the marketplace like a private insurer." *Id.* at 177. In facilitating the acquisition of Credit Suisse, the Swiss government likewise acted in its capacity as the ultimate guardian of the stability of Swiss financial markets and the Swiss economy. As the complaint itself alleges, FINMA and other government representatives repeatedly issued "demand[s]" and "instruct[ions]" to Credit Suisse to achieve what they viewed as the best outcome for the country—hardly actions similar to those of a private M&A advisor dealing with its client. *See, e.g.*, Compl. ¶¶ 93-97. At no time did the Swiss government provide investment banking services "in any traditional sense" or "otherwise compete in the marketplace" for those services. *Jamsostek*, 600 F.3d at 177.

As the relevant authorities show, "[i]n determining whether the 'commercial activity' exception applies, the court looks to the character of the foreign state's exercise of power rather than its effects." *Rong* v. *Liaoning Province Gov't*, 452 F.3d 883, 888 (D.C. Cir. 2006); *see also Jamsostek*, 600 F.3d at 177. That remains true when—as here—the effect of the foreign state's activity is an acquisition of a private entity. *Rong* v. *Liaoning Province Government*, 452 F.3d 883 (D.C. Cir. 2006), illustrates the point. The plaintiff, who had entered into a joint venture with a Chinese city, challenged the provincial government's appropriation of his equity interests, which had been accomplished through a "takeover" of a related entity. *Id.* at 886-88. The court held that

the provincial government's activity was not "commercial," even though a private party could also take control of a private entity. *Id.* at 889-91. Rather, its activity was "quintessentially sovereign" because it had effected the "takeover" by making law—specifically, by issuing a declaration that all equity interests in the entity were "state assets." *Id.* at 889-90. As the court put it, "[a] private party in the market could not have done what the Province did here." *Id.* at 890. A private party likewise could not have done what the Swiss government did here—enact and apply ordinances to facilitate the merger of Credit Suisse and UBS and protect national financial stability. That is dispositive in determining that the Swiss government's activity was sovereign, not commercial.

Even assuming for argument's sake that the Swiss government's activity in implementing the "overall [Takeover] package" was "commercial," Compl. ¶ 63, the FINMA write-down order was not "in connection with" that activity, § 1605(a)(2). An act is "in connection with" a commercial activity "so long as there is a 'substantive connection' or a 'causal link' between them." *Jamsostek*, 600 F.3d at 178 (quoting *Garb* v. *Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006)). Plaintiffs' own allegations show that there is no such link between the FINMA write-down order and the Swiss government's implementation of the "Takeover" package. The complaint acknowledges that the amended ordinance enacted by the Federal Council on March 19, 2023 specifically confirmed FINMA's authority to order Credit Suisse to write down its Additional Tier 1 capital. *See* Compl. ¶ 121 (quoting Emergency Ordinance, SR 952.3, art. 5a ("At the time of the credit approval in accordance with Article 5, FINMA may order the borrower and the financial group to write down additional Tier 1 capital.")). The ordinance did not condition the exercise of that authority on a merger of Credit Suisse and UBS, but rather on the extraordinary state support given to Credit Suisse. Furthermore, the complaint itself emphasizes, as an alternative to the "Takeover," a "Resolution solution"—*i.e.*, a government-supervised

restructuring plan—that was "ready for signature" on March 19, 2023.   Compl. ¶ 89 & n.34 (quoting FINMA Report 20).   Under that Resolution plan, "[t]he AT1 instruments would also have been completely written off, with the result that the AT1 creditors would also have lost their entire investment with this option."   FINMA Report 19.   Indeed, as FINMA explained, an AT1 write-down also would have occurred in the other alternative scenarios—nationalization or bankruptcy of Credit Suisse.   *See id.* at 20.   Thus, neither FINMA's authority to issue the write-down order nor its exercise of that authority was "in connection with" the merger or any alleged "commercial activity" to facilitate the merger.   *See Jamsostek*, 600 F.3d at 178 (quoting *Garb*, 440 F.3d at 587).

### B.   The FINMA write-down order did not cause a direct effect in the United States

The FINMA write-down order did not "cause[] a direct effect in the United States." 28 U.S.C. § 1605(a)(2).   The "commercial activity" exception therefore does not apply to this case, even assuming that the write-down order was an act "in connection with a commercial activity." *Id.*   According to plaintiffs, the write-down order "proximately and inexorably caused the complete loss of [their] beneficial interests in the AT1s."   Compl. ¶ 62.   And, they allege, because those beneficial interests "were held in New York by DTC," a securities depository corporation, "[t]his total loss of all proprietary value . . . constitutes a direct effect on intangible property held in the United States."   *Id.* ¶ 64.

Contrary to plaintiffs' assertion, the effect of the FINMA write-down order on their alleged AT1 interests was far from direct.   An effect is "direct" for purposes of the commercial activity exception "if it follows as an immediate consequence of the defendant's activity."   *Daou* v. *BLC Bank, S.A.L.*, 42 F.4th 120, 135 (2d Cir. 2022) (quoting *Weltover*, 504 U.S. at 618).   "[T]he mere fact that a foreign state's commercial activity outside of the United States caused physical or financial injury to a United States citizen is not itself sufficient to constitute a direct effect in the

United States." *Id.* (quoting *Guirlando* v. *T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 78 (2d Cir. 2010)).  Here, most of the plaintiffs are not even American entities, with no alleged connection to the United States other than their claimed interests in notes registered with DTC.  *See* Compl. ¶¶ 12-19.  In any event, the effect of the write-down order on plaintiffs' alleged AT1 interests was indirect, not "immediate."  *Daou*, 42 F.4th at 135.

Plaintiffs acknowledge that FINMA, as "Switzerland's financial regulator," "issued the Write-Down direction to Credit Suisse" in Switzerland, not to any person or entity in the United States.  Compl. ¶ 111.  Under the terms of the AT1 notes registered with DTC, Credit Suisse was then obligated to notify registered noteholders that a "Write-down Event" had occurred, resulting in the permanent cancellation of the notes on the noticed write-down date.  *See* Note Terms pt. A, § 7(a)(ii)-(iii), (b)(i)-(iv).  As alleged holders of beneficial note interests, plaintiffs were "Indirect Holders" under the terms of the notes.  *See id.* pt. A, § 18.  And as such, they were neither the subject of the FINMA write-down order nor recipients of any notice by Credit Suisse.  Indeed, as "Indirect Holders," they generally had no rights under the notes.  *See id.*

As the foregoing shows, the loss of plaintiffs' alleged beneficial interests in AT1 notes was not "an immediate consequence" of the FINMA write-down order.  *Daou*, 42 F.4th at 135.  The "direct effect" of the order was on Credit Suisse, a Swiss bank subject to FINMA's regulatory jurisdiction and the only recipient of the order.  *Id.*  Plaintiffs' alleged loss was merely the ultimate consequence of Credit Suisse's decision to issue a write-down notice to registered noteholders, as contemplated by the note terms.[3]

---

[3] Because exercising jurisdiction over a foreign state implicates U.S. foreign policy interests, a court may invite the State Department to submit a statement of interest regarding a motion for dismissal under the FSIA.  *See, e.g.*, *Matar* v. *Dichter*, 500 F. Supp. 2d 284, 287 (S.D.N.Y. 2007), *aff'd*, 563 F.3d 9 (2d Cir. 2009) (dismissing complaint after inviting the State Department to "state its views, if any" on a motion for dismissal under the FSIA).

## II.    THE COURT SHOULD DISMISS THIS ACTION IN FAVOR OF A SWISS FORUM

Irrespective of whether the Court has jurisdiction over this action, the Court may—and should—apply the *forum non conveniens* doctrine to dismiss it in favor of a Swiss forum.  *See Magi XXI, Inc.* v. *Stato della Citta del Vaticano*, 714 F.3d 714, 720 n.6 (2d Cir. 2013) (dismissing action under *forum non conveniens* doctrine without reaching the question of jurisdiction under the FSIA because a "non-merits ground for dismissal," such as *forum non conveniens*, permits the court to "bypass[] questions of subject-matter and personal jurisdiction").

"The central purpose of a *forum non conveniens* inquiry is to determine where trial will be most convenient and will serve the ends of justice."  *Star Colbert* v. *Dougan*, 724 F. Supp. 3d 304, 319 (S.D.N.Y. 2024) (quoting *R. Maganlal & Co.* v. *M.G. Chem. Co.*, 942 F.2d 164, 167 (2d Cir. 1991)).  Here, that analysis clearly points to the courts of Switzerland.  Indeed, this Court has already applied the *forum non conveniens* doctrine to dismiss two actions brought by former Credit Suisse AT1 noteholders.  *See Star Colbert*, 724 F. Supp. 3d at 339; *Schur* v. *Dougan*, 2024 WL 4252647, at *1 (S.D.N.Y. Sept. 19, 2024).  As the Second Circuit has explained, "the principles underlying the *forum non conveniens* doctrine apply with equal weight—indeed, in some cases perhaps with greater weight—to lawsuits against foreign states."  *Aenergy, S.A.* v. *Republic of Angola*, 31 F.4th 119, 127 (2d Cir. 2022).

To determine if dismissal is appropriate, the court (1) determines the degree of deference properly accorded the plaintiffs' choice of forum; (2) considers whether the alternative forum proposed by the defendant is adequate to adjudicate the parties' dispute; and (3) balances the private and public interests implicated in the choice of forum.  *Aenergy*, 31 F.4th at 128.

Plaintiffs' choice to sue in this Court is "entitled to little deference" because the majority of them are foreign entities.  *Star Colbert*, 724 F. Supp. 3d at 320; *see* Compl. ¶¶ 12-58.  "[W]hen

a foreign plaintiff sues in a United States forum such choice is entitled to less deference because one may not easily presume that choice is convenient." *Star Colbert*, 724 F. Supp. 3d at 320 (quoting *Pollux Holding Ltd.* v. *Chase Manhattan Bank*, 329 F.3d 64, 71 (2d Cir. 2003)). Moreover, all plaintiffs are suing as alleged former holders of interests in the AT1 notes—notes issued by a Swiss corporation and whose terms contain Swiss choice-of-law and forum-selection provisions. *See* Note Terms pt. A, § 19. It would therefore be "unreasonable" to conclude that plaintiffs "were not on notice of possible litigation in foreign courts." *Star Colbert*, 724 F. Supp. 3d at 320; *see also In re Alcon S'holder Litig.*, 719 F. Supp. 2d 263, 271 (S.D.N.Y. 2010) (according "only limited deference" to choice of U.S. forum by shareholders of a Swiss corporation and dismissing action in favor of a Swiss forum).

Switzerland easily qualifies as an adequate alternative forum. An alternative forum is adequate "if the defendants are amenable to service of process there" and "if it permits litigation of the subject matter of the dispute." *Aenergy*, 31 F.4th at 130 (quoting *Pollux*, 329 F.3d at 75). Private parties may assert civil claims against the Swiss Confederation in Swiss courts. *See* von Salis Decl. ¶¶ 8-9. And Switzerland allows litigation on the subject of this dispute. *See id.* Indeed, the Swiss Federal Administrative Court is presently adjudicating more than 230 appeals of the FINMA write-down order, involving approximately 2,500 appellants. *See* Press Release, Swiss Federal Administrative Court; *see also* von Salis Decl. ¶¶ 23-24.

Plaintiffs allege that "[t]his Court is the only forum where [they] can seek relief" because they missed the 30-day deadline that Swiss law imposes on "challenges to Switzerland's Takeover and Write-Down Direction." Compl. ¶ 122. Plaintiffs' unexplained failure to meet that alleged deadline does not render Switzerland an inadequate forum. To begin with, the 30-day deadline to which plaintiffs apparently refer is a deadline of Swiss administrative law that generally applies to

18

actions seeking to overturn the decision of a regulatory agency.  *See* von Salis Decl. ¶ 26.  By contrast, an action asserting claims for monetary relief against the Swiss Confederation is subject to a three-year statute of limitations—and that is the kind of action plaintiffs seek to bring in this Court.  *See id.*  In any event, this Court need not resolve the question of the timeliness of plaintiffs' claims under Swiss law to find that Switzerland is an adequate forum.  "[C]ourts overwhelmingly hold that analysis of a foreign legal system's statute of limitations issues is more appropriately conducted by the foreign court."  *Star Colbert*, 724 F. Supp. 3d at 327 (collecting cases).  So "the open statute of limitations questions do not render Switzerland an inadequate forum," but rather "render Switzerland the correct forum in which to resolve this dispute."  *Id.* at 327-28.  Nor does the possibility of a Swiss ruling adverse to plaintiffs on the time-bar issue undermine this conclusion.  "The courts of this country do not expand the rights available to litigants under foreign law."  *Id.* at 328.  Therefore, "if a claim arising under Swiss law is barred by limitations in Switzerland, it will be barred by limitations in the United States."  *Id.*

A balancing of the private and public interest factors "strongly favors" litigation in the courts of Switzerland.  *Id.* at 329.  The relevant private interests, such as the ease of access to evidence and the cost of witnesses to attend trial, are served by litigation in Switzerland.  *See Aenergy*, 31 F.4th at 132.  Plaintiffs' claims are premised on their allegation that the FINMA write-down order was "unauthorized."  Compl. ¶¶ 62, 115, 131.  Documentary evidence concerning that order is located in Switzerland, not New York.  *See Aenergy*, 31 F.4th at 133 (finding private interest factors supported dismissal where "[a]ll of the key events occurred in Angola").  And most, if not all of that evidence, will have to be translated into English for use in this Court, as English is not one of the four official languages of Switzerland.  *See* von Salis Decl. ¶ 22; *Aenergy*, 31 F.4th  at 133-34 (finding that cost and difficulty of translating documents and witness testimony

weighs in favor of dismissal).  Such evidence would also have to be collected "in a manner . . . compliant with Swiss legal restrictions," including the Hague Convention of March 18, 1970 on the Taking of Evidence Abroad in Civil or Commercial Matters.  *Star Colbert*, 724 F. Supp. 3d at 330; *see* von Salis Decl. ¶¶ 12, 16-21.  As this Court concluded in another case brought by former Credit Suisse AT1 noteholders, "this massive inefficiency and inconvenience that using the Hague Evidence Convention would create . . . is all the more striking given the existence of an alternative forum where many of these problems would not arise."  *Star Colbert*, 724 F. Supp. 3d at 332 (internal quotation marks and alterations omitted); *see also* von Salis Decl. ¶¶ 10-11.

Litigation in this Court will require the Swiss government to bear the travel costs of its witnesses, and travel to New York will diminish the time they would otherwise spend on their official duties.  *See Star Colbert*, 724 F. Supp. 3d at 331 (concluding that, given the cost and complexity of "attempting to compel [Swiss government] officials to travel to the Southern District, it is far more convenient for the case to instead proceed within the Swiss court system"); *Aenergy*, 31 F.4th at 133 (finding no error in "giving priority to the availability of Angolan state officials" because "[t]he Angolan government is at the heart of this case").  Furthermore, the United States and Switzerland do not have a treaty providing for the reciprocal recognition of judgments, and the Swiss Confederation's governmental status poses additional hurdles to the enforcement in Switzerland of a judgment issued by a U.S. court.  *See Star Colbert*, 724 F. Supp. 3d at 336; von Salis Decl. ¶¶ 13-15.

The relevant public interests are likewise served by litigation in Switzerland.  These include the administrative burdens of court congestion, the unfairness of imposing jury duty on a community with no relation to the litigation; the local interest in deciding local controversies; and the avoidance of difficult problems in conflict of laws and the application of foreign law.  *Aenergy*,

31 F.4th at 133.

Most relevant here, New York has "at best, limited relations to this litigation." *Star Colbert*, 724 F. Supp. 3d at 337. That is because "[t]he FINMA-ordered write-down of Credit Suisse's AT1 bonds is at the heart of this case." *Id.* Accordingly, it would be unfair to require a New York jury to spend time resolving this dispute. *See id.* "Whatever interest the United States has" in resolving this dispute, "it pales in comparison with that of Switzerland" because "Switzerland possesses a strong interest in regulating the conduct of banks within its borders." *Id.* (quoting *LaSala* v. *UBS, AG*, 510 F. Supp. 2d 213, 229 (S.D.N.Y. 2007)). And "[t]he uncontested role of the Swiss regulator in ordering the write-down of the AT1 bonds necessarily lessens the United States' interest in the litigation while further increasing that of Switzerland." *Id.* at 338.

Furthermore, plaintiffs' claims cannot be resolved without resolving issues of Swiss law, which governs not only the terms of the AT1 notes but also the scope of Switzerland's law-making and regulatory authority. *See von Salis Decl.* ¶¶ 8, 25; Note Terms pt. A, § 19(a) (Swiss choice-of-law provision); *see also United States* v. *Moseley*, 980 F.3d 9, 20 (2d Cir. 2020) ("contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction"). "[D]etermining the content of Swiss law is obviously easier at trial" in Switzerland. *Star Colbert*, 724 F. Supp. 3d at 338 (quoting *Schertenlieb* v. *Traum*, 589 F.2d 1156, 1165 (2d Cir. 1978)); *see also Bahgat* v. *Arab Republic of Egypt*, 2015 WL 13654006, at *9 (S.D.N.Y. Mar. 31, 2015), *aff'd*, 631 F. App'x 69 (2d Cir. 2016) (dismissing action after finding that public interest factors weighed in favor of an Egyptian forum where "at least some of the claims are related to the 2004 Agreement containing an Egyptian choice-of-law clause").

And while a U.S. court can undertake a determination of Swiss law, doing so "necessitates the introduction of inevitably conflicting expert evidence on numerous questions of Swiss law,

and it creates the uncertain and time-consuming task of resolving such questions by an American judge unversed in civil law tradition." *Star Colbert*, 724 F. Supp. 3d at 338-39 (quoting *Schertenlieb*, 589 F.2d at 1165). Especially given the existence of pending proceedings challenging the FINMA write-down order in Switzerland, *see* von Salis Decl. ¶¶ 23-27, and the concomitant risk of inconsistent judgments presented by parallel litigation in New York, Switzerland has the greatest interest in adjudicating this dispute. *See Star Colbert*, 724 F. Supp. 3d at 334 (concluding that "[t]he risk of inconsistent judgments," given the pending Swiss Federal Administrative Court proceedings, "weighs in favor of dismissal").

As this Court concluded in ordering a *forum non conveniens* dismissal of another action by former Credit Suisse AT1 noteholders, "[t]his case is not even close." *Id.* at 318. Plaintiffs "seek to recover for losses on bonds that were issued in Switzerland and whose terms are governed by Swiss law," that "were the subject of a mandatory write-down by order of the Government of Switzerland," and that "contain a forum-selection clause that specifies Zurich as the exclusive location for any lawsuit" based on their terms. *Id.* "In light of all this," the Court found, "the answer is obvious. New York has no business adjudicating this dispute." *Id.*

## III.    THE COMPLAINT FAILS TO STATE A CLAIM FOR RELIEF

Even if the Court determines that it has jurisdiction, and that it should exercise that jurisdiction, this action should still be dismissed for failure to state a claim.

**Conversion.** The complaint alleges that "Switzerland exercised an unauthorized dominion over the AT1s and plaintiffs' beneficial interests in them by executing the Write-Down Direction," which "violated the AT1's terms." Compl. ¶¶ 130, 132. But under New York law, a conversion claim "cannot be predicated on a mere breach of contract." *Rynasko* v. *New York Univ.*, 63 F.4th 186, 196 (2d Cir. 2023) (quoting *Jeffers* v. *Am. Univ. of Antigua*, 125 A.D.3d 440, 443 (1st Dep't

2015)); *see Rolls-Royce Motor Cars, Inc.* v. *Schudroff*, 929 F. Supp. 117, 124 (S.D.N.Y. 1996) (dismissing conversion claims because "[i]n identifying the dealer agreement as the source of its allegedly superior right of possession, plaintiff tacitly admits that it is seeking to enforce a contract right"). The complaint also alleges that the write-down order violated "Swiss law, New York law, and international law prohibitions." Compl. ¶ 132. But the complaint elsewhere acknowledges that the write-down order was expressly authorized by the emergency ordinance of the Swiss Federal Council, *id.* ¶¶ 8, 121 & n.88, and nowhere identifies what Swiss or international law was supposedly violated. And, as explained below, the complaint does not state a claim for violation of the only New York law allegedly violated—New York General Business Law § 349.

There is another problem with the claim. A conversion claim can lie only with respect to "segregated and specifically identifiable" funds "of which claimant was the owner and entitled to immediate possession." *Rynasko*, 63 F.4th at 196 (dismissing claim). But here, plaintiffs allege conversion of beneficial interests in AT1 notes registered with DTC—and securities deposited with DTC are "held in fungible bulk for the benefit of its participants and their customers." Issuer Restrictions or Prohibitions on Ownership by Securities Intermediaries, 69 Fed. Reg. 70852, 70854 (Dec. 7, 2004); *see also* 4 Thomas Lee Hazen, *Law of Sec. Reg.* § 14:22 (8th ed. 2024).

Given these apparent weaknesses in their conversion claim, plaintiffs assert— "solely in the alternative"—a claim for tortious interference with contract, alleging that the write-down order "intentionally induced" Credit Suisse to breach the terms of the AT1 notes, or made its "performance of them impossible." Compl. ¶¶ 139, 142. This claim, too, has fatal defects. Plaintiffs do not allege which terms Credit Suisse violated or otherwise failed to satisfy, let alone how Credit Suisse did so. Moreover, a defendant can be liable for this claim only if it "specifically intend[ed] to interfere with" the plaintiff's contract and did so "without justification." *Roche*

*Diagnostics GmbH* v. *Enzo Biochem, Inc.*, 992 F. Supp. 2d 213, 221 (S.D.N.Y. 2013).  But the complaint alleges nothing to show such an intent.  To the contrary, it relies on the FINMA report, which expressly explains FINMA's view that the write-off of Credit Suisse AT1 capital was "in accordance with the provisions laid down and as contractually agreed" and permitted the AT1 notes to "perform[] the function for which they were designed"—to shift risk from "taxpayers" "in the event of extraordinary state assistance or to head off insolvency" of a systemically important bank.  FINMA Report 40.  Nor does the complaint show that Switzerland, and specifically FINMA, acted "without justification" in issuing the write-down order.  Conduct is justified if it is "incidental to some other lawful purpose."  *Aetna Casualty & Surety Co.* v. *Aniero Concrete Co.*, 404 F.3d 566, 589 (2d Cir. 2005) (per curiam).  Here, FINMA was acting to advance its statutory mandate—"ensur[ing] the proper functioning of the financial markets."  FINMA Report 10.  New York courts have "uniformly rejected tortious interference claims when the alleged interference is a discretionary act taken by a public official in performance of public duties that are justifiable pursuant to statutory command."  *Abramoski* v. *State*, 146 A.D.3d 1063, 1064 (3d Dep't 2017).

**N.Y. Gen. Bus. Law § 349.**  The complaint alleges that FINMA's write-down order to Credit Suisse was a "deceptive" act that violated N.Y. General Business Law § 349.  Compl. ¶ 136.  The complaint does not sustain a claim under § 349, which prohibits "[d]eceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this state." *Teller* v. *Bill Hayes, Ltd.*, 213 A.D.2d 141, 145 (2d Dep't 1995) ("[t]he typical violation contemplated by the statute involves . . . misrepresentations made by a seller of consumer goods").  The complaint does not allege that Switzerland "conduct[ed] . . . any business, trade or commerce" or "furnish[ed] . . . any service in this state."  § 349.  Nor does the complaint allege facts to support "a prima facie case under § 349"—that "(1) the defendant's deceptive acts were directed at

consumers, (2) the acts are misleading in a material way, and (3) the plaintiff has been injured as a result." *Maurizio* v. *Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000); *see Rand* v. *Travelers Indem. Co.*, 637 F. Supp. 3d 55, 72 (S.D.N.Y. 2022) (dismissing § 349 claim because plaintiff did not allege exposure to any misrepresentation); *Int'l Design Concepts, LLC* v. *Saks Inc.*, 486 F. Supp. 2d 229, 239 (S.D.N.Y. 2007) (dismissing § 349 claim because defendants' alleged conduct was not consumer-oriented).

    **Unjust enrichment.**  Finally, the complaint alleges an unjust enrichment claim.  But such a claim is not "a catchall," but instead "available only in unusual situations when, though the defendant has not breached a contract nor committed a recognized tort, circumstances create an equitable obligation running from the defendant to the plaintiff." *Bates* v. *Abbott Labs.*, 727 F. Supp. 3d 194, 226-29 (N.D.N.Y. 2024), *aff'd*, 2024 WL 65668 (2d Cir. Jan. 10, 2025) (quoting *Corsello* v. *Verizon N.Y., Inc.*, 18 N.Y.3d 777, 790 (N.Y. 2012)).  The complaint does not allege a non-duplicative unjust enrichment claim, let alone circumstances that would make it equitable for the Swiss Confederation to bear plaintiffs' losses.  *See Ashland Inc.* v. *Morgan Stanley & Co.*, 652 F.3d 333, 339 (2d Cir. 2011) (affirming dismissal of unjust enrichment claim because "there is little in equity and good conscience that weighs in favor of the return of the [transaction] fees" to the plaintiff, "a sophisticated investor" that "failed to apprise itself of the publicly disclosed riskiness" of the instrument it purchased).

## CONCLUSION

    For the foregoing reasons, the Court should dismiss the complaint under Federal Rule of Civil Procedure 12(b)(1) and (2) for lack of jurisdiction or under the *forum non conveniens* doctrine.  In the alternative, the Court should dismiss the complaint under Rule 12(b)(6) for failure to state a claim upon which relief can be granted.

Dated:  February 21, 2025
        New York, New York

WACHTELL, LIPTON, ROSEN & KATZ

By: _____

William Savitt
Anitha Reddy
Alexis J. Abboud

51 West 52nd Street
New York, New York 10019
Telephone:  (212) 403-1000
Facsimile:  (212) 403-2000

*Attorneys for the Swiss Confederation*

26

## CERTIFICATION OF COMPLIANCE

This memorandum complies with the page-count limit of Rule 4(c)(ii) of Judge Ho's

Individual Rules and Practices in Civil Cases because it contains 25 pages, excluding the parts of

the memorandum exempted by Rule 4(c)(iv).

Dated:  February 21, 2025              WACHTELL, LIPTON, ROSEN & KATZ
        New York, New York

                                       By:

                                       William Savitt
                                       Anitha Reddy
                                       Alexis J. Abboud

                                       51 West 52nd Street
                                       New York, New York 10019
                                       Telephone:  (212) 403-1000
                                       Facsimile:  (212) 403-2000

                                       *Attorneys for the Swiss Confederation*