**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| CREDITINCOME LIMITED, *et al.*, | |
| Plaintiffs, | |
| v. | Case No.: 24-cv-04316-DEH |
| THE SWISS CONFEDERATION, | ORAL ARGUMENT REQUESTED |
| Defendant. | |

**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO THE SWISS CONFEDERATION'S MOTION TO DISMISS THE AMENDED COMPLAINT**

# <u>TABLE OF CONTENTS</u>

<u>Page</u>

PRELIMINARY STATEMENT ................................................................................................1

BACKGROUND ...................................................................................................................3

    A.    Switzerland's Commercial Efforts To Broker A Sale Of Credit Suisse ..................3

    B.    Switzerland's Write-Down Direction ......................................................................4

ARGUMENT .......................................................................................................................6

I.     PLAINTIFFS HAVE ESTABLISHED JURISDICTION UNDER THE THIRD
      CLAUSE OF THE FSIA'S COMMERCIAL ACTIVITY EXCEPTION...........................6

    A.    Switzerland's Efforts To Broker The Takeover Were Commercial.........................7

    B.    The Write-Down Direction Was Connected To Switzerland's Takeover
        Efforts. ...................................................................................................................11

    C.    The Write-Down Direction Had A Direct Effect In The United States. ................13

II.    PLAINTIFFS' SUIT CANNOT BE DISMISSED ON FORUM NON
      CONVENIENS GROUNDS..............................................................................................14

    A.    Switzerland Is Not An Adequate Alternative Forum. ...........................................15

    B.    The Other Forum Non Conveniens Factors Disfavor Dismissal. ..........................18

III.   PLAINTIFFS HAVE PROPERLY PLEADED THEIR CLAIMS FOR RELIEF.............21

CONCLUSION...................................................................................................................25

# TABLE OF AUTHORITIES

**Page**

## Cases

*135 Flat LLC v. Triadou SPY S.A.*,
  2016 WL 5945933 (S.D.N.Y. June 21, 2016) .........................................................................17

*Accent Delight Int'l Ltd. v. Sotheby's*,
  394 F. Supp. 3d 399 (S.D.N.Y. 2019) ...................................................................................19

*ADP Inv. Commc'n Servs. v. In House Att'y Servs.*,
  390 F. Supp. 2d 212 (E.D.N.Y. 2005) ...................................................................................22

*In re Air Crash Off Long Island, N.Y., on July 17, 1996*,
  65 F. Supp. 2d 207 (S.D.N.Y. 1999) .....................................................................................17

*All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*,
  190 F.3d 16 (2d Cir. 1999).....................................................................................................14

*Amusement Indus., Inc. v. Midland Ave. Assocs.*,
  820 F. Supp. 2d 510 (S.D.N.Y. 2011)....................................................................................21

*Andes Petroleum Ecuador Ltd. v. Occidental Petroleum Co.*,
  213 A.D.3d 403 (1st Dep't 2023) ..........................................................................................18

*Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*,
  59 A.D.3d 473 (2d Dep't 2009)..............................................................................................24

*Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*,
  600 F.3d 171 (2d Cir. 2010)..........................................................................................9, 10, 11

*Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*,
  571 U.S. 49 (2013) .................................................................................................................15

*Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*,
  813 F.3d 98 (2d Cir. 2016)...........................................................................................7, 13, 14

*Awadallah v. W. Union Co.*,
  2016 WL 11469858 (E.D.N.Y. Mar. 30, 2016) .....................................................................17

*Azima v. RAK Inv. Auth.*,
  305 F. Supp. 3d 149 (D.D.C. 2018)........................................................................................12

*Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan*,
  273 F.3d 241 (2d Cir. 2001)........................................................................................2, 15, 17

*Barnet v. Ministry of Culture & Sports of the Hellenic Republic*,
    961 F.3d 193 (2d Cir. 2020)......................................................................................11

*Bigio v. Coca-Cola Co.*,
    448 F.3d 176 (2d Cir. 2006)...............................................................................18, 19

*Branch of Citibank, N.A. v. De Nevares*,
    74 F.4th 8 (2d Cir. 2023) ........................................................................................24

*Breitman v. Xerox Educ. Servs., LLC*,
    2013 WL 5420532 (S.D.N.Y. Sept. 27, 2013)........................................................25

*Broad. Rts. Int'l Corp. v. Societe du Tour de France, S.A.R.L.*,
    675 F. Supp. 1439 (S.D.N.Y. 1987)........................................................................23

*Brown & Brown, Inc. v. Johnson*,
    25 N.Y.3d 364 (2015) ..............................................................................................23

*City of Almaty v. Ablyazov*,
    278 F. Supp. 3d 776 (S.D.N.Y. 2017)......................................................................21

*Com. Bank of Kuwait v. Rafidain Bank*,
    15 F.3d 238 (2d Cir. 1994)........................................................................................14

*Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración Y Producción*,
    832 F.3d 92 (2d Cir. 2016)................................................................................23, 25

*Daou v. BLC Bank, S.A.L.*,
    42 F.4th 120 (2d Cir. 2022) .....................................................................................13

*Donnelly v. Anand*,
    2022 WL 4385901 (S.D.N.Y. Sept. 22, 2022).........................................................17

*DRFP LLC v. Republica Bolivariana de Venezuela*,
    706 F. App'x 269 (6th Cir. 2017) ............................................................................11

*Emps. Ret. Sys. for City of Providence v. Rohner*,
    224 A.D.3d 439 (1st Dep't 2024) ............................................................................21

*Exp.-Imp. Bank of the Republic of China v. Grenada*,
    768 F.3d 75 (2d Cir. 2014).....................................................................................2, 7

*Fir Tree Cap. Opportunity Master Fund, LP v. Anglo Irish Bank Corp.*,
    2011 WL 6187077 (S.D.N.Y. Nov. 28, 2011)...........................................................9

*Fontana v. Republic of Argentina*,
    962 F.3d 667 (2d Cir. 2020).....................................................................................14

*Freeman v. Jacobson*,
    2021 WL 3604754 (S.D.N.Y. Aug. 13, 2021) .......................................................21

*Gerena v. Korb*,
    617 F.3d 197 (2d Cir. 2010) ..............................................................................18

*Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*,
    50 N.Y.2d 183 (1980) .......................................................................................24

*Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*,
    64 A.D.3d 85 (2d Dep't 2009) ..........................................................................22

*Holborn Corp. v. Sawgrass Mut. Ins.*,
    304 F. Supp. 3d 392 (S.D.N.Y. 2018) ..............................................................23

*Iragorri v. United Techs. Corp.*,
    274 F.3d 65 (2d Cir. 2001) .........................................................................18, 19

*Jota v. Texaco, Inc.*,
    157 F.3d 153 (2d Cir. 1998) ..............................................................................16

*Maurizio v. Goldsmith*,
    230 F.3d 518 (2d Cir.2000) ...............................................................................25

*Merlini v. Canada*,
    926 F.3d 21 (1st Cir. 2019) ...............................................................................10

*Nam v. Permanent Mission of Republic of Korea to United Nations*,
    118 F.4th 234 (2d Cir. 2024) ..............................................................................7

*New York Univ. v. Cont'l Ins.*,
    87 N.Y.2d 308 (1995) .......................................................................................22

*Norex Petroleum Ltd. v. Access Indus., Inc.*,
    416 F.3d 146 (2d Cir. 2005) .........................................................15, 16, 17, 18

*Owen v. Elastos Found.*,
    343 F.R.D. 268 (S.D.N.Y. 2023) ......................................................................20

*Pablo Star Ltd. v. Welsh Gov't*,
    961 F.3d 555 (2d Cir. 2020) ......................................................................6, 9, 10

*Pauwels v. Deloitte LLP*,
    83 F.4th 171 (2d Cir. 2023) ...............................................................................25

*Petersen Energia Inversora, S.A.U. v. Argentine Republic*,
    2016 WL 4735367 (S.D.N.Y. Sept. 9, 2016) ....................................14, 15, 20, 21

*Republic of Argentina v. Weltover, Inc.*,
    504 U.S. 607 (1992) ...................................................................................7, 8, 9, 10, 13

*Reynolds v. Xerox Educ. Servs., Inc.*,
    2014 WL 4437622 (N.D.N.Y. Sept. 9, 2014) ........................................................25

*Robinson v. Gov't of Malaysia*,
    269 F.3d 133 (2d Cir. 2001) .............................................................................6, 9

*Rong v. Liaoning Province Gov't*,
    452 F.3d 883 (D.C. Cir. 2006) ..............................................................................11

*Sahu v. Union Carbide Corp.*,
    548 F.3d 59 (2d Cir. 2008)...................................................................................13

*Schur v. Dougan*,
    2024 WL 4252647 (S.D.N.Y. Sept. 19, 2024) ................................................16, 20

*Smith v. Overseas Korean Cultural Heritage Found.*,
    279 F. Supp. 3d 293 (D.D.C. 2018) ......................................................................10

*Solomatina v. Mikelic*,
    370 F. Supp. 3d 420 (S.D.N.Y. 2019) ..................................................................22

*Star Colbert v. Dougan*,
    724 F. Supp. 3d 304 (S.D.N.Y. 2024)..........................................................16, 17, 20

*In re Terrorist Attacks on Sept. 11, 2001*,
    298 F. Supp. 3d 631 (S.D.N.Y. 2018)...................................................................25

*Unicorn Crowdfunding, Inc. v. New St. Enter.*,
    507 F. Supp. 3d 547 (S.D.N.Y. 2020) ...................................................................24

*Virtual Countries, Inc. v. Republic of South Afr.*,
    300 F.3d 230 (2d Cir. 2002)................................................................................13

*Wasserstein Perella Emerging Markets Fin., LP v. Province of Formosa*,
    2000 WL 573231 (S.D.N.Y. May 11, 2000) ...........................................................8

*Weltover, Inc. v. Republic of Argentina*,
    941 F.2d 145 (2d Cir. 1991)...................................................................................9

*Wultz v. Bank of China Ltd.*,
    910 F. Supp. 2d 548 (S.D.N.Y. 2012).....................................................................20

## **Statutes**

28 U.S.C. § 1330(a) .....................................................................................................19

iv

28 U.S.C. § 1604 ..............................................................................................................7

28 U.S.C. § 1605(a)(2) ...........................................................................................2, 7, 8, 13

Del. Code tit. 8, § 251(d) ...............................................................................................11

N.Y. C.P.L.R. § 202 ........................................................................................................18

## Treaties

Hague Convention on the Taking of Evidence Abroad in Civil or Commercial
    Matters, Mar. 18, 1970, 23 U.S.T. 2555 ...............................................................20

## Rules

Fed. R. Civ. P. 12(b)(6) ...................................................................................................21

Fed. R. Evid. 803(8) .......................................................................................................12

## Other Authorities

Restatement (First) of Conflict of Laws (1934) ...............................................................13

Restatement (Fourth) of Foreign Relations Law § 454 cmt. b (2018) .............................8

Restatement (Fourth) of Foreign Relations Law § 455 reporter's note 4 (2018) .........23

Plaintiffs respectfully submit this memorandum of law in opposition to the Swiss Confederation's ("**Switzerland**") motion to dismiss and memorandum of law in support thereof (Dkt. 85, "**Br.**") the First Amended Complaint (Dkt. 44, "**FAC**").

## PRELIMINARY STATEMENT

This case arises out of Switzerland's March 19, 2023 conversion of debt securities known as Additional Tier 1 Bonds ("**AT1s**") issued by Credit Suisse AG ("**Credit Suisse**"); beneficially owned by Plaintiffs; and held in New York at the Depository Trust Corporation ("**DTC**").

When Credit Suisse began to fail in Fall 2022, Switzerland declined to employ regulatory solutions to stave off contagion.  It instead assumed the role of an investment bank brokering the sale of Credit Suisse.  As often happens when bureaucrats playact as businessmen, Switzerland botched the job.  It cherry-picked the only remaining major Swiss bank, UBS Group AG ("**UBS**"), to buy Credit Suisse and refused to consider other buyers.  This decision allowed UBS to dictate its own terms for its "**Takeover**" of Credit Suisse: a price that was a fraction of Credit Suisse's worth, billions of dollars in Switzerland guarantees, and, as relevant here, Switzerland issuing a "**Write-Down Direction**" that wiped out the AT1s unnecessarily and without authority, in plain violation of the bondholders' rights.  This was a singular event in financial history: a $17 billion conversion by Switzerland's executive branch intended to facilitate a commercial takeover of a company that was not in bankruptcy.  But Switzerland has slammed shut its courthouse doors to any bondholder seeking to challenge the Write-Down Direction who did not file within a month of their losses.  Plaintiffs, the holders of $372 million in AT1s, thus have no choice but to hold Switzerland to account in New York, where their AT1s were held and wiped out.

Switzerland argues that this Court lacks jurisdiction under the Foreign Sovereign Immunities Act (the "**FSIA**"); should decline jurisdiction based on forum non conveniens; and should dismiss for failure to state a claim.  These arguments are unpersuasive.

1

First, this Court has subject-matter jurisdiction.  The third clause of the FSIA's commercial activity exception "allows for suits against a foreign sovereign that merely *relate to* commercial activity" and applies here.  *Exp.-Imp. Bank of the Republic of China v. Grenada*, 768 F.3d 75, 90 (2d Cir. 2014) (emphasis in original); 28 U.S.C. § 1605(a)(2).  Switzerland issued the Write-Down Direction in connection with its commercial efforts to broker the Takeover, which had a direct effect here because it canceled AT1s held and registered at the DTC in New York.  Switzerland itself has maintained the Takeover would not have happened without the Write-Down Direction, and has called its efforts a "commercial solution" and a "private-law merger."  Switzerland responds that it acted to stabilize the financial system.  But Switzerland's *reason* for acting is irrelevant.  What matters is it did not employ powers peculiar to sovereigns in brokering a sale.

Next, Switzerland urges dismissal on forum non conveniens grounds in favor of Switzerland, but this Court cannot do so because "a statute of limitations bars the bringing of the case in that forum."  *Bank of Credit & Com. Int'l (Overseas) Ltd. v. State Bank of Pakistan*, 273 F.3d 241, 246 (2d Cir. 2001) ("**BCCI**").  Switzerland required that all challenges to the Write-Down Direction be brought in an administrative proceeding within 30 days.  Decl. of Markus Müller-Chen ¶¶ 16-40 ("**Müller-Chen**").  That draconian deadline has long since passed.

Finally, Plaintiffs have plausibly alleged claims for conversion, tortious interference with contract, deceptive trade practices, and unjust enrichment.  Outside a passing assertion here and there, Switzerland does not contend that it had valid authority to issue the Write-Down Direction.  That all but resolves Switzerland's arguments: The notion that unlawfully destroying $372 million of New York bonds does not give rise to ***any*** cause of action is the height of implausibility.  In contending otherwise, Switzerland just invokes inapplicable precedent and ignores the FAC.

For all these reasons, Switzerland's motion to dismiss should be denied.

## BACKGROUND

### A.    Switzerland's Commercial Efforts To Broker A Sale Of Credit Suisse

In 2022, Switzerland determined that its former national champion, the scandal-plagued Credit Suisse, was no longer viable.  FAC ¶¶ 89-92.  Switzerland came to this conclusion long before there was a crisis and had long planned for this contingency.  *Id.* ¶¶ 85-89.  In the fourteen years since the 2008 financial crisis, the world's leading economies, including Switzerland, developed state-of-the-art "**Resolution**" restructuring solutions to save too-big-to-fail banks in a fair and predictable manner.  *Id.* ¶¶ 3, 74.  In a Resolution process, financial authorities act as receiver to restructure the banks' assets and liabilities, by, for example, liquidating portfolios, selling subsidiaries, or other necessary steps tailored to the banks' financial needs.  *Id.* ¶ 74.

Switzerland had a Resolution solution tailored to Credit Suisse's problems "ready for signature." *Id.* ¶¶ 89, 92.  Given Credit Suisse's close U.S. ties and the United States' overlapping jurisdiction over Credit Suisse, Switzerland had devised this solution in close cooperation with U.S. regulatory authorities, including the U.S. Federal Reserve Board, the Federal Depository Insurance Corporation, the U.S. Securities and Exchange Commission, the Federal Reserve Bank of New York, and the New York State Department of Financial Services.  *Id.* ¶ 125.  But Switzerland threw out the Resolution playbook and employed what it called a "commercial solution" instead:  Switzerland would act as Credit Suisse's investment bank, and broker a sale of Credit Suisse via a "private-law merger." *Id.* ¶¶ 4, 92.  A leading U.S. official later described Switzerland's decision, in a triumph of understatement, as "unhelpful." *Id.* ¶ 9.

From October 2022 through March 2023, Switzerland worked as Credit Suisse's sell-side advisor, ticking off every textbook step that an investment bank is supposed to perform. *Id.* ¶¶ 93-101.  It arranged meetings between Credit Suisse and a potential buyer; selected the buyer universe; worked with Credit Suisse to set up a "data room" with seller financial information; negotiated

with the preferred buyer on Credit Suisse's behalf; obtained foreign regulatory approvals; and negotiated the financing. *Id.* ¶¶ 93-96, 98-100. Switzerland did not legally compel UBS or Credit Suisse to deal. Instead, it induced them to cooperate by promising UBS financial guarantees and making Credit Suisse low-interest loans. *Id.* ¶ 98. Throughout this time, Switzerland also had "daily interactions" with U.S. "partner authorities." *Id.* ¶ 125.

But Switzerland made a mistake. Driven by economic nationalism and pride, Switzerland decided that the only other major Swiss bank, UBS, would be the sole bidder for Credit Suisse. *Id.* ¶¶ 5, 103-05. It did not solicit alternative bids and refused to consider alternative bidders, spurning multiple U.S. and European bids as well as one bid from major shareholders. *Id.* ¶¶ 102-04. A buyer universe of one, of course, gives the buyer all the leverage. And UBS exploited Switzerland's mistake. It conditioned its purchase of Credit Suisse on Switzerland meeting extortionary demands on price, regulatory and governance requirements, and financial and public relations support from Switzerland. *Id.* ¶¶ 106-08. Switzerland eventually caved.

On March 19, 2023, Switzerland announced that UBS would buy the once-mighty Credit Suisse for $3.4 billion, a fraction of its book value and market capitalization, while receiving billions of dollars of guarantees and a multi-billion-dollar debt write-off. *Id.* ¶¶ 6, 108. So one-sided was the deal that UBS reported Q2 2023 profits of $29 billion—the most profitable quarter any bank has ever had in history, and a 2,800% increase over the prior quarter. *Id.* ¶ 109. But someone had to subsidize UBS's gains, and that someone was AT1 bondholders like Plaintiffs.

## B.    Switzerland's Write-Down Direction

The same day the Takeover was announced, Switzerland's financial regulator, FINMA, issued the Write-Down Direction, which wiped out Credit Suisse's $17.3 billion outstanding AT1s, contingent debt instruments that can be written down under limited, defined circumstances. *Id.* ¶¶ 76, 111. Credit Suisse was legally compelled to carry out the Write-Down Direction. *Id.* DTC,

the New York securities depository where all the AT1s were registered and cleared, immediately canceled the AT1s, delisted them, and suspended clearances and settlements in them. *Id.* ¶ 111.

The Write-Down Direction was unlawful under the AT1s' governing terms. *Id.* ¶¶ 112-18. Under the AT1s' terms, a write-down was authorized only if (1) "customary measures to improve" Credit Suisse's "capital adequacy" were "inadequate or unfeasible"; (2) Credit Suisse "receive[d] an irrevocable commitment of extraordinary support from the public sector"; and (3) that support had, or imminently would have, the effect of improving Credit Suisse's capital adequacy. *Id.* ¶ 115. These conditions were not met. Both Switzerland and Credit Suisse represented that Credit Suisse "satisfied the regulatory capital requirements" in March 2023, and post-Takeover events have since proven that Credit Suisse's capitalization ratios were more than adequate. *Id.* ¶¶ 91, 116. When the Takeover was announced, Credit Suisse had a crisis of confidence and a liquidity problem at most, and a Write-Down Direction was not permitted under these conditions. *Id.* A write-down of long-term debt instruments does not improve liquidity, which is why the AT1s' terms allowed a write-down only to address capital adequacy, not liquidity. *Id.*

Everyone knew the Write-Down Direction was unlawful too. Credit Suisse argued that the conditions for a write-down were not met, and that Switzerland had effected an "expropriation." *Id.* ¶¶ 100, 118. Switzerland had not decided whether the Write-Down Direction would be lawful even as of March 17, 2023, two days before the Takeover and five months after Switzerland began studying the issue. *Id.* ¶ 118. Because it had no such lawful authority for the Write-Down Direction, the night of the Takeover Switzerland issued an "**Emergency Ordinance**" providing that "FINMA may order the borrower and the financial group to write down additional Tier 1 capital." *Id.* ¶ 121. Switzerland has defended the lawfulness and necessity of the Write-Down Direction in the press and a "**FINMA Report**" studying the Takeover. *Id.* ¶ 9. But this defense

is suspect.  UBS required, as a condition of the Takeover, that Switzerland would defend the Write-Down Direction as lawful and necessary.  *Id.* ¶ 119.

Switzerland's real reasons for issuing the Write-Down Direction were far more cynical. Reliable reports suggest that Switzerland issued the Write-Down Direction to make the predominantly foreign AT1 bondholders subsidize the gains of UBS, and "make the deal more palatable for Swiss citizens and the bank's equity investors," who should have borne losses before the AT1 bondholders.  *Id.* ¶ 114.  FINMA records show that it issued the Write-Down Direction "to cushion expected losses" for UBS, not improve Credit Suisse's capital adequacy.  *Id.* ¶ 120.

Several AT1 bondholders have filed administrative appeals of the Write-Down Direction in Swiss court under the Swiss Administrative Procedure Act ("**APA**"), challenging the order and the Emergency Ordinance as unlawful.  Müller-Chen ¶¶ 28, 31-33.  All such challenges had to be filed within 30 days of the Write-Down Direction.  *Id.* ¶¶ 16-27.

## ARGUMENT

## I.  PLAINTIFFS HAVE ESTABLISHED JURISDICTION UNDER THE THIRD CLAUSE OF THE FSIA'S COMMERCIAL ACTIVITY EXCEPTION.

Switzerland first contends that this Court lacks jurisdiction because Switzerland is a foreign sovereign that is immune from Plaintiffs' lawsuit.  Br. 8-16.  It is wrong.

When the FSIA applies, the plaintiff "make[s] an initial showing that an enumerated exception to sovereign immunity applies," and then the defendant must "prov[e], by a preponderance of the evidence, that the alleged exception does not apply."  *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020).  "[T]he ultimate burden of persuasion remains on the party seeking sovereign immunity."  *Id.*  When the state "challenges only the legal sufficiency of the plaintiff's jurisdictional allegations, the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff."  *Robinson v. Gov't of Malaysia*, 269

F.3d 133, 140 (2d Cir. 2001) (cleaned up).  If the foreign state challenges the truth of the plaintiff's allegations, the court must "weigh evidence and make findings of fact."  *Nam v. Permanent Mission of Republic of Korea to United Nations*, 118 F.4th 234, 245 n.12 (2d Cir. 2024).

The FSIA provides that "a foreign state shall be immune from the jurisdiction of the courts of the United States and of the States except as provided in sections 1605 to 1607 of" the FSIA. 28 U.S.C. § 1604.  Plaintiffs invoked jurisdiction under the third clause of the FSIA's commercial activity exception, 28 U.S.C. § 1605(a)(2).  Under this clause, a foreign state is not immune from suit in actions "based upon … an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere [when] that act causes a direct effect in the United States."  *Id.*  "The 'in connection with' language" in this clause "allows for suits against a foreign sovereign that merely *relate to* commercial activity."  *Exp.-Imp. Bank*, 768 F.3d at 90 (emphasis in original).  Plaintiffs made their initial showing that this Court has jurisdiction, FAC ¶¶ 62-64, and Switzerland fails to meet its burden of rebutting Plaintiffs' showing by a preponderance of evidence.  It "does not dispute that" Plaintiffs' suit is based on the Write-Down Direction, which occurred "outside the United States" in Switzerland, and has thus conceded the point.  *Atlantica Holdings v. Sovereign Wealth Fund Samruk-Kazyna JSC*, 813 F.3d 98, 108 (2d Cir. 2016).  It wrongly argues only that the Write-Down Direction was not undertaken "in connection with commercial activity" and had no "direct effect in the United States."  Br. 9-10.

### A.      Switzerland's Efforts To Broker The Takeover Were Commercial.

The commercial activity exception's third clause requires that the act on which the suit is based be connected to "a commercial activity of the foreign state elsewhere."  28 U.S.C. § 1605(a)(2).  A foreign state's activities are "commercial" when it "acts, not as regulator of a market, but in the manner of a private player within it."  *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 614 (1992).  "[T]he question is not whether the foreign government is acting with a

profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive behind them) are the *type* of actions by which a private party engages in 'trade and traffic or commerce.'" *Id.* (citation omitted; emphasis in original); *see id.* at 614-15 ("[A] contract to buy army boots or even bullets is a 'commercial' activity because private companies can similarly use sales contracts.").

Switzerland's efforts to broker the Takeover qualify as commercial activity. Switzerland characterized its actions as a "commercial solution" and "private-law merger." FAC ¶¶ 4, 63, 92, 98; *see* Br. 11 (acknowledging the point but not responding to it). How true. Switzerland took all the steps that investment banks do when facilitating a takeover: arranging meetings between the seller and potential buyer; selecting the buyer universe; setting up a "data room" with seller financial information; negotiating with the preferred buyer; obtaining necessary approvals from foreign regulatory authorities; and negotiating the financing. FAC ¶¶ 93-96, 98-100 (citing a leading investment banking textbook). UBS and Switzerland have admitted that they negotiated the terms of sale between themselves. *Id.* ¶ 100. Switzerland also loaned money to Credit Suisse and gave UBS guarantees to facilitate the Takeover. *Id.* ¶¶ 97-98. "[B]orrowing money and hiring investment banks" are commercial acts. *Wasserstein Perella Emerging Markets Fin., LP v. Province of Formosa*, 2000 WL 573231, *9 (S.D.N.Y. May 11, 2000). So is lending money and acting as an investment bank, even when a foreign state seeks to contain a financial crisis. Private actors (like J.P. Morgan in the Panic of 1907) historically rescued defunct financial institutions during financial crises by lending money and brokering sales of failed banks. FAC ¶¶ 67-71. These activities do not become any less commercial simply because a sovereign performs them.

Switzerland does not dispute that the "lending of money and the provision of standard banking services" are commercial activities. Restatement (Fourth) of Foreign Relations Law § 454

cmt. b (2018); *see* Br. 10-14.  Instead, it claims it acted "to stabilize Credit Suisse and prevent a broader disruption to financial markets."  Br. 10.  But as Switzerland later admits, "the '*reason*'" why it brokered the Takeover is irrelevant; "[w]hat matters is only the activity's 'nature (*i.e.*, the outward form of the conduct that the foreign state performs or agrees to perform).'"  Br. 12 (quoting *Weltover*, 504 U.S. at 617) (emphasis in original); *see, e.g.*, *Weltover*, 504 U.S. at 616-17 (issuing bonds "to address a domestic credit crisis" is commercial); *Fir Tree Cap. Opportunity Master Fund, LP v. Anglo Irish Bank Corp.*, 2011 WL 6187077, *14 (S.D.N.Y. Nov. 28, 2011) (efforts to contain the 2008 financial crisis were commercial).  Switzerland's commercial acts thus cannot be characterized as "sovereign [] simply because [they are] part of a broader governmental scheme" to protect financial stability.  *Weltover, Inc. v. Republic of Argentina*, 941 F.2d 145, 150 (2d Cir. 1991), *aff'd*, 504 U.S. 607 (1992); *see* Br. 14.

Switzerland responds that it did not act "at the behest or engagement of Credit Suisse or UBS" "in exchange for a fee," Br. 11, but "the lack of a profit motive is irrelevant to the determination of whether the activity is 'commercial.'"  *Pablo Star*, 961 F.3d at 563.

Switzerland claims that all it did "to facilitate an acquisition of Credit Suisse [was] the enactment and enforcement of laws," but that is not true.  Br. 12.  Again, Plaintiffs allege that Switzerland took numerous commercial steps that a bank and investment bank would perform, FAC ¶¶ 92-110; Switzerland does not challenge the truth or plausibility of those allegations, *see* Br. 10-14; and so this Court must accept them as true and draw all inferences in Plaintiffs' favor, *see Robinson*, 269 F.3d at 140.  This case is thus unlike *Anglo-Iberia Underwriting Mgmt. v. P.T. Jamsostek*, 600 F.3d 171 (2d Cir. 2010) (*cited* Br. 13), which held that the state insurance administrator did not engage in commercial activity because it did not sell insurance or compete in private insurance markets.  *See id.* at 178.  It instead *regulated* insurance by requiring employers

to "comply with the government mandate that they provide ... health insurance coverage to their workers." *Id.*  Here, Switzerland enforced no regulation; it negotiated the terms of sale.  FAC ¶¶ 99-100.  That the FAC describes Switzerland as "demand[ing]" Credit Suisse create a shortlist of buyers and "instruct[ing]" it to add documents to the data room, does not, as Switzerland contends, suggest otherwise.  Br. 13 (quoting FAC ¶¶ 94-95).  Plaintiffs plausibly allege that Credit Suisse obeyed because of Switzerland's financial inducements, not legal compulsion.  FAC ¶ 98.

Equally unpersuasive is Switzerland's contention that it must have acted as a sovereign because it enacted ordinances to authorize the guarantees, loans, Write-Down, and merger.  Br. 12-14.  Lending money, extending guarantees, and acting as a sell-side advisor do not stop being commercial just because a statute authorizes these actions.  All foreign states act via statutes, regulations, and ordinances.  But when they enact laws to act "in the manner of a private player within it, [their] actions are 'commercial.'"  *Weltover*, 504 U.S. at 614.  That is why issuing bonds by statute and repudiating them by "Presidential Decree" is commercial.  *Id.* at 610, 617.  Switzerland misquotes Supreme Court precedent when it claims that "issuance of regulations ... is a sovereign activity."  Br. 12 (quoting *Weltover*, 504 U.S. at 614; ellipsis in the brief but not in *Weltover*).  That *Weltover* passage actually says that "issuance of regulations *limiting foreign currency exchange* is a sovereign activity."  "[L]egislati[on] ... provide[s] the motivation for" a state's act, but it cannot "strip" that act "of its 'commercial' character."  *Merlini v. Canada*, 926 F.3d 21, 37 n.8 (1st Cir. 2019); *see Pablo Star*, 961 F.3d at 562 (acting "pursuant to its statutory mandate" goes to the state's "purposes"); *Smith v. Overseas Korean Cultural Heritage Found.*, 279 F. Supp. 3d 293, 296-97 (D.D.C. 2018) (decree establishing museum is commercial activity).

Finally, Switzerland exaggerates its sovereign activities.  It claims to have "enforce[d]" Swiss "law" but does not identify any laws it enforced against private actors.  Br. 12.  That

distinguishes this case from *Barnet v. Ministry of Culture & Sports of the Hellenic Republic*, which held that "enforcement" of laws nationalizing culturally significant artifacts is a sovereign act. 961 F.3d 193, 201-02 (2d Cir. 2020) (*cited* Br. 12) ("insisting on compliance with" laws was akin to enforcement). Nor is this case similar to *Rong v. Liaoning Province Government*, 452 F.3d 883 (D.C. Cir. 2006) (*cited* Br. 13-14). *Rong* held only that "expropriation is a quintessential governmental act." *Id.* at 889. Plaintiffs are not arguing that the Write-Down Direction is a commercial act, just that it was in "connection with" Switzerland's commercial acts to broker a sale. And "the FSIA does not require that every act by the foreign state be commercial for [this] clause of the commercial activity exception ...." *DRFP LLC v. Republica Bolivariana de Venezuela*, 706 F. App'x 269, 274 (6th Cir. 2017) (citation omitted). The one other purportedly sovereign act Switzerland identifies, waiving "legal requirements for shareholder approval of mergers" (Br. 11), is commercial, as it is akin to corporate boards' commercial power to override shareholder approval of mergers. Del. Code tit. 8, § 251(d). Alternatively and at worst, this would be the one other sovereign act Switzerland took. It does not change the fact that the Write-Down Direction was connected to five months of Switzerland's other commercial acts. *Supra*, p.7.

### B.    The Write-Down Direction Was Connected To Switzerland's Takeover Efforts.

Switzerland fails to rebut Plaintiffs' showing that the Write-Down Direction was done "in connection" with Switzerland's efforts to broker the Takeover. *See* Br. 14-15. The FSIA requires a "substantive connection" or "causal link" between the act and the commercial activity, not a "tangential" one. *Anglo-Iberia Underwriting*, 600 F.3d at 178-79 (citation omitted). That test is easily met because both sides assert that there is a causal link between Switzerland's efforts to broker the Takeover and the Write-Down Direction. Switzerland has asserted that the "Write-Down Direction was "necessary," meaning that the Takeover would not have happened without it. FAC ¶¶ 9, 63. Indeed, the Write-Down Direction happened because Switzerland performed poorly

as a sell-side advisor:  It limited bidding to UBS, giving UBS leverage to demand the Write-Down Direction.  *Id.* ¶¶ 106-08, 114.  At minimum, Switzerland issued the Write-Down Direction to help effectuate the Takeover.  *Id.*  All this establishes a sufficient connection.  *See, e.g.*, *Azima v. RAK Inv. Auth.*, 305 F. Supp. 3d 149, 166 (D.D.C. 2018) (K.B. Jackson, J.) (computer hacking "to gain an advantage" in commercial activity satisfies the "in connection with" requirement), *rev'd on other grounds*, 926 F.3d 870 (D.C. Cir. 2019).  Switzerland responds that the Emergency Ordinance did not "condition the exercise of that authority on" the Takeover.  Br. 14.  But that does not matter:  The Write-Down Direction is the relevant "act" connected to commercial activity, not the Emergency Ordinance.  *Supra*, p.7.  Besides, Switzerland enacted the Emergency Ordinance after negotiating, and invoked it to effect, the Takeover.  FAC ¶ 121.

Switzerland otherwise claims that it would have issued the Write-Down Direction had it employed sovereign-like Resolution procedures rather than broker the Takeover.  *See* Br. 14-15.  Even if that were true (it is not, *see infra*), it would not matter:  The substantive connections outlined above still exist, even if the Write-Down Direction might have issued in other hypothetical scenarios.  Switzerland also ignores the FAC's plausible allegations that the Write-Down Direction would have been unnecessary had Switzerland expanded the bidding beyond UBS.  FAC ¶¶ 9, 113.  But Switzerland's contention is wrong even as to Resolution, which required that Switzerland write off equity holders before wiping out AT1s, which could be written down only if certain conditions—which Credit Suisse itself conceded were inapplicable here—were met.  *Id.* ¶¶ 113, 115-18.  Switzerland notes that the FINMA Report contradicts these allegations, but it does so only in vague terms, without elaboration, and thus does not overcome Plaintiffs' well-pleaded allegations.  Br. 15.  Even if the FINMA Report were somewhat clearer, it would be inadmissible on its own:  It is a one-off report, not public records covered by Fed. R. Evid. 803(8)'s hearsay

exception; and its second-hand claims about Resolution plans are barred by the best evidence rule. Plaintiffs, by contrast, do not rely on this or any other report as evidence, as Switzerland implies, Br. 9 n.2, but just cite it to establish their allegations' plausibility. *See, e.g.*, *Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67-68 (2d Cir. 2008) (a complaint may cite a document to establish that its allegations are plausible without incorporating and pleading the whole document by reference).

### C.    The Write-Down Direction Had A Direct Effect In The United States.

Finally, Plaintiffs have showed that the Write-Down Direction "cause[d] a direct effect in the United States." 28 U.S.C. § 1605(a)(2). The alleged direct effect need only be "an immediate consequence of the defendant's … activity," not a "substantial[] or foreseeab[le]" one. *Weltover*, 504 U.S. at 618. Thus, "only speculative, generalized, immeasurable, and ultimately unverifiable effects in the United States" are excluded. *Virtual Countries, Inc. v. Republic of South Africa*, 300 F.3d 230, 237 (2d Cir. 2002) (citation omitted). For tort claims, the Second Circuit has "found a direct effect (at least) at 'the locus of the tort,'" as defined by the First Restatement of Conflict of Laws. *Atlantica Holdings*, 813 F.3d at 109 n.5 (citation omitted). The direct effect test is also met when "[m]oney that was supposed to have been delivered to a New York bank for deposit was not forthcoming" because of the foreign state's act. *Weltover*, 504 U.S. at 619. Switzerland rightly admits that Plaintiffs' citizenship has no bearing on the "direct effect" analysis. Br. 15-16; *see Atlantica Holdings*, 813 F.3d at 111 (direct effects satisfied even if all plaintiffs were foreigners).

The Write-Down Direction caused a direct effect in the United States, for two reasons.

*First*, the Write-Down Direction is a tortious act, and New York is the locus of the tort. FAC ¶¶ 127-43. The place of wrong for a tort causing harm to chattels "is the place where the force takes effect on the thing." *Daou v. BLC Bank, S.A.L.*, 42 F.4th 120, 137 (2d Cir. 2022) (citation omitted). In *Daou*, that meant that conversion of Lebanese bank deposits occurred in Lebanon. *See id.* By the same logic, conversion of Plaintiffs' beneficial interests in AT1s held by

DTC happened in New York. The situs of "intangible property rights" (like the property interests in the AT1s) is wherever the garnishee for that property right is based, and DTC in New York is a garnishee for the AT1s. *All. Bond Fund, Inc. v. Grupo Mexicano De Desarrollo, S.A.*, 190 F.3d 16, 25 n.9 (2d Cir. 1999); *see* FAC ¶ 11. Thus, New York is the locus of the tort.

*Second*, Credit Suisse had a contractual obligation to make principal and interest payments on the AT1s "to the order of DTC" in New York. *E.g.*, Dkt. 86-1 at 97. The Write-Down Direction canceled that obligation, and thus had a direct effect in the United States. *See, e.g.*, *Com. Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 241 (2d Cir. 1994) ("[F]ailure … to remit funds in New York, as they were contractually bound to do, had a direct effect in the United States ….").

Switzerland says that the Write-Down Direction's effect "on plaintiffs' alleged AT1 interests was indirect" because it was addressed to Credit Suisse. Br. 16. That does not matter: FSIA plaintiffs "need only show a direct effect on someone in the United States, plaintiff or not." *Fontana v. Republic of Argentina*, 962 F.3d 667, 673 (2d Cir. 2020) (citation omitted). The Write-Down Direction had a direct effect on DTC in New York even though Credit Suisse conveyed the instruction to DTC because Credit Suisse was "legally compelled to carry out the Write-Down." FAC ¶¶ 7, 111. A foreign state's use of a "third party" breaks the chain only when, unlike here, the third party acts "independent" of the foreign state. *Atlantica Holdings*, 813 F.3d at 114.

## II.    PLAINTIFFS' SUIT CANNOT BE DISMISSED ON FORUM NON CONVENIENS GROUNDS.

Forum non conveniens "provides courts discretion to decline to exercise jurisdiction whenever it appears that such a case may be more appropriately tried in another forum." *Petersen Energia Inversora, S.A.U. v. Argentine Republic*, 2016 WL 4735367, *11 (S.D.N.Y. Sept. 9, 2016) (cleaned up). This Court may "consider and credit any evidence in the record, including affidavits, when ruling on motions to dismiss for forum non conveniens." *Id.* When "evaluating a motion to

dismiss for forum non conveniens, a court must determine" "whether the defendant's proposed forum is adequate"; "the degree of deference owed to the plaintiff's choice of forum"; and "whether the balance of private and public interest weighs in favor of the alternative forum." *Id.* "The defendant bears the burden of proof on all [these] elements," *BCCI*, 273 F.3d at 246, and a "heavy" one at that, *Atl. Marine Const. Co. v. U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 66 n.8 (2013) (citation omitted).  Switzerland fails to meet its burden.

### A.    Switzerland Is Not An Adequate Alternative Forum.

"To secure dismissal of an action on grounds of forum non conveniens, a movant ***must*** demonstrate the availability of an adequate alternative forum." *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 157 (2d Cir. 2005) (emphasis added).  "If the movant fails to carry this burden, the forum non conveniens motion ***must be denied*** …." *Id.* (emphasis added).  "For this reason, courts sometimes begin their forum non conveniens analysis with this factor." *Id.*

Switzerland fails to show that its own courts are an adequate forum.  "An alternative forum is adequate … if it permits litigation of the subject matter of the dispute." *Id.* (citation omitted). "It follows that an adequate forum does not exist if a statute of limitations bars the bringing of the case in that forum." *BCCI*, 273 F.3d at 246.  Switzerland states that it "allows litigation on the subject of this dispute," citing the pending "appeals of the FINMA write-down order." Br. 18. But these pending cases are all administrative challenges to the legality of the Write-Down Direction under the APA.  Müller-Chen ¶¶ 39-40.  APA claims are subject to a 30-day deadline, and that deadline has since elapsed. *Id.* ¶¶ 16-23; *see* FAC ¶ 122.  Even if the pending challengers in Switzerland were to prevail in their cases, that would result only in the reinstatement of those litigants' interests in the bonds; Plaintiffs would not benefit at all.  Müller-Chen ¶¶ 29-30.

Switzerland does not deny that this 30-day deadline would bar Plaintiffs from bringing an APA claim.  Switzerland's purported Swiss law "expert"—who, unlike Plaintiffs' expert, is not an

independent academic but was Switzerland's deal counsel in negotiating the Takeover, *see id.* ¶¶ 3, 10-11—notes that the 30-day deadline can be extended "in certain circumstances." Dkt. 87 ¶ 26. Switzerland does not make this argument. *See* Br. 18-19. And for good reason: Its "expert" does not even claim that the circumstances allowing for an extension of a deadline would apply. Dkt. 87 ¶ 26. They would not: The deadline could be extended only if, at minimum, Plaintiffs sued within thirty days of learning about the Write-Down Direction. *See* Müller-Chen ¶¶ 23-26. Switzerland blames Plaintiffs for missing this draconian 30-day deadline. Br. 18. But this Court cannot "concern itself with the reason why an alternative foreign forum is no longer available." *Norex*, 416 F.3d at 159. What matters is that the Swiss courthouse doors are now closed.

It bears emphasis that Switzerland, as a sovereign, could enact legislation abolishing the 30-day deadline in Swiss courts, at minimum with respect to AT1 bondholders like Plaintiffs, but it does not offer to do so. *Cf. Jota v. Texaco, Inc.*, 157 F.3d 153, 159 (2d Cir. 1998) (requiring "a commitment by Texaco to submit to the jurisdiction of the Ecuadoran courts"). That is because Switzerland wants to dispose of Plaintiffs' claims once and for all, not try them elsewhere.

Switzerland irrelevantly contends that "this Court has already applied the forum non conveniens doctrine to dismiss two actions brought by" AT1 bondholders. Br. 17. It omits that these were claims against "Credit Suisse Directors and Officers" for corporate mismanagement, not suits against Switzerland subject to the 30-day clock. *Star Colbert v. Dougan*, 724 F. Supp. 3d 304, 311 (S.D.N.Y. 2024); *Schur v. Dougan*, 2024 WL 4252647, *1 (S.D.N.Y. Sept. 19, 2024).

Switzerland implies Plaintiffs could circumvent the 30-day bar by suing in Swiss courts "for monetary relief … subject to a three-year statute of limitations," Br. 19, but it knows this is not true. Under Switzerland's Liability Act, which governs such claims for monetary relief, "[t]he legality of formally legally binding orders," like the Write-Down Direction, "cannot be reviewed."

FAC ¶ 122 & n.90.  Such challenges must instead be brought under the APA and its 30-day clock. *Id.*; Müller-Chen ¶¶ 34-42.  (This is unsurprising; suits challenging U.S. agency action are similarly brought under the Administrative Procedure Act to invalidate agency action, not under the Federal Tort Claims Act for damages.)  Switzerland does not dispute this point.  Switzerland cannot meet its heavy burden with "conclusory statement[s]" that it could be sued for damages in inapplicable circumstances.  *Donnelly v. Anand*, 2022 WL 4385901, *9 (S.D.N.Y. Sept. 22, 2022).

Switzerland then urges this Court to flout Second Circuit precedent because, it says, "analysis of a foreign legal system's statute of limitations issues is more appropriately conducted by the foreign court."  Br. 19 (quoting *Star Colbert*, 724 F. Supp. 3d at 327).  That is contrary to *BCCI* and *Norex*, which held that the defendant must show that the plaintiff could sue in the alternative forum.  416 F.3d at 159; *see, e.g.*, *BCCI*, 273 F.3d at 246 ("defendant bears the burden of proof"); *CF 135 Flat LLC v. Triadou SPY S.A.*, 2016 WL 5945933, *5 (S.D.N.Y. June 21, 2016) (Nathan, J.) (Defendant must be able to "guarantee" that plaintiffs could sue abroad).  *Star Colbert* and the two cases *Star Colbert* cites for this proposition are distinguishable:  Either "no one ha[d] argued that all of Plaintiffs' Swiss law claim is [time-]barred," 724 F. Supp. 3d at 327; *see Awadallah v. W. Union Co.*, 2016 WL 11469858, *5 (E.D.N.Y. Mar. 30, 2016) (only "*some*" claims were barred) (emphasis in original), or the court found that there was no time bar abroad, *In re Air Crash Off Long Island, N.Y., on July 17, 1996*, 65 F. Supp. 2d 207, 215 (S.D.N.Y. 1999).

Switzerland incorrectly asserts that this Court need not trouble itself with the limitations issue because "if a claim arising under Swiss law is barred by limitations in Switzerland, it will be barred by limitations in the United States."  Br. 19 (quoting *Star Colbert*, 724 F. Supp. 3d at 328).  Plaintiffs' claims arise under *New York* law, by contrast.  *Infra*, Part III.  Statutes of limitations are also procedural for conflict-of-law purposes, and so New York limitations periods govern Swiss

claims too. *Gerena v. Korb*, 617 F.3d 197, 206 (2d Cir. 2010).[1]  But even if the 30-day clock did apply here, it would not affect forum non conveniens.  In *Norex*, the district court dismissed because the purported barrier to litigating in Russia (a preclusive Russian judgment) would also apply in New York.  416 F.3d at 158.  The Second Circuit reversed:  The foreign forum must be "presently available," even if the foreign bar to litigation might also apply here.  *Id.* at 159.

### B.    The Other Forum Non Conveniens Factors Disfavor Dismissal.

Even if Swiss courts were available, this Court should still retain jurisdiction.  Plaintiffs' choice of forum is entitled to significant deference.  "[A] plaintiff's choice of her home forum should be given great deference."  *Iragorri v. United Techs. Corp.*, 274 F.3d 65, 71 (2d Cir. 2001) (en banc).  Fourteen Plaintiffs, holding about $60 million of claims, are based in New York.  FAC ¶¶ 20-28, 31, 42, 52-54 & Dkt. 44-1 at 1-2.  And "even a foreign plaintiff['s]" choice receives "more deference" if its reasons for suing here are "legitimate."  *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 179 (2d Cir. 2006) (citation omitted).  All Plaintiffs have good reason to sue here, given the (at minimum) substantial doubts over whether Swiss courts are available, *supra*, Part II.A, and delays in the pending Swiss APA cases, Müller-Chen ¶ 33.  *See Iragorri*, 274 F.3d at 73 (inability "to obtain jurisdiction" abroad is legitimate reason to sue here); *Bigio*, 448 F.3d at 179 (reasonable to sue here after failed "efforts to seek relief from the Egyptian authorities").  "Also weighing in favor of deference is the fact that Plaintiffs cannot intend to exploit the generosity of American juries," as the FSIA precludes any "right to a jury trial."  *Accent Delight Int'l Ltd. v. Sotheby's*,

---

[1] Switzerland's 30-day clock for administrative challenges would not apply under New York's borrowing statute either.  Under CPLR 202, this Court must borrow the "most closely analogous" foreign cause of action, Plaintiffs' claims sound in tort, and Switzerland applies a 3-year limitations period to all tort claims.  *Andes Petroleum Ecuador Ltd. v. Occidental Petroleum Co.*, 213 A.D.3d 403, 404 (1st Dep't 2023); *see* Müller-Chen ¶ 53.  Plus, CPLR 202 applies only to non–New York residents (and thus would not apply to the 14 New York Plaintiffs, FAC ¶¶ 20-28, 31, 42, 52-54), and then only if Plaintiffs' claims "accru[ed] without the state," CPLR 202.

394 F. Supp. 3d 399, 410 (S.D.N.Y. 2019); *see* 28 U.S.C. § 1330(a).  Switzerland notes that the AT1s contain forum-selection and choice-of-law clauses.  Br. 18.  But these clauses do not apply:  Switzerland is not a party to the AT1s and will not permit Plaintiffs to sue under these clauses.

Deference aside, Switzerland also fails to meet its burden of showing that New York is "genuinely inconvenient and" Switzerland "significantly preferable" when weighing the private and public factors.  *Bigio*, 448 F.3d at 179 (quoting *Iragorri*, 274 F.3d at 74-75).  Private interest factors include "the relative ease of access to sources of proof"; "the availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses"; and other issues "that make trial of a case easy, expeditious and inexpensive."  *Accent Delight*, 394 F. Supp. 3d at 411 (citation omitted).  Public interest factors include "court congestion; the interest of forums in having local disputes decided at home; and, the interest in having issues of law decided by courts of the nation whose law is involved."  *Id.* (citation omitted).

These factors disfavor Swiss courts.  Even if Plaintiffs could sue in Switzerland, it would not be easier to access proof or obtain compulsory process than here:  There is no pre-trial discovery in Swiss APA cases; the judge (not the parties) examines all witnesses, limits the collection of witness testimony, and controls the collection of all evidence; and oral hearings are rare.  Müller-Chen ¶ 46.  Nor would a Swiss proceeding be easier, faster, or cheaper:  The 230 actions against the Write-Down Direction have not progressed in the two years since they were filed.  *Id.* ¶ 33.  By contrast, Switzerland estimates that a trial in New York would last only two days.  Dkt. 88-1 at 4.  And Switzerland's interest in this case does not overwhelm New York's.  Switzerland implemented the Write-Down Direction to shift the costs of the Takeover from Swiss citizens to foreign nationals, by wiping out bonds held in New York.  FAC ¶ 114.  New York is thus the main victim, and has just as much reason to hear this case as it would had a foreign state

wiped out the AT1s by cyber-attack or bank heist instead.  New York has every reason to protect the integrity of the financial system and investors, like Plaintiffs, who rely on it.  *Id.* ¶¶ 123-26.

In contending otherwise, Switzerland places undue emphasis on Judge McMahon's opinions in *Schur* and *Star Colbert*.  The evidence, witnesses, facts, law, and connection to New York for cases seeking to hold Credit Suisse officers liable for "the bad risk culture they instilled" in violation of Swiss statutory law, 724 F. Supp. 3d at 312, differs from that applicable here.

Switzerland's convenience arguments fail to persuade.  It wrongly asserts that, if this Court retains jurisdiction, "evidence would [] have to be collected 'in a manner … compliant with Swiss legal restrictions,' including the" Hague Convention on the Taking of Evidence Abroad in Civil or Commercial Matters, Mar. 18, 1970, 23 U.S.T. 2555 (the "**Hague Convention**").  Br. 20 (citation omitted).  The Hague Convention and foreign law do not "deprive a District Court of the jurisdiction it would otherwise possess 'to order a foreign national party before it to produce evidence physically located'" abroad.  *Wultz v. Bank of China Ltd.*, 910 F. Supp. 2d 548, 552 (S.D.N.Y. 2012) (citation omitted); *see, e.g.*, *Owen v. Elastos Found.*, 343 F.R.D. 268, 289 (S.D.N.Y. 2023).  Switzerland's "expert" states generally that "[o]fficial documents are not translated into English as a matter of course."  Dkt. 87 ¶ 22.  But many documents likely are in English here, as Switzerland was in "daily" contact with U.S. regulators from October 2022 through March 2023.  FAC ¶ 125; *see Petersen*, 2016 WL 4735367, *12 (discounting costs when relevant documents were already translated).  Switzerland also has "not identified witnesses [it] would call at trial who would be unwilling to appear," and "modern technologies" render "costs" of witness travel "less important."  *Petersen*, 2016 WL 4735367, *12 (citation omitted).

Switzerland finally asserts that its own courts are better equipped to decide Swiss law, but it does not even argue that Swiss law governs Plaintiffs' claims, and, indeed, assumes New York

law applies in its Rule 12(b)(6) arguments.  Br. 21; *see infra*, p.23.  In any case, the need to apply foreign law "is not a justification for dismissal under forum non conveniens."  *Petersen*, 2016 WL 4735367, *13; *Emps. Ret. Sys. for City of Providence v. Rohner*, 224 A.D.3d 439, 440 (1st Dep't 2024) ("New York courts routinely find that there is no inordinate burden involved in applying … Swiss law.").  Nor will hearing this case risk "inconsistent judgments."  Br. 22.  The Swiss APA cases involve different plaintiffs and, unlike here, arise under Swiss law, seek reinstatement of the claimants' AT1 bonds instead of damages, and, in any case, are indefinitely stalled.  Müller-Chen ¶¶ 31-33.  Underscoring the cases' lack of overlap, Switzerland does not concede that a ruling here on the Write-Down Direction's legality would be issue preclusive in the Swiss APA cases.

## III.    PLAINTIFFS HAVE PROPERLY PLEADED THEIR CLAIMS FOR RELIEF.

Finally, this Court should deny Switzerland's motion to dismiss for failure to state a claim. *See* Br. 22-25.  To survive dismissal, " a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *City of Almaty v. Ablyazov*, 278 F. Supp. 3d 776, 797 (S.D.N.Y. 2017) (cleaned up).  "A claim is facially plausible when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* (cleaned up).  Plaintiffs' four claims are all plausible.

**Conversion:**  Conversion has two elements: "(1) a 'possessory right or interest in the property and (2) defendant's dominion over the property or interference with it, in derogation of plaintiff's rights.'"  *Amusement Indus., Inc. v. Midland Ave. Assocs.*, 820 F. Supp. 2d 510, 534 (S.D.N.Y. 2011) (citation omitted).  Plaintiffs had a beneficial interest in the AT1s, and Switzerland wrongly exercised dominion over their interests by issuing the Write-Down Direction. FAC ¶¶ 128-32.  "[I]ntangible property" like Plaintiffs' interests in the AT1s "may be subject to conversion when represented by … an electronic … record," as here.  *Freeman v. Jacobson*, 2021 WL 3604754, *7 (S.D.N.Y. Aug. 13, 2021) (citation omitted).  DTC holds the AT1s and records

custodial banks and brokers that hold the certificates, while those banks and brokers record Plaintiffs' ownership rights in real time. FAC ¶ 11. These records show that Plaintiffs' interests in the AT1s are "segregated and specifically identifiable." Br. 23 (citation omitted). Indeed, even for cash, "identification of a named bank account has been found to satisfy the identifiable fund requirement," as has identifying "a particular and 'definite sum of money, although the specific bills are not identified.'" *ADP Inv. Commc'n Servs. v. In House Att'y Servs.*, 390 F. Supp. 2d 212, 224 (E.D.N.Y. 2005) (citation omitted). Plaintiffs identified the definite sum they owned, Dkt. 44-1, have alleged ownership, FAC ¶ 11, and can supply account numbers if this Court requires.

The rule that conversion "cannot be predicated on a mere breach of contract" does not apply here either because Switzerland did not breach any contract. Br. 22 (citation omitted). True, a bond is a contract between an investor and the issuer, but that does not mean that the investor is precluded from suing a third party who steals the bond. So too here. Switzerland is a nonparty to the AT1s, and so Switzerland has "engaged in tortious conduct separate from [any] failure to fulfill contractual duties." *Solomatina v. Mikelic*, 370 F. Supp. 3d 420, 431 (S.D.N.Y. 2019); *see, e.g.*, *New York Univ. v. Cont'l Ins.*, 87 N.Y.2d 308, 316 (1995) ("[C]onduct outside the contract but intended to defeat the contract … may support an independent tort claim."). Absent authority to issue the Write-Down Direction, Switzerland's "unauthorized assumption of the right of ownership" was just as unlawful as it would have been had Switzerland simply stolen the AT1s. *Hamlet at Willow Creek Dev. Co. v. Ne. Land Dev. Corp.*, 64 A.D.3d 85, 113 (2d Dep't 2009).

Switzerland's abbreviated, unpersuasive defense of its authority to issue the Write-Down Direction hinges on the Emergency Ordinance. But it does not even try to prove, under a conflict-of-laws analysis, why a Swiss executive branch ordinance governs the "authority" issue. Br. 22. Nor could it. "[A] choice of law determination" is fact-intensive and thus inappropriate "at the

motion to dismiss stage," let alone for the first time on reply. *Holborn Corp. v. Sawgrass Mut. Ins.*, 304 F. Supp. 3d 392, 398 (S.D.N.Y. 2018) (citation omitted). If this Court does perform such an analysis, New York law controls because the AT1s were in New York. *Supra*, pp.13-14. The AT1s' choice-of-law clause does not apply, of course, because Switzerland is not party to the AT1s and that clause. *Broad. Rts. Int'l Corp. v. Societe du Tour de France, S.A.R.L.*, 675 F. Supp. 1439, 1448 (S.D.N.Y. 1987). Switzerland's other arguments for dismissal (fungibility and overlapping contract rights) also assume that New York law applies here. Br. 22-23.

Even if a conflict-of-laws analysis favored Swiss law, Switzerland would not have the requisite authority to wipe out Plaintiffs' property rights in the AT1s, for three reasons. *First*, New York courts will not apply foreign law that violates "a fundamental public policy of this State." *Brown & Brown, Inc. v. Johnson*, 25 N.Y.3d 364, 370 (2015) (citation omitted). "Retroactive [law] that cancels existing contract rights is repugnant to United States law." *Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. v. Pemex-Exploración Y Producción*, 832 F.3d 92, 108 (2d Cir. 2016) ("***Pemex***"). The Write-Down Direction also violated international law prohibitions against takings that target foreign investors or otherwise deny just compensation. *See* Restatement (Fourth) of Foreign Relations Law § 455 reporter's note 4 (2018); FAC ¶ 114 (Switzerland wrote down the AT1s to shift burdens to foreign investors). *Second*, the Write-Down Direction violated the AT1s' terms and Swiss law requiring government action to be proportionate and necessary. FAC ¶¶ 115-16; Decl. of Dennis H. Hranitzky ¶ 4 & Exs. 1-3 ("**Hranitzky Decl.**"). The Write-Down Direction fails this test (which is akin to the "arbitrary and capricious" test for U.S. agency action). The Write-Down Direction violated the AT1s' terms, discriminated against foreign investors, and was unnecessary: Other buyers would have purchased Credit Suisse without the write-down, and writing down long-term debt could not improve the bank's liquidity issues.

FAC ¶¶ 113-16.  *Third*, an ordinance like the Emergency Ordinance is valid only if there is an unforeseeable emergency.  Hranitzky Decl. ¶ 5.  There was no emergency here: Switzerland began planning for Credit Suisse's failure five months before the Emergency Ordinance.  FAC ¶¶ 89-95.

**Tortious Interference:** Tortious interference has four elements: (1) "a contract between the plaintiff and a third party," "(2) the defendant's knowledge of the contract, (3) the defendant's intentional inducement of the third party to breach or otherwise render performance impossible, and (4) damages."  *Anesthesia Assocs. of Mount Kisco, LLP v. N. Westchester Hosp. Ctr.*, 59 A.D.3d 473, 476 (2d Dep't 2009) (citation omitted).  The AT1s are contracts between Plaintiffs and Credit Suisse that Switzerland knew of, and it rendered Credit Suisse's performance impossible by ordering Credit Suisse to write down the bonds.  FAC ¶¶ 111, 114-18, 139-43.

Switzerland also contends that it acted with justification, but this is a multi-factor, fact-bound issue that should not be resolved on the pleadings.  Br. 23-24 (citing only summary judgment cases); *see Guard-Life Corp. v. S. Parker Hardware Mfg. Corp.*, 50 N.Y.2d 183, 190 (1980) (adopting the Restatement's multi-factor test).  Switzerland suggests, incorrectly, that this Court must accept the truth of the FINMA Report's unsubstantiated assertions that the Write-Down Direction was properly motivated and lawful.  Br. 24.  But the FINMA Report cannot be credited to the extent it contradicts the FAC, *supra*, pp.12-13, and this Court must decide foreign law questions de novo, *see, e.g.*, *Branch of Citibank, N.A. v. De Nevares*, 74 F.4th 8, 14 & n.5 (2d Cir. 2023).  Plaintiffs in any case plead lack of justification, which is established if the defendant "'engages in conduct for the *sole* purpose of inflicting intentional harm on plaintiffs' or employs 'wrongful means.'"  *Unicorn Crowdfunding, Inc. v. New St. Enter.*, 507 F. Supp. 3d 547, 566 (S.D.N.Y. 2020) (emphasis in original; citation omitted).  On purpose, Switzerland issued the Write-Down Direction to harm foreign bondholders and "make the deal more palatable for Swiss

citizens" and shareholders.  FAC ¶ 114 (citation omitted).  On means, the Write-Down Direction was invalid under the AT1s' terms, and again, "[r]etroactive legislation that cancels existing contract rights is repugnant to United States law."  *Pemex*, 832 F.3d at 108; *see* FAC ¶¶ 114-21.

**GBL § 349:**  For this claim, Plaintiffs properly allege that Switzerland's "acts were directed at consumers" and "misleading in a material way" and that they were "injured as a result." *Maurizio v. Goldsmith*, 230 F.3d 518, 521 (2d Cir. 2000).  Switzerland acted in commerce towards New York consumers and injured them by writing down investors' AT1s held at DTC.  FAC ¶¶ 135-37.  Switzerland acted deceptively, or at least can be held vicariously liable for Credit Suisse's deception, as it "fail[ed] to properly implement" the AT1s' "agreement" not to write down the AT1s outside specified circumstances.  *Breitman v. Xerox Educ. Servs., LLC*, 2013 WL 5420532, *3 (S.D.N.Y. Sept. 27, 2013); *see Reynolds v. Xerox Educ. Servs., Inc.*, 2014 WL 4437622, *6 (N.D.N.Y. Sept. 9, 2014) (failure to follow amortization schedule was deceptive); *In re Terrorist Attacks on Sept. 11, 2001*, 298 F. Supp. 3d 631, 644 (S.D.N.Y. 2018) (principals can be held liable for the tortious acts of their agents).

**Unjust Enrichment:**  "To state a cause of action for unjust enrichment, a plaintiff must allege that it conferred a benefit upon the defendant, and that the defendant will obtain such benefit without adequately compensating plaintiff therefor."  *Pauwels v. Deloitte LLP*, 83 F.4th 171, 189 (2d Cir. 2023) (citation omitted).  Plaintiffs plead these elements.  "The Write-Down Direction enriched Switzerland because it spared it the need to extend further guarantees to UBS to complete the Takeover and … reduced Switzerland's exposure in case UBS suffered losses," while transferring losses to Plaintiffs.  FAC ¶¶ 145-46.  The Write-Down Direction violated the AT1s' terms and thus subverted sophisticated investors' expectations.  *Id.* ¶¶ 113-18.

## CONCLUSION

For all these reasons, Switzerland's motion to dismiss should be denied.

DATED:  April 4, 2025                    Respectfully submitted,

                                         QUINN EMANUEL URQUHART &
                                         SULLIVAN, LLP

                                         By:    */s/ Dennis H. Hranitzky*
                                                Dennis H. Hranitzky
                                                Tanner S. Lyon (*Pro hac vice*)
                                                2755 E. Cottonwood Pkwy, Ste. 430
                                                Salt Lake City, UT 84121
                                                801-515-7300 Main Office Number

                                                Jeremy D. Andersen (*Pro hac vice*)
                                                865 S. Figueroa St., 10th Floor
                                                Los Angeles, CA 90017
                                                213-443-3000 Main Office Number

                                                Debra D. O'Gorman
                                                295 5th Avenue
                                                New York, NY 10016
                                                212-849-7000 Main Office Number

                                                Alex H. Loomis (*Pro hac vice*)
                                                111 Huntington Ave, Suite 520
                                                Boston, MA 02199
                                                617-712-7100 Main Office Number

                                         WOLLMUTH MAHER & DEUTSCH LLP

                                                David H. Wollmuth
                                                Joshua M. Slocum
                                                Sean P. McGonigle
                                                500 Fifth Avenue
                                                New York, NY 10110
                                                212-382-3300 Main Office Number

                                                *Counsel for Plaintiffs*

## CERTIFICATE OF COMPLIANCE

This memorandum complies with the page-count limit of Rule 4(c)(ii) of Judge Ho's Individual Rules and Practices in Civil Cases because it contains 25 pages, excluding the parts of the memorandum exempted by Rule 4(c)(iv).

DATED: April 4, 2025                    Respectfully submitted,

                                        By:    _/s/ Dennis H. Hranitzky_
                                               Dennis H. Hranitzky

                                               *Counsel for Plaintiffs*