UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

CREDITINCOME LIMITED et al.,

                Plaintiffs,

v.

THE SWISS CONFEDERATION,

                Defendant.

24 Civ. 4316 (DEH)

**OPINION<br>AND ORDER**

---

DALE E. HO, United States District Judge:

In 2023, Defendant the Swiss Confederation ("Switzerland") facilitated a merger between two banks, Credit Suisse AG ("Credit Suisse") and UBS Group AG ("UBS"). UBS subsequently bought Credit Suisse. As a result of the buyout, debt securities issued by Credit Suisse called "Additional Tier 1 Bonds" ("AT1s") were written down to zero, resulting in their permanent cancellation. Plaintiffs, 51 beneficial owners of the written-down AT1s, subsequently brought this suit against Switzerland, arguing that it is responsible for the write-down and, consequently, for their lost investments. Plaintiffs' claim sounds in conversion or, in the alternative, tortious interference with contract. They also allege that Switzerland violated New York General Business Law § 349 and are liable for common law unjust enrichment. Switzerland has moved to dismiss. *See* ECF No. 84. For the reasons explained below, Switzerland's Motion is **GRANTED**.

## BACKGROUND

Unless otherwise specified, the following facts are taken from Plaintiffs' Amended Complaint and the documents incorporated by reference therein. *See Kinsey v. N.Y. Times Co.*, 991 F.3d 171, 174 (2d Cir. 2021).[1] The Court assumes these facts are true for the purpose of

---

[1] In all quotations from cases, the Court omits citations, alterations, emphases, internal quotation marks, and ellipses, unless otherwise indicated.

adjudicating Switzerland's Motion to Dismiss. *See, e.g.*, *Kleinman v. Elan Corp., PLC*, 706 F.3d 145, 152 (2d Cir. 2013). The Court construes these facts in the light most favorable to Plaintiffs as the non-moving party. *See id.*

Credit Suisse was, at one point, one of the two largest banks in Switzerland. Am. Compl. ¶ 80, ECF No. 44. But by the "early 2020s, it became enmeshed in fraud and corruption scandals, leading to massive fines, civil litigation, and resulting capital outflows." *Id.* ¶ 81. In 2022, after "Credit Suisse was "fined $22 million" "by Swiss authorities for helping Bulgarian cocaine traffickers launder money," *id.* ¶ 84, and after "customers withdrew CHF 111 billion from Credit Suisse" (accounting for "8% of all assets under management"), *id.* ¶ 86, the Swiss government began preparing "potential rescue plans" for the bank, *id.* ¶ 88.

Plaintiffs allege that, "beginning in Fall 2022, Switzerland began hosting secret, 'non-formalized non-meetings' with Credit Suisse and UBS 'to explore the fundamental feasibility of . . . the sale of Credit Suisse" to UBS. *Id.* ¶ 93.[2] "[A]t least five such meetings were held" between October and December 2022. *Id.* Then, "[i]n late December," Switzerland's banking regulator, the Swiss Financial Market Supervisory Authority ("FINMA"), *see id.* ¶ 66, "held a so-called 'non-meeting' with Credit Suisse's Chairman[] in which it demanded 'a concrete shortlist of potential

---

[2] This paragraph of the Amended Complaint, and numerous others, quote and cite to a document titled "The Management of the Federal Authorities in the Context of the CS Crisis, Report of the Parliamentary Commission of Inquiry." *See* Am. Compl. ¶ 9 n.9. This is, apparently, a "report into Credit Suisse's collapse" authored by "an exhaustive Swiss parliament commission." *Id.* ¶ 9. Plaintiffs acknowledge that the report is an "unofficial English translation." *Id.* ¶ 9 n.9. Switzerland opposes Plaintiffs' use of the report and argues that, "if plaintiffs seek to rely on the report to carry their burden of production on any disputed jurisdictional matters, they are required to submit a certified translation." Def.'s Mem. Supp. Mot. Dismiss Am. Compl. ("Def.'s Mem.") at 9 n.2, ECF No. 85. The Court reiterates that it accepts the allegations in the Amended Complaint as true for the limited purpose of adjudicating Switzerland's Motion to Dismiss, which includes allegations based on facts pulled from the disputed report. *See Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 560 (2d Cir. 2020) (noting that, in determining issues of jurisdiction pursuant to the FSIA, the district court "review[s] allegations in the complaint and any undisputed facts," "resol[ves] . . . any disputed issues of fact," and "may look to evidence outside of the pleadings").

buyers, the establishment of a virtual data room,' and . . . 'the development of a scenario for a takeover by UBS,'" *id.* ¶ 94.

Over the following three months, from January through March 2023, "Switzerland was in constant, and sometimes daily, contact with Credit Suisse." *Id.* ¶ 95. During that time, Switzerland "talked Credit Suisse through the possibilities and pitfalls of different potential buyers, the 'cultural difference' between UBS and Credit Suisse, and the 'synergies' between them." *Id.* It also "instructed [Credit Suisse] to add further key documents to [its] data room." *Id.* Switzerland then gave UBS access to Credit Suisse's data room, urging UBS to "acquire Credit Suisse" and warning UBS that, "if it failed to do so, Credit Suisse might be placed into Resolution." *Id.* ¶ 96.[3] Indeed, Switzerland had "spent months perfecting" Resolution plans, as well as "plans for the temporary nationalization of Credit Suisse," which were "ready for signature in March 2023." *Id.* ¶ 89.

"While Switzerland was urging UBS to acquire Credit Suisse, it was also pressuring Credit Suisse to agree to the merger." *Id.* ¶ 97. On the same day Switzerland had its conversation with UBS, where it urged UBS to acquire Credit Suisse, "Switzerland and the [Swiss National Bank ("SNB")] extended to Credit Suisse CHF 50 billion in emergency loans." *Id.* Purportedly as a condition of the loans, Switzerland "told the CEO and Chair of Credit Suisse: 'You will merge with UBS and announce Sunday evening before Asia opens. This is not optional.'" *Id.*

---

[3] Resolution, a tool developed "[i]n the wake of the 2008 financial crisis," "is the principal rescue mechanism" "to prevent distressed banks from failing and to rescue distressed banks from collapse." Am. Compl. ¶ 74. "Resolution generally entails placing large, systematically important banks into receivership. In a Resolution process, national financial authorities act as receiver to restructure the banks' assets and liabilities . . . . Leadership is immediately replaced, [and] corporate operations are stabilized . . . ." *Id.* Generally, a bank is not permitted to exit Resolution until it "reaches an agreement with creditors to swap prior debts for new debt or equity." *Id.*

3

UBS subsequently bought Credit Suisse.[4] "On Sunday, March 19, 2023, Switzerland, FINMA, the SNB, UBS, and Credit Suisse announced . . . that UBS would purchase Credit Suisse for the equivalent of $3.4 billion. As per the transaction, Switzerland offered Credit Suisse CHF 200 billion in increased liquidity and UBS a CHF 9 billion guarantee against losses arising from the Takeover." *Id.* ¶ 108. Credit Suisse and UBS did not directly negotiate the terms of the merger. *See id.* ¶ 99. Instead, "Switzerland negotiated with each bank on behalf of the other." *Id.*

One consequence of the merger was that Credit Suisse's AT1s were written down.[5] "As of March 2023, there was a $275 billion AT1 market worldwide[, with] Credit Suisse's $17.3 billion in outstanding AT1s ma[king] up . . . just over 6% of that market." *Id.* ¶ 79. But Credit Suisse's $17.3 billion in AT1s were "wipe[d]-out" upon its acquisition by UBS. *Id.* ¶ 111. FINMA instructed Credit Suisse to write down its AT1s, issuing, on the day the merger was announced, a directive stating as much.[6] *Id.* Its legal authority to issue such a directive was derived from "an emergency ordinance," issued by "the Swiss Federal Council (Switzerland's executive branch)," that was "good for one day only, [and] provid[ed] that 'FINMA [could] order the borrower and the financial group to write down additional Tier 1 capital." *Id.* ¶ 121. This legislation was necessary because the direction to write down the AT1s was "impermissible under the AT1s' governing terms," which stated that they could be written down "only if (1) 'customary measures to improve' Credit Suisse's 'capital adequacy' were 'inadequate or unfeasible'; (2) Credit Suisse

---

[4] Plaintiffs refer to this as the "Takeover." *See* Am. Compl. ¶ 4. Subsequent references to the "Takeover" in language quoted from Plaintiffs' papers refer to UBS's acquisition/purchase of Credit Suisse.

[5] "AT1s are a type of bank debt securities known as contingent convertibles. AT1s are convertible because they can be converted from bonds into equity or written down, and contingent because the conversion or write-down can occur only in limited (and clearly defined) circumstances." *Id.* ¶ 76.

[6] Plaintiffs refer to this as the "Write-Down Direction," *see* Am. Compl. ¶ 7, nomenclature the Court adopts for clarity.

4

'receive[d] an irrevocable commitment of extraordinary support from the public sector'; and (3) that support had, or imminently would have, the effect of improving Credit Suisse's capital adequacy." *Id.* ¶ 115. "These conditions were not met" at the time UBS bought Credit Suisse. *Id.* ¶ 116; *see also id.* ¶ 115 ("In March 2023, Credit Suisse had a crisis of confidence and a liquidity problem at most, and Switzerland was not authorized to issue a Write-Down Direction under these conditions. The bondholders agreed only to a write-down in response to capital adequacy problems, not liquidity issues."). And Credit Suisse itself believed "that the Write-Down Direction was not permissible under Swiss law or the AT1s' governing terms." *Id.* ¶ 118. Nonetheless, Credit Suisse "was legally compelled to carry out the Write-Down," *id.* ¶ 111, which resulted in the "New York-based DTC, the securities depository holding the bonds, . . . suspend[ing] all clearance and settlement of the AT1s[,] and [the] beneficial owners of interest in the AT1s immediately and inexorably lo[sing] their property," *id.*

Plaintiffs, beneficial owners of interest in Credit Suisse's written-down AT1s, subsequently filed this suit against Switzerland, arguing that they "should be compensated for the losses they suffered as a result of the Write-Down Direction." *Id.* at 34.

## DISCUSSION

Switzerland provides three grounds for this Court to dismiss Plaintiffs' Amended Complaint: for lack of jurisdiction, under the doctrine of *forum non conveniens*, or for failure to state a claim upon which relief can be granted. As explained below, the Court resolves this motion on jurisdictional grounds.

### I.   This Court's Jurisdiction Over Switzerland

Switzerland first argument for dismissal is that it is immune from suit under the Foreign Sovereign Immunities Act (the "FSIA"). Def.'s Mem. Supp. Mot. Dismiss Am. Compl. ("Def.'s Mem.") at 8, ECF No. 85. The Court agrees.

5

"The FSIA is a statute containing 'a comprehensive set of legal standards governing claims of immunity in every civil action against a foreign state or its political subdivisions, agencies or instrumentalities.'" *Havlish v. Taliban*, No. 23 258 CV, 2025 WL 2447193, at *7 (2d Cir. Aug. 26, 2025) (quoting *Verlinden B.V. v. Cent. Bank of Nigeria*, 461 U.S. 480, 488 (1983)). It "provides the sole basis for obtaining jurisdiction over a foreign state in federal court." *Pablo Star Ltd. v. Welsh Gov't*, 961 F.3d 555, 559 (2d Cir. 2020). "Under the Act, a foreign state is presumptively immune from the jurisdiction of United States courts; unless a specified exception applies, a federal court lacks subject-matter jurisdiction over a claim against a foreign state." *Id.* (quoting *Saudi Arabia v. Nelson*, 507 U.S. 349, 355 (1993)).

"To the extent the [FSIA] permits litigation against foreign states, it usually requires that the litigation be premised on the foreign state's private, commercial conduct." *Republic of Hungary v. Simon*, 604 U.S. 115, 131 (2025). At issue in this case is the so-called commercial-activity exception, Section 1605(a)(2), which abrogates a foreign state's sovereign immunity when it engages in such commercial conduct. Section 1605(a)(2) provides, in relevant part, that:

> (a) A foreign state *shall not be immune* from the jurisdiction of courts of the United States or of the States *in any case*—(2) *in which the action is based . . . upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere* **and that act causes a direct effect in the United States**.

*Guirlando v. T.C. Ziraat Bankasi A.S.*, 602 F.3d 69, 74 (2d Cir. 2010) (emphases in original) (quoting 28 U.S.C. § 1605(a)(2)).

"Plaintiffs' claims are 'based . . . upon' the Write-Down Direction," Am. Compl. ¶ 62, which they claim was "an act" taken "outside the territory of the United States in connection with a commercial activity under 28 U.S.C. § 1605(a)(2) because it was undertaken by Switzerland, in Switzerland in connection with Switzerland's brokering of the Takeover," *id.* ¶ 63. The Write-Down Direction, Plaintiffs claim, "caused a direct effect in the United States" because it "caused

6

the AT1s to be canceled, delisted, and lose all value in New York," where they were cleared and held by DTC. *Id.* ¶ 64. Switzerland disputes this contention, advancing two arguments: that the "act of FINMA"—that is, when FINMA "ordered Credit Suisse to write down its AT1 regulatory capital" "[f]ollowing the [Swiss Federal Counsel's] enactment of the [emergency] ordinance," Def.'s Mem. at 7, 9-10—"does not establish jurisdiction under § 1605(a)(2)" because it was neither taken "'in connection with a commercial activity' of Switzerland" nor "cause[d] a direct effect in the United States," *id.* at 10 (quoting 28 U.S.C. § 1605(a)(2)). The Court begins by considering whether the Write-Down Direction was an act that was (A) taken in connection with (B) a commercial activity of Switzerland." [7]

### A.     "*In Connection With*" A Commercial Activity

The parties dispute whether, in issuing the Write-Down Direction, Switzerland took an act "*in connection with* a commercial activity" of Switzerland, where the "commercial activity" is (according to Plaintiffs) the facilitation of UBS's acquisition of Credit Suisse. "The Second Circuit has instructed that 'the statutory term "in connection," as used in the FSIA, is a term of art,' and is to be 'interpreted narrowly.'" *Fir Tree Cap. Opportunity Master Fund, LP v. Anglo Irish Bank Corp.*, No. 11 Civ. 955, 2011 WL 6187077, at *17 (S.D.N.Y. Nov. 28, 2011) (quoting *Garb v. Republic of Poland*, 440 F.3d 579, 587 (2d Cir. 2006)). "[A]cts are 'in connection' with commercial activity so long as there is a 'substantive connection' or a 'causal link' between them and the commercial activity." *Garb*, 440 F.3d at 587; *see also Anglo-Iberia Underwriting Mgmt.*

---

[7] A defendant seeking sovereign immunity bears the burden of establishing a prima facie case that it is a foreign sovereign. *Pablo Star*, 961 F.3d at 559-60. Plaintiffs acknowledge that Switzerland is, in fact, a foreign sovereign. *See* Am. Compl. ¶ 59. Thus, the burden has shifted back to Plaintiffs to "make an initial showing that an enumerated exception to sovereign immunity applies." *Pablo Star*, 961 F.3d at 560. The Court therefore *begins* its analysis here, understanding that "once the plaintiff has met its initial burden of production, the defendant bears the burden of proving, by a preponderance of the evidence, that the alleged exception does not apply." *Id.*

7

*v. P.T. Jamsostek*, 600 F.3d 171, 178 (2d Cir. 2010) (same). An act cannot be "in connection with" commercial activity when it has "only an attenuated connection" to that commercial activity. *Drexel Burnham Lambert Grp., Inc. v. Comm. of Receivers for Galadari*, 12 F.3d 317, 330 (2d Cir. 1993).

Plaintiffs and Switzerland's dispute on this point turns on, essentially, whether the Write-Down Direction was independent of Switzerland's facilitating Credit Suisse's acquisition by UBS. Plaintiffs state that "Switzerland has asserted that the Write-Down Direction was 'necessary,' meaning that the Takeover would not have happened without it." Pls.' Mem. Opp'n to Def.'s Mot. Dismiss ("Pls.' Opp'n") at 11, ECF No. 92 (citing Am. Comp. ¶¶ 9, 63). They argue that Switzerland was compelled to issue the Write-Down Direction because it "performed poorly as a sell-side advisor" to Credit Suisse by "limit[ing] bidding to UBS, giving UBS leverage to demand the Write-Down Direction." *Id.* at 11-12. "At minimum," they argue, "Switzerland issued the Write-Down Direction to help effectuate the Takeover. All this establishes a sufficient connection." *Id.* at 12.

Switzerland, conversely, argues that the Write-Down Direction was independent of the banks' merger. Drawing directly from a report FIMA issued in 2018, Switzerland avers that "the write-down order was not 'in connection with'" its "activity concerning the merger" because "a write down of the AT1 notes would have happened even if the merger did not." Def.'s Reply Mem. Supp. Mot. Dismiss Am. Compl. ("Def.'s Reply") at 4, ECF No. 95.[8] This is because, apparently, had UBS not acquired Credit Suisse, Switzerland would have pursued "a Resolution

---

[8] Here, and elsewhere, Switzerland cites a FINMA-issued report called, "Lessons Learned from the CS Crisis," which is attached as an exhibit to a declaration by FINMA's Head of Legal and Compliance. *See* Mauerhofe Decl., ECF No. 98; FINMA, Lessons Learned from the CS Crisis, ECF No. 98-1.

8

solution—i.e., a government-supervised restructuring plan" for Credit Suisse,[9] under which "[t]he AT1 instruments would also have been completely written off, with the result that the AT1 creditors would also have lost their entire investment." Def.'s Mem. at 14-15. Plaintiffs take issue: with the substance of this argument, claiming that "Switzerland's contention is wrong," Pls.' Opp'n at 12; with the premise of this argument, arguing that the "connections" between the Write-Down Direction and the merger "still exist, even if the Write-Down Direction might have issued in other hypothetical scenarios," *id.*; and with Switzerland's substantiation of its argument by citation to the FINMA report, which they claim is "inadmissible," *id.* at 12-13.

Ultimately, the Court need not resolve the parties' dispute on this point. Even if Plaintiffs are correct that the Write-Down Direction was "in connection with" Credit Suisse's acquisition by UBS, as explained below, Switzerland's facilitation of the banks' merger was not "commercial activity" within the meaning of the FSIA.

### B.  Switzerland's "*Commercial Activity*"

"The FSIA defines 'commercial activity' as 'either a regular course of commercial conduct or a particular commercial transaction or act.'" *Pablo Star*, 961 F.3d at 560 (quoting 28 U.S.C. § 1603(d)). "[T]his definition 'leaves the critical term "commercial" largely undefined.'" *Id.* (quoting *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 612, (1992)). That said, the Act does counsel that "the commercial character of an activity" should "be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose." 28 U.S.C. § 1603(d). Thus, the Supreme Court has explained that, in evaluating whether a foreign sovereign's act is "commercial" for purposes of the FSIA,

> the question is not whether the foreign government is acting with a profit motive or instead with the aim of fulfilling uniquely sovereign objectives. Rather, the issue is whether the particular actions that the foreign state performs (whatever the motive

---

[9] *See supra* note 3.

behind them) are the *type* of actions by which a private party engages in "trade and traffic or commerce." *Weltover*, 504 U.S. at 614. "This is a standard more easily stated than applied, however," and "[s]eparating the 'nature' from the 'purpose' of an activity may require a nuanced examination of the context of the acts involved." *Pablo Star*, 961 F.3d at 561. Ultimately, "when a foreign government acts, not as regulator of a market, but in the manner of a private player within it, the foreign sovereign's actions are 'commercial' within the meaning of the FSIA." *Weltover*, 504 U.S. at 614. And critically, a foreign state engages in commercial activities for purposes of the FSIA when "it exercises *only* those powers that can also be exercised by private citizens." *Id.* (emphasis added).

The parties' disagreement centers on whether, in brokering the deal between Credit Suisse and UBS, Switzerland was acting like an "investment bank[] . . . facilitating a takeover," Pls.' Mem. at 8, or whether "[t]he actions of the Federal Council, the Swiss National Bank and FINMA . . . were all undertaken using their governmental powers," Def.'s Mem. at 10. The Court recounts that, per the Amended Complaint, Switzerland:

- "Held a so-called 'non-meeting' with Credit Suisse's Chairman, in which it demanded 'a concrete shortlist of potential buyers, the establishment of a virtual data room,' and . . . 'the development of a scenario for a takeover by UBS,'" Am. Compl. ¶ 94;

- "[T]alked Credit Suisse through the possibilities and pitfalls of different potential buyers, the 'cultural differences' between UBS and Credit Suisse, and the 'synergies' between them," *id.* ¶ 95;

- "[I]nstructed [Credit Suisse] to add . . . key documents to [its] data room," *id.*;

- "[M]et with UBS leadership, urged UBS to acquire Credit Suisse, and . . . gave UBS access to Credit Suisse's data room," and warned that if UBS did not acquire Credit Suisse, the latter "might be placed into Resolution," *id.* ¶ 96;

- "[P]ressur[ed] Credit Suisse to agree to the merger" and told the CEO and Chair of Credit Suisse, "[y]ou will merge with UBS and announce Sunday evening before Asia opens. This is not optional;" *id.* ¶ 97;

- "[E]xtended to Credit Suisse CHF 50 billion in emergency loans . . . ," *id.*;

- "[N]egotiated with each bank on behalf of the other," *id.* ¶ 99;

- "[H]ad high-level officials meet with the banks individually to settle on terms; agreed to extend the financing necessary to make the deal happen; lobbied financial authorities in Germany, France, the UK and the United States not to block the deal; sold the deal to at least one major Credit Suisse investor based in the Middle East; and . . . declined, on Credit Suisse's behalf, that investor's offer to inject $3.5 billion into Credit Suisse to stabilize the company," *id.*;

- "[O]ffered Credit Suisse CHF 200 billion in increased liquidity and UBS a CHF 9 billion guarantee against losses arising from the Takeover," *id.* ¶ 108; and

- "[I]ssued the Write-Down Direction to Credit Suisse," *id.* ¶ 111, but only after "issu[ing] an emergency ordinance that authorized" it; *id.* ¶ 121.

Viewed in isolation, at least some of these acts could be properly characterized as "commercial activity," because they are instances of Switzerland exercising "powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Pablo Star*, 961 F.3d at 561. But when looking at the full range of Switzerland's actions, and the overall context in which it performed them, the Court concludes that Switzerland's facilitation of UBS's acquisition of Credit Suisse did not constitute "commercial activity" for purposes of the FSIA, as it did not consist of the exercise of "only those powers that can also be exercised by private citizens." *Weltover*, 504 U.S. at 614. This is apparent from several factors, including the nature of the loans and guarantees provided by Switzerland to Credit Suisse and UBS; the manner in which Switzerland directed the transaction between the parties; and the legislation that Switzerland passed to implement the deal, which included the waiver of normally applicable legal requirements for shareholder approval of mergers. In combination, these factors compel the conclusion that Switzerland's facilitation of the Credit Suisse-UBS transaction was not commercial activity for purposes of the FSIA exemption.

First, start with the extraordinary nature of the loans to Credit Suisse and the financial guarantees to UBS that Switzerland made "to facilitate the Takeover." Pls.' Mem. at 8 (citing Am. Compl. ¶¶ 97-98.). Specifically, Switzerland issued at least "CHF 50 billion in emergency loans" to Credit Suisse, Am. Compl. ¶ 97, and offered the bank "CHF 200 billion in increased liquidity" "as part of the transaction," *id.* ¶ 108. It also "extended to UBS a CHF 9 billion loss protection guarantee covering certain assets of Credit Suisse." Def.'s Mem. at 11; *see also* Am. Compl. ¶ 100. For their part, Plaintiffs say Switzerland's actions were commercial because "'borrowing money and hiring investment banks' are commercial acts" and "[s]o is lending money and acting as an investment bank." Pls.' Mem. at 8. At that level of generality, Switzerland's actions could perhaps be considered as analogous to those "exercised by private citizens," as private financial institutions issue loans and loss protection guarantees. *Cf. Pablo Star*, 961 F.3d at 561-62 (explaining that determining whether a foreign state engaged in commercial activity "may sometimes depend on the level of generality at which the conduct is viewed").

But this is a not a case where a foreign state issued "garden variety" financial assistance, as the Republic of Argentina did in *Weltover*. There, the Supreme Court held that Argentina's issuance of bonds was a "commercial activity" under the FSIA because the bonds were "in almost all respects garden-variety debt instruments: They [could] be held by private parties; they [were] negotiable and [could] be traded on the international market (except in Argentina); and they promise[d] a future stream of cash income." *Weltover*, 504 U.S. at 615. Here, by contrast, Switzerland's extraordinary financial assistance involved hundreds of billions of Swiss francs worth of loans to Credit Suisse and 9 billion in guarantees to UBS that were hardly "garden variety"—they were not negotiable or tradeable, but rather were made available only to UBS and Credit Suisse. *See* Def.'s Reply at 3; *cf.* Am. Compl. ¶ 108 (describing the loans and guarantees at issue). Moreover, the scale of these loans and guarantees far exceeds comparable activities by

12

private actors in the market. Indeed, here, a private party—a "major Credit Suisse investor based in the Middle East"—offered to inject $3.5 billion into Credit Suisse to stabilize the company, a drop in the bucket compared to the hundreds of billions in emergency liquidity that Switzerland eventually provided. Am. Compl. ¶ 99.[10] The scale is so dissimilar as to render the difference categorical, rather than simply one of degree.

The extraordinary nature of these guarantees—in terms of both their form and their amounts—demonstrates that Switzerland was not operating like a private commercial lender. Rather, it was operating as a nation seeking to stabilize a major financial institution of systemic importance, in order to "prevent a broader disruption to financial markets." Def.'s Mem. at 10.[11]

---

[10] For reference, the average exchange rate of the Swiss Franc (CHF) to the U.S. Dollar in 2023 was 1 CHF : 1.1137 USD. *See Swiss Franc to US Dollar History: 2023*, ExchangeRates.org.uk, https://www.exchangerates.org.uk/CHF-USD-spot-exchange-rates-history-2023.html [https://perma.cc/GXC3-MNE6] (last visited Sept. 26, 2025). The Court assumes that the relatively equal value of Swiss Francs and US Dollars is not disputed by the parties, but notes that it may take judicial notice of the exchange rate because "[o]n a Rule 12(b)(1) motion challenging the . . . court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings." *Zappia Middle E. Constr. Co. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000) (referencing Fed. R. Civ. P. 12(b)(1)); *see also Jamsostek*, 600 F.3d at 175 (same).

[11] Plaintiffs note that private actors have historically also taken actions with the purpose of rescuing distressed financial institutions, "like J.P. Morgan in the Panic of 1907." Pls.' Mem. at 8. But as noted, *supra*, it is not the purpose but the nature of a government's actions that matters in determining whether they are commercial for purposes of the FSIA exemption. As explained *supra*, Switzerland's actions here were extraordinary in nature. And while it is unnecessary to and plays no role in the Court's ultimate decision, a more recent J.P. Morgan example puts the deal in perspective. J.P. Morgan's landmark 2008 acquisition of Bear Stearns—then "the fifth largest investment bank in the world"—was for $10 a share, *In re Bear Stearns Cos., Inc. Sec., Derivative, & ERISA Litig.*, 763 F. Supp. 2d 423, 455, 560 (S.D.N.Y. 2011), which translated to a cost of about $1.2 billion for J.P. Morgan, *see* Landon Thomas, Jr. & Eric Dash, *Seeking Fast Deal, JPMorgan Quintuples Bear Stearns Bid*, N.Y. Times (Mar. 25, 2008), https://archive.nytimes.com/www.nytimes.com/2008/03/25/business/25bear.html [https://perma.cc/9LJP-PREZ]. That figure—which, incidentally, was backed by the Federal Reserve Bank of New York guaranteeing $29 billion in losses (after the first $1 billion), *see id.*—is less than the approximately $3.4 billion that UBS paid for Credit Suisse, *see* Am. Compl. ¶ 108. And it is dwarfed by Switzerland's loans and guarantees here, which were of a fundamentally

13

That is not to say that the Court's conclusion here—that Switzerland's actions were those of a sovereign rather commercial under the FSIA—hinges on Switzerland's *purpose*. *See* 28 U.S.C. § 1603(d) (instructing that "[t]he commercial character of an activity" should "be determined by reference to the nature of the course of conduct or particular transaction or act, rather than by reference to its purpose"). The Court simply describes the context in which Switzerland was acting, because without "some understanding of context," simply describing the actions at issue "is not much help in distinguishing sovereign from commercial conduct." *Pablo Star*, 961 F.3d at 562. Here, the broader context helps illustrate that the extraordinary *nature* of Switzerland's "activities did not equate to those of an independent actor in the private [financial] marketplace . . . but were sovereign in nature and outside the commercial activity exception to the FSIA." *Barnet v. Ministry of Culture & Sports of the Hellenic Republic*, 961 F. 3d 193, 202 (2d Cir. 2020) (describing reasoning of and quoting language from *Jamsostek*, 606 F.3d at 178).

Second, in facilitating UBS's acquisition of Credit Suisse and demanding that Credit Suisse agree to the deal, Switzerland went far beyond the sorts of services that a private broker provides. Rather, the allegations in the Amended Complaint reveal that Switzerland was the driving force behind the deal and left Credit Suisse with virtually no choice in matter. As the Amended Complaint alleges, in a "non-meeting" with Credit Suisse's chairman, Switzerland, through FINMA, "*demanded* 'a concrete shortlist of potential buyers, the establishment of a virtual data room,' and . . . 'the development of a scenario for a takeover by UBS.'" Am. Compl. ¶ 94 (emphasis added). Switzerland then gave UBS access to Credit Suisse's data room, urging UBS to "acquire Credit Suisse" and warning UBS that, "if it failed to do so, Credit Suisse might be placed into Resolution." *Id.* ¶ 96. Switzerland subsequently "pressur[ed] Credit Suisse to agree

---

different nature from the acts of the private commercial actors (UBS and J.P. Morgan) in these acquisitions.

to the merger" and told the CEO and Chair of Credit Suisse, "[y]ou *will* merge with UBS and announce Sunday evening before Asia opens. This is *not optional*." *Id.* ¶ 97 (emphases added). And in making its own loans and liquidity assistance to Credit Suisse, Switzerland, on behalf of the bank, rejected an offer of liquidity assistance from a private investor. *See id.* ¶ 99.

Plaintiffs argue that, in "broker[ing] the Takeover," Switzerland simply took steps that are analogous to what "investment banks do when facilitating a takeover." Pls.' Mem. at 8. This includes setting up meetings between the banks, negotiating the terms of the buyout on each bank's behalf, and talking "Credit Suisse through the possibilities and pitfalls of different potential buyers, the 'cultural differences' between UBS and Credit Suisse, and the 'synergies' between them." Am Compl. ¶ 95; *see also id.* ¶ 98 ("Switzerland acted as an investment bank, using the promises of financial guarantees to UBS and low-interest loans to Credit Suisse to broker a merger between [its] two largest banks."). It is of course true that private actors regularly help facilitate companies' mergers and buyouts by, *inter alia*, participating in contract negotiations. *See, e.g.*, *Good v. Aramco Servs. Co.*, 971 F. Supp. 254, 257 (S.D. Tex. 1997) ("Commercial activity includes contract negotiations . . . ." (citing *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1108-09 (5th Cir. 1985)). Thus, courts have held that a foreign sovereign "did not exercise uniquely sovereign powers when it negotiated a contract with the plaintiffs [and] facilitated investment in the proposed [state-owned] business." *Millicom Int'l Cellular v. Republic of Costa Rica*, 995 F. Supp. 14, 21 (D.D.C. 1998); *see also Terenkian v. Republic of Iraq*, 694 F.3d 1122, 1133 (9th Cir. 2012) ("[A] foreign nation's contract negotiations, including a meeting, and telephone and wire communications, are commercial activity . . . .").[12]

---

[12] *See also Broker*, Black's Law Dictionary (12th ed. 2024) (defining a "broker" as "[o]ne who is engaged for another, usually on a commission, to negotiate contracts relating to property in which he or she has no custodial or proprietary interest," or as "[a]n agent who acts as an intermediary or negotiator, especially between prospective buyers and sellers"); Fed. Sec. L. Rep. P. 21157.28

But here, Switzerland did more than simply advise a client or broker a deal. Rather, as the Amended Complaint alleges, it "demanded" that Credit Suisse take steps to prepare for a deal; warned that without the UBS deal, Credit Suisse "might be placed into Resolution"; rejected a private investor's offer of liquidity assistance to Credit Suisse in favor of its own; and then once the terms with UBS were in place, told Credit Suisse's CEO and Chair that the merger "will" happen and that it was "not optional." Am. Compl. ¶¶ 94, 96, 97, 99. As Switzerland notes, "[t]hat is just the opposite of how an investment bank behaves with its client. Investment banks take directions, not give them . . . ." Def.'s Reply at 2. Plaintiffs contend that "Credit Suisse obeyed because of Switzerland's financial inducements, not legal compulsion." Pls.' Mem. at 10. But their use of the word "obey" is rather telling. There is a world of difference between, on one hand, a private adviser cautioning a client that failing to make a deal could result in bankruptcy, and then allowing the client to make the final decision, and, on the other hand, a government demanding a deal, saying that it is not optional, and warning that a failure to comply might result in the bank being placed in Resolution—particularly when, as Plaintiffs allege, that government had already "spent months perfecting" Resolution plans, as well as "plans for the temporary nationalization," which were "ready for signature" at that precise moment. Am. Compl. ¶ 89. One is strong advice backed by a prediction; the other is a thinly veiled threat by a government to exercise its sovereign power, perhaps to go so far as to nationalize the company.

And finally, the extraordinary financial relief here was authorized and implemented through legislation that altered legal requirements in order to facilitate the merger. As the Supreme

---

(C.C.H.) (describing registration requirement for "[a] private investment bank firm, doing business as . . . a negotiator of mergers and sales of assets"); *Partner Reinsurance Co. v. RPM Mortg., Inc.*, No. 18 Civ. 5831, 2019 WL 3802235, at *2 (S.D.N.Y. Aug. 13, 2019) (describing private investment bank and law firm as being retained "to assist in negotiating [a] [m]erger [a]greement" between two companies).

16

Court observed in *Nelson*, "acts [such] as legislation . . . cannot be performed by an individual acting in his own name. They can be performed only by the state acting as such." 507 U.S. 349. *See also Barnet*, 961 F.3d at 201 (observing that "the enactment and enforcement of laws" does not normally constitute commercial activity for purposes of the FSIA exemption). To be sure, as Plaintiffs note, "[a]ll foreign states act via statutes, regulations, and ordinances." *See* Pls.' Mem. at 10. The means through which Switzerland acted (i.e., that it enacted ordinances) is not by itself dispositive. If a state enacted legislation that did nothing more than simply direct an indisputably commercial transaction, such as the buying or selling of goods or services, that would ordinarily satisfy the commercial activity exception under the FSIA. *Cf. Weltover*, 504 U.S. at 614-15 ("[A] contract to buy army boots or even bullets is 'commercial' activity, because private companies can similarly use sales contracts to acquire goods."). But here, the *substance* of the legislation points to the conclusion that the activity in question was not commercial for purposes of the FSIA. The Swiss "Federal Counsel, exercising its constitutional authority, enacted ordinances that . . . waived normally applicable legal requirements for shareholder approval of mergers, . . . and confirmed FINMA's supervisory authority to order a write-down of Credit Suisse's Additional Tier 1 capital." Def.'s Mem. at 10-11. These actions involved exercises of "powers peculiar to sovereigns." *Weltover*, 504 U.S. at 614. As the Supreme Court has made clear, "a foreign government's issuance of [financial] regulations . . . is a sovereign activity, because such authoritative control of commerce cannot be exercised by a private party." *Id.* If the issuance of financial regulations constitutes sovereign activity, then it follows that the waiver of them for a particular transaction does as well.

Plaintiffs, however, describe Switzerland's waiver of normally applicable legal requirements for shareholder approval of mergers as "akin to corporate boards' commercial power to override shareholder approval of mergers" under Delaware law. Pl. Mem. at 11 (citing Del.

17

Code tit. 8 § 251(d)). The Court fails to see an apt analogy here. Delaware law provides that "[a]ny agreement of merger or consolidation may contain a provision that . . . the agreement may be terminated by the board of directors . . . notwithstanding approval of the agreement by the stockholders of all or any of the constituent corporations." Del. Code tit. 8 § 251(d). This simply authorizes a merger agreement to provide that the corporation's own board can terminate the agreement notwithstanding shareholder approval. The exercise of such veto power by a Board is simply an exercise of the Board's rights in accordance with the terms of a merger agreement under existing (Delaware) law. But *changing* the legal requirements for a merger (or eliminating some of them)—here, through bespoke financial legislation to enable UBS to acquire Credit Suisse—is something that only a *sovereign* can do.

Indeed, Plaintiffs seem to acknowledge this point, stating that "at worst, this would be the one . . . sovereign act Switzerland took." Pls.' Mem. at 11. But they nevertheless assert that the commercial activity exception under the FSIA remains applicable because "the Write-Down Direction was connected to five months of Switzerland's other commercial acts." *Id.* To the extent that Plaintiffs appear to argue that the exception applies because some of Switzerland's acts might fall within the ambit of private commercial activity, that argument fails as well. When courts undertake a commercial activity exception analysis, the question is not whether a foreign sovereign, in taking "an act outside the territory of the United States in connection with [its] commercial activity of the foreign state elsewhere," 18 U.S.C. § 1605(a)(2), engages in *some* activity that could be performed by a private, non-sovereign actor. Rather, the inquiry as to whether the commercial activity exception applies turns on whether the foreign sovereign "exercises *only* those powers that can also be exercised by private citizens, as distinct from those powers peculiar to sovereigns." *Pablo Star*, 961 F.3d at 561 (emphasis added) (quoting *Nelson*, 507 U.S. at 360). "To hold otherwise and look only" at the fact that some of Switzerland's acts

18

here are those a private actor, like a bank, could take "would allow the [commercial activity] exception to swallow the rule of presumptive sovereign immunity codified in the FSIA." *Barnet*, 961 F. 3d at 202.

* * *

In sum, after conducting the requisite "nuanced examination of the context of the acts involved," *Pablo Star*, 961 F.3d at 561, the Court concludes that Switzerland's doings are not commercial in nature for purposes of the FSIA. The Court reaches this conclusion based on the unique combination of facts in this case, including the extraordinary nature of the loans and guarantees that Switzerland provided, in terms of both their form and size; the manner in which Switzerland demanded that the deal with UBS be consummated, which was backed by an implicit threat to use the nation's sovereign power to place Credit Suisse into Resolution or even to nationalize it; and the laws that Switzerland enacted, which included provisions for waiving normally applicable legal requirements for mergers. One or more of these acts might, when viewed in isolation, appear to be of a commercial nature. But when viewed in context, these acts collectively reflect the exercise of sovereign power, rather than "only those powers that can also be exercised by private citizens." *Nelson*, 507 U.S. at 360.

Because the Court holds that FINMA's directive to Credit Suisse to write down its AT1s was not an act taken in connection with a commercial activity of Switzerland, it need not determine whether the Write-Down Direction "cause[d] a direct effect in the United States." And because the commercial activity exception does not apply, the Court holds that Switzerland's sovereign immunity is not abrogated, meaning that the Court lacks subject-matter jurisdiction over Plaintiffs' claims. Finally, because Switzerland's Motion to Dismiss is granted on FSIA grounds, the Court declines to consider its other arguments for dismissal.

## CONCLUSION

For the reasons explained above, Switzerland's Motion to Dismiss is **GRANTED**. The Amended Complaint is dismissed with prejudice for lack of subject matter jurisdiction. The Clerk of Court is respectfully requested to terminate ECF No. 84 and terminate this case.

SO ORDERED.

Dated: September 30, 2025

    New York, New York

                                                            DALE E. HO
                                         United States District Judge